FILED
RICHARD W. NAGEL
CLERK OF COURT

2020 JUL 30  AM 8: 31

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**1 1 2 0 C R 0 7 7**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

       **v.**

**LARRY HOUSEHOLDER,**
**JEFFREY LONGSTRETH,**
**NEIL CLARK,**
**MATTHEW BORGES,**
**JUAN CESPEDES, and**
**GENERATION NOW,**

    **Defendants.**

**CASE NO.**

**JUDGE JUDGE BLACK**

**I N D I C T M E N T**

**18 U.S.C. § 1962(d)**

**FORFEITURE ALLEGATION**

---

**THE GRAND JURY CHARGES**:

**COUNT ONE**
**(RICO CONSPIRACY)**

At times relevant to this Indictment:

**THE ENTERPRISE**

1.    Defendants **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES**, **JUAN CESPEDES**, and **GENERATION NOW**, and others known and unknown to the Grand Jury constituted an "Enterprise," (hereinafter "**Householder's Enterprise**") as that term is defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals and entities associated in fact. **Householder's Enterprise** constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of

achieving the objectives of the enterprise, and the enterprise engaged in, and its activities affected, interstate commerce.

### Roles of the Conspirators

2.      Defendant **LARRY HOUSEHOLDER** represents the State of Ohio's 72 District in the Ohio House of Representatives and has done so since January 2017. He also is the current Speaker of the Ohio House of Representatives and has served in that capacity since January 7, 2019.

3.      Defendant **GENERATION NOW** was a self-titled 501(c)(4), organized under the laws of Delaware, registered in Ohio, and purported to be organized primarily for a social welfare purpose under the Internal Revenue Code. The Internal Revenue Code, Title 26, United States Code, Section 501(c)(4), provides for tax exempt status for social welfare organizations. A "501(c)(4)" social welfare organization may "not [be] organized for profit but operated exclusively for the promotion of social welfare[.]" 26 U.S.C. § 501(c)(4)(A). An entity may not qualify for tax-exempt 501(c)(4) status "unless no part of the net earnings of such entity inures to the benefit of any private shareholder or individual." 26 U.S.C. § 501(c)(4)(B). A 501(c)(4) entity must notify the IRS of its intent to operate as a 501(c)(4) organization. 26 U.S.C. § 506. The names and addresses of contributors to 501(c)(4)s are not made available for public inspection.

4.      **GENERATION NOW** maintained offices in Columbus, Ohio, within the Southern District of Ohio. Although registered as a 501(c)(4), in reality, **GENERATION NOW** operated as **HOUSEHOLDER's** slush fund for the benefit of **HOUSEHOLDER** and his coconspirators. From 2017 to present, **GENERATION NOW** received more than $59 million from "Company A Service Co.," "Company A-1," and "Energy Pass-Through."

5. Defendant **JEFFREY LONGSTRETH** was **HOUSEHOLDER's** campaign and political strategist since at least in or about 2016. **LONGSTRETH** opened and is a signor on the **GENERATION NOW** bank accounts. **LONGSTRETH** also owns and operates JPL & Associates LLC and Constant Content Co., in Columbus, Ohio, in the Southern District of Ohio. From 2017 through 2020, JPL & Associates received approximately $10.5 million directly from **GENERATION NOW,** and another $4.4 million indirectly through Front Company (described below). **LONGSTRETH** transferred $1,000,000 of the **GENERATION NOW** money to his brokerage account in 2020.

6. Defendant **NEIL CLARK** owned and operated Grant Street Consultants, a Columbus, Ohio-based lobbying firm that focuses on legislative, regulatory, and procurement lobbying at the Ohio Statehouse. Prior to starting Grant Street Consultants, **CLARK** served as budget director for the Ohio Senate Republican Caucus. Along with **LONGSTRETH**, **CLARK** served as one of **HOUSEHOLDER's** closest advisors and was **HOUSEHOLDER's** "proxy" in meetings with **Householder's Enterprise** members and associates relating to House Bill 6 (described below) when **HOUSEHOLDER** was unavailable. In 2019, **CLARK** received approximately $290,000 from **GENERATION NOW**, which had been laundered through other accounts.

7. Defendant **MATTHEW BORGES** was a Columbus-based, lobbyist for Company A-1 (defined below). On or about August 5, 2019, **BORGES** registered with the Ohio Secretary of State, "17 Consulting Group LLC" (hereinafter "17 Consulting") as a for-profit limited liability company. Two days later, on or about August 7, 2019, **BORGES** opened a bank account for 17 Consulting Group LLC. **BORGES** listed himself as the President/Owner/CEO of 17 Consulting Group LLC and as the sole signatory on the account. The day after **BORGES** opened the account,

**GENERATION NOW** wired $400,000 into the account.  Between in or about August 2019 and October 21, 2019, **Householder's Enterprise** funded the 17 Consulting account with $1.62 million in wire transfers from **GENERATION NOW**.  **BORGES** used the bank account to pay himself, pay **CESPEDES**, attempt to bribe an employee and agent of the Ballot Campaign (described below), and pay for other expenses incurred by the Enterprise in defeating the Ballot Campaign.

8.  Defendant **JUAN CESPEDES** was an outside lobbyist for Company A-1 who was central to Company A-1's efforts and **Householder's Enterprise** to get the bailout legislation passed in Ohio.  **CESPEDES** was paid both by **Householder's Enterprise** and Company A's Service Co. for his efforts and often served as a key middleman.  In 2019, **CESPEDES** received $600,000 from **GENERATION NOW** via **BORGES'** account.

<u>**Other Individuals and Entities**</u>

9.  "Company A Corp." was an Akron-based public utility holding company. Throughout the start of the relevant period until in or around February 2020, Company A Corp. was the parent company to entities involved in nuclear energy generation, including Company A-1.  Company A Service Co. is a principle subsidiary of Company A Corp.  According to its 2019 annual report, the President and Chief Executive Officer of Company A Corp. also served as the President and Chief Executive Officer of Company A Service. Co.

10.  "Company A Service Co." was a principle subsidiary of Company A Corp., and operated as Company A's service company, providing legal, financial, and other corporate support services to Company A and its affiliates, including Company A-1.  Services provided by Company A Service Co. included corporate contributions and advocacy on behalf of Company A and its affiliates at the federal, state, and local levels, among other services.  The President and Chief

Executive Officer of Company A Corp., also serves as the President and Chief Executive Officer of Company A Service Co. Company A Service Co. provides services to Company A-1, as described below, including "external affairs," "corporate contributions," "Federal/State/Local Regulatory Affairs," and "advocacy at the Federal, State, and Local levels." From in or about March 2017 to October 22, 2019, Company A Service Co. wired millions of dollars to **GENERATION NOW**.

11.    "Company A-1" was a wholly-owned subsidiary of Company A Corp. involved in nuclear energy generation. Through subsidiaries, Company A-1 owned and operated two nuclear plants in Ohio, "Nuclear Plant 1" and "Nuclear Plant 2" (together, the "Nuclear Plants"). In March 2018, Company A-1 filed for Chapter 11 bankruptcy. As a result of the bankruptcy proceedings, Company A-1 separated from Company A Corp. in or around February 2020.

12.    "Energy Pass-Through" was registered as a 501(c)(4) entity in Ohio approximately two days after **GENERATION NOW** registered in Delaware. During the period from its inception in or around February 2017 to October 2019, Energy Pass-Through was funded exclusively by $25 million from Company A Service Co. **GENERATION NOW** then received more than $15 million from Energy Pass-Through between in or around February 2017 through in or around March 2020.

13.    "Company A" refers collectively to Company A Corp., Company A Service Co., and Company A-1. Prior to February 2020, both Company A Service Co. and Company A-1 were subsidiaries of Company A Corp. Until February 2020, all three entities shared a common first name, and members and associates often referred generically to the "company" or to the common first name ("Company A") in communications.

14. "Company-A-to-**GENERATION-NOW** payments" refers to money from Company A Corp, Company A-1, Company A Service Co., and Energy Pass-Through that was deposited into **GENERATION NOW's** bank account.

15. "PAC" was a federal Political Action Committee. During the 2018 election cycle, **Householder's Enterprise** laundered at least $1,000,000 from **GENERATION NOW** through PAC to pay for media buys in PAC's name to help elect candidates loyal to defendant **HOUSEHOLDER**. During the 2020 primary election, **Householder's Enterprise** laundered over $1,000,000 from **GENERATION NOW** to PAC, via Coalition, to pay for media buys in PAC's name to help elect candidates supported by **HOUSEHOLDER**.

16. "Coalition" was a purported 501(c)(4) entity. In 2020, **Householder's Enterprise** wired over $1,000,000 from **GENERATION NOW** to Coalition, which was then wired to PAC to for media buys in PAC's name to help elect candidates supported by **HOUSEHOLDER**. According to **LONGSTRETH**, he oversees political activities for Coalition.

17. "Dark Money Group 1" was incorporated on or about September 21, 2018, less than two months before the 2018 general election. In the weeks before the 2018 general election, **GENERATION NOW** wired $670,000 to Dark Money Group 1, while Energy Pass-Through wired $500,000. Between on or about October 20, 2018 and November 1, 2018, Dark Money Group 1 spent all of this money to pay for television, radio and print advertisements ("media buys") targeting the rivals of **HOUSEHOLDER's** candidates in the name of Dark Money Group 1.

18. **Householder's Enterprise** employed numerous individuals in various capacities, (designated herein as "Associates"), whom **Householder's Enterprise** paid either through **GENERATION NOW** or by funneling **GENERATION NOW** money through **LONGSTRETH's** accounts.

**The Ohio Legislature**

19.     The Ohio House of Representatives is an elected body of the Ohio General Assembly.  Members of the Ohio House of Representatives serve two-year terms and are limited to four consecutive two-year terms.  House members propose, advance, and vote on legislation.

20.     The Speaker of Ohio is the leader of the Ohio House of Representatives.  The Speaker guides the agenda of the chamber, presides over the House session, and provides direction to House members and staff.  The Speaker also decides when bills reach the House floor for a vote and who serves in leadership positions in the Speaker's caucus.  The Speaker names all committees and subcommittees, and appoints all members and chairs to committees and subcommittees.

21.     The Speaker is elected at the beginning of every General Assembly, which convenes its first regular session on the first Monday of January in odd-numbered years.  To choose a Speaker, representatives-elect of the majority caucus in the House nominate and vote for a candidate for Speaker.  The Speaker candidate who receives an absolute majority of those votes is then voted on by all House members during the first session day of the General Assembly.

**Company A's Bail Out**

22.     Beginning in and around 2016, Company A Corp. reported to shareholders billions of dollars in losses, including financial losses by Company A-1 and its nuclear-generating assets. By in and around 2017, Company A Corp. announced publicly that, absent a legislative solution, Company A-1's strategic options were limited to bankruptcy, plant deactivations, and/or restructuring debt.

23.     In or around March 2018, Company A-1 and other nuclear-generation-related affiliates of Company A Corp. filed Chapter 11 bankruptcy.  Under Company A-1's proposed

restructuring plan, Company A Corp. would divest its interest in Company A-1 and its other nuclear generation assets.

24.     Also in or around March 2018, Company A-1 announced that it would close the Nuclear Plants absent legislative action.  Specifically, Company A-1 stated that it would deactivate Nuclear Plant 1 and Nuclear Plant 2 in the next three years but would continue normal operations of the facilities until then.  Company A-1 also announced that it was seeking a legislative solution as an alternative to deactivation of the Nuclear Plants.

25.     House Bill 6 ("HB 6") was proposed legislation introduced in the Ohio House of Representatives on or about April 12, 2019, roughly three months after **HOUSEHOLDER** became Speaker of the Ohio House of Representatives.  Titled the "Ohio Clean Air Program," HB 6 was referred to the House Energy and Natural Resources Committee, which assigned the bill to a newly created subcommittee, the House Energy and Natural Resources Subcommittee on Energy Generation ("Subcommittee on Energy Generation").  HB 6 allowed nuclear or solar resources to apply to be "qualifying" resources, which would make them eligible for a state subsidy of $9 per megawatt hour produced.  The legislation provided for the collection of a monthly-fixed charge to all residential, commercial, industrial, and large consumers to pay for the subsidy. Under the legislation, the subsidy is dispersed at the Direction of the Ohio Air Quality Development Authority.  As passed, HB 6 added six new members to the Ohio Air Quality Development Authority, increasing the total from seven to thirteen, three of which are selected by the Speaker of the House.  As passed, HB 6 also included a provision that gave an electric distribution utility, such as Company A Corp, the ability to decouple energy rates, which would allow a company to bill retail customers for a surcharge if the company's annual revenue fell below a baseline revenue.

HB 6 passed the House on or about May 29, 2019. The bill passed the Senate and, on or about July 23, 2019, the Governor signed the legislation into law.

26. "Ballot Campaign," was a ballot issue political action committee formed to repeal HB 6 through a ballot referendum. On or about July 29, 2019, Ballot Campaign submitted to the Ohio Attorney General its petition to repeal the legislation through a ballot referendum.

27. The next day, on or about July 30, 2019, "Front Company" was formed to defeat the Ballot Campaign. "Front Company," operated as a pass-through entity. According to required disclosures, Front Company paid for millions of dollars in direct mailers and television advertisements. However, **Householder's Enterprise** fully funded Front Company through Company-A-to-**GENERATION-NOW** payments. Specifically, between August 2019 and November 2019, **Householder's Enterprise** received over $38 million into **GENERATION NOW** from Company A and then transferred approximately $23 million from **GENERATION NOW** to Front Company.

28. On or about August 29, 2019, the Ohio Attorney General approved the Ballot Campaign's second proposed summary of its referendum petition. The Ohio Secretary of State validated its initial submission of signatures the next day, meaning that the Ballot Campaign had until on or about October 22, 2019, the effective date of HB 6, to circulate its petition and collect the requisite signatures for a ballot referendum. If the Ballot Campaign was successful, the implementation of HB 6 would be stayed until the following year's general election.

29. "CHS-1" was employed by and was an agent of the Ballot Campaign as a supervisor, who, among other things, managed signature collectors. After receiving a bribery solicitation in or about September 2019, CHS-1 contacted the Federal Bureau of Investigation ("FBI"), assisted the FBI in its investigation, and acted at FBI's direction.

30.     Signature collectors were employees and agents of the Ballot Campaign, whose duties included collecting signatures in favor of the referendum.  Between in or about September 2019 through October 21, 2019, agents of Front Company attempted to bribe signature collectors.

31.     The Ballot Campaign failed to collect enough signatures to put the issue on the ballot for a vote by Ohio citizens, and HB 6 became law effective on or about October 22, 2019.

### THE PURPOSES OF THE ENTERPRISE

32.     The primary purposes of **Householder's Enterprise** included:

A.     Obtaining, preserving, and expanding **HOUSEHOLDER's** political power in the State of Ohio through the receipt and use of secret payments;

B.     Enriching and benefitting the enterprise, its members, and associates; and

C.     Promoting, concealing, and protecting purposes (A) and (B) from public exposure and possible criminal prosecution.

### THE RACKETEERING CONSPIRACY

33.     Beginning in or about 2016 and continuing to the present, the exact date being unknown to the Grand Jury, in the Southern District of Ohio and elsewhere, the Defendants, **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**, **MATTHEW BORGES**, **JUAN CESPEDES,** and **GENERATION NOW**, and others known and unknown to the Grand Jury, being persons employed by and associated with **Householder's Enterprise**, an enterprise, engaged in, and the activities of which affected interstate commerce, did knowingly and intentionally conspire with each other and others known and unknown to the Grand Jury to violate Title 18 United States Code, Section 1962(c), that is, to conduct and participate directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in 18 U.S.C. §§ 1961(1) and 1961(5), consisting of multiple acts

indictable under 18 U.S.C. §§ 1343, 1346 (relating to honest services wire fraud); 18 U.S.C. § 1951 (relating to interference with commerce, robbery, or extortion); 18 U.S.C. § 1952 (relating to racketeering, including multiple acts of bribery under Ohio Revised Code § 3517.22(a)(2)); 18 U.S.C. § 1956 (relating to the laundering of monetary instruments); 18 U.S.C. § 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity); and multiple acts involving bribery, chargeable under Ohio Revised Code § 2921.02. It was part of the conspiracy that each Defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

## MANNER AND MEANS OF THE CONSPIRACY

34.     It was part of the conspiracy that since at least 2016, members and associates of **Householder's Enterprise** planned for **HOUSEHOLDER's** election as the Speaker of the House for the State of Ohio.

35.     It was part of the conspiracy that **Householder's Enterprise** created an entity called **GENERATION NOW** to solicit, receive, and disburse money obtained in furtherance of its purposes.

36.     It was part of the conspiracy that **HOUSEHOLDER** controlled and directed **GENERATION NOW**, with **LONGSTRETH** and others operating **GENERATION NOW** for the benefit of **Householder's Enterprise** and at **HOUSEHOLDER's** direction. However, **Householder's Enterprise** concealed **HOUSEHOLDER's** connection to **GENERATION NOW** and its true purpose on documents **Householder's Enterprise** submitted to financial institutions, the State of Ohio, and the IRS, which concealed its criminal activities.

37.     It was part of the conspiracy that, although **GENERATION NOW** claimed to operate as a nonprofit, 501(c)(4) social welfare entity, **Householder's Enterprise** used

**GENERATION NOW** as a mechanism to receive and conceal bribe payments for the benefit of **Householder's Enterprise** members, **Householder's Enterprise** associates, and others, both directly and indirectly.

38. It was part of the conspiracy that **Householder's Enterprise** and its associates solicited and received contributions to **HOUSEHOLDER** through **GENERATION NOW** because the contributions were concealed from public scrutiny and not subject to reporting requirements.

39. It was part of the conspiracy that **Householder's Enterprise** used **GENERATION NOW** as a vehicle to receive "secret" money because **HOUSEHOLDER's** connection to **GENERATION NOW** and the names of contributors to **GENERATION NOW**, as a purported 501(c)(4), were not made public.

40. It was part of the conspiracy that **HOUSEHOLDER** and other **Householder's Enterprise** members and associates solicited and received money from individuals and entities into **GENERATION NOW** with the intent that the profit from **GENERATION NOW** would benefit directly **HOUSEHOLDER** and **Householder's Enterprise** members, **Householder's Enterprise** associates, and other private individuals. To conceal the benefits to **Householder's Enterprise** members and associates, **Householder's Enterprise** funneled payments to **GENERATION NOW** through other entities controlled by **Householder's Enterprise** before paying the benefits to **Householder's Enterprise** members and associates.

41. It was part of the conspiracy that, between on or about March 2017 and March 2020, **Householder's Enterprise** agreed to receive and accept millions of dollars in bribe payments from Company A, including bribe payments paid through **GENERATION NOW**, in return for **HOUSEHOLDER** taking specific official action for the benefit of Company A, namely,

to help enact into law legislation that would go into effect and save the operation of the Nuclear Plants. Examples of **HOUSEHOLDER's** specific official action of helping enact into law legislation that would go into effect and save the operation of the Nuclear Plants include: assisting in crafting the legislation; creating a House subcommittee for the legislation and appointing members to the House subcommittee; using his position as Speaker to pressure and advise public officials to take official action to further the legislation and to further efforts to ensure the legislation took effect; scheduling and arranging for votes to ensure passage of the legislation; and voting in favor of the legislation.

42.     It was further part of the conspiracy that **HOUSEHOLDER** and **Householder's Enterprise** received and accepted payments from Company A corruptly with the intent that **HOUSEHOLDER** would be influenced and rewarded in connection with the legislation that would save the operation of the Nuclear Plants. These payments included millions of dollars in payments from Company A that passed through Energy Pass-Through before being transferred to **Householder's Enterprise** through **GENERATION NOW** and other entities controlled by **Householder's Enterprise** and its associates.

43.     It was part of the conspiracy that **Householder's Enterprise** used the Company-A-to-**GENERATION-NOW** payments to further **Householder's Enterprise's** purposes, including by enriching and benefitting **Householder's Enterprise** members and associates by paying the operating costs of **Householder's Enterprise** (such as wages, rent and legal fees); to advance **HOUSEHOLDER** politically by, for example, paying for media buys and campaign staff for **HOUSEHOLDER's** candidates and for himself; to pressure public officials to support HB 6; and to enrich and benefit members and associates of **Householder's Enterprise**. In so doing,

**Householder's Enterprise** laundered Company-A-to-**GENERATION-NOW** payments through other entities controlled by **Householder's Enterprise**.

44.    It was part of the conspiracy that **Householder's Enterprise** used Company-A-to-**GENERATION-NOW** payments to further **Householder's Enterprise's** purposes including obtaining, preserving, and expanding **HOUSEHOLDER's** political power and enriching and benefitting **Householder's Enterprise**, its members and associates.

45.    It was part of the conspiracy that **Householder's Enterprise** used payments into **GENERATION NOW**, including bribe payments from Company A Service Co. and Company A-1, to support candidates for House seats in the 2018 primary and general elections, who would vote for **HOUSEHOLDER** for Speaker, and would later support HB 6.  It was further part of the conspiracy that **Householder's Enterprise** used payments into **GENERATION NOW**, including bribe payments from Company A Service Co. and Company A-1, to support candidates for House seats in the 2020 primary elections.  **Householder's Enterprise**, at times, characterized candidates supported by the Enterprise as a member of the "team" and "Team Householder" candidates.

46.    It was part of the conspiracy that during the 2018 election cycle and the 2020 primary season, **Householder's Enterprise** laundered payments into **GENERATION NOW**, including Company-A-to-**GENERATION-NOW** bribe payments, through different accounts to further **Householder's Enterprise's** purposes and to enrich and benefit its members and associates.

47.    It was part of the conspiracy that, after his election as Speaker in 2019, **HOUSEHOLDER** promised to perform and performed specific official action on behalf of **Householder's Enterprise** by helping enact into law HB 6 in return for payments from Company A.

48. It was part of the conspiracy that **Householder's Enterprise** received and accepted millions of dollars in bribe payments into **GENERATION NOW** from Company A while HB 6 was pending before Ohio public officials, which **Householder's Enterprise** used to further the purposes of **Householder's Enterprise** and pass HB 6.

49. It was part of the conspiracy that **Householder's Enterprise** coordinated with agents of Company A relating to payments into **GENERATION NOW** and the passage of HB 6.

50. It was part of the conspiracy that, after the passage of HB 6, **Householder's Enterprise** worked to defeat the Ballot Campaign.

51. It was part of the conspiracy that to conceal the origin of the attacks on the Ballot Campaign, **Householder's Enterprise** created Front Company, which served as a front organization for **Householder's Enterprise**, and through which **Householder's Enterprise** laundered payments from Company A.

52. It was part of the conspiracy that **Householder's Enterprise** bribed and attempted to bribe employees and agents of the Ballot Campaign to improperly discharge their campaign duties and to obtain information about the Ballot Campaign's organization in order to defeat the Ballot Campaign, and did so by laundering money through various entities, including Front Company.

53. It was part of the conspiracy that, after the Ballot Campaign failed, **Householder's Enterprise**, its members and associates, used the Company-A-to-**GENERATION-NOW** payments to further **Householder's Enterprise's** purposes, including enriching and benefitting themselves, by laundering the money through various accounts controlled by the **Enterprise**.

## ACTS IN FURTHERANCE OF THE CONSPIRACY

54.     In furtherance of the conspiracy and to achieve the objectives thereof, the conspirators performed and caused to be performed the following acts, among others:

### Formation of Generation Now

55.     Between 2016 and 2017, **Householder's Enterprise** developed a strategy for **HOUSEHOLDER's** bid to become the Ohio Speaker of the House in 2019.  The "Game Plan 2018," which **Householder's Enterprise** committed to writing, included "*hit[ting] the ground running with a C4 working as the recruitment and fundraising arm*" and noted that "*[t]he only things that matter right away are raising money and recruiting candidates.*"

56.     On or about February 6, 2017, **GENERATION NOW** was incorporated in Delaware.  On or about February 6, 2017, **Householder's Enterprise** opened two bank accounts for **GENERATION NOW**, with **LONGSTRETH** as a signor on both accounts.  **Householder's Enterprise** listed **GENERATION NOW** as a "non profit corp" in the bank filings for both accounts.

57.     On or about July 26, 2017, **GENERATION NOW** registered with the Ohio Secretary of State as a foreign nonprofit corporation.  Publicly available registration documents filed with the Ohio Secretary of State falsely described **GENERATION NOW's** purpose as being "organized exclusively for the promotion of social welfare and economic development purposes within the meaning of Section 501(c)(4) of the Internal Revenue Code."  The filings contain a certification from the Delaware Secretary of State stating that **GENERATION NOW** is an "Exempt Corporation."

58.     **Householder's Enterprise** did not include **HOUSEHOLDER's** name on the state filings, bank account, or IRS filings.

59.     **GENERATION NOW's** publicly available website listed Seniors, Energy, Health Care, and Financial Security as its "Issues."

60.     On November 13, 2019, **LONGSTRETH** signed under penalty of perjury an IRS Form 990 for the tax year 2017, which was filed with IRS on November 19, 2019, declaring that **GENERATION NOW** was a 501(c)(4).     According to the publicly available filing, **GENERATION NOW** described its mission as "promot[ing] energy independence and economic development opportunities throughout the United States." **GENERATION NOW** indicated that it had "delegated control over management duties" to "JPL & Associates," which was also **GENERATION NOW's** sole "voting member." Further, **GENERATION NOW** reported that out of $1,332,103 in contributions into **GENERATION NOW** in 2017—of which bank records show, $1,000,000 came from Company A during that year—it paid JPL & Associates $580,833 as "Management Fees," and $639,213 remained in the **GENERATION NOW** account as "assets." **GENERATION NOW** also claimed that it had paid no benefits to or for members and paid no salaries, other compensation, or employee benefits. **GENERATION NOW's** 990 Form for tax year 2017 also stated that it raised all of its funds through "mail solicitations" and "internet and email solicitations."

61.     Contribution forms for **GENERATION NOW's** donors, created by and at the direction of Enterprise members and associates, stated that **GENERATION NOW** was an "independent, nonprofit organization exempt from federal taxation under Section 501 (c)(4) of the Internal Revenue Code." The Contribution Forms further stated:

> I would like to contribute to Generation Now, Inc., a nonprofit organization under §501 of the Internal Revenue Code promoting energy independence and economic development opportunities throughout the United States. Generation Now is not registered or acting as a political committee under federal election law or any state or local election law. It may in limited cases engage in political

activity consistent with applicable laws and IRS regulations by making independent expenditures and/or electioneering communications, but not to the extent such activity could be considered its primary purposed [sic].

62.     **Householder's Enterprise** entered a grant agreement on behalf of **GENERATION NOW** with another entity, in which **GENERATION NOW** received funds from the other entity by asserting that it was a "tax-exempt, not for profit organization that operates in accordance with the Internal Revenue Code Section 501(c)(4)." **GENERATION NOW** further agreed, "grant funds will be used by Generation Now Inc. in furtherance of its primary tax exempt purpose, and exclusively in connection with programs, efforts, and activities that promote the social welfare." **GENERATION NOW** certified that "[f]unds provided by [grantee] to Generation Now Inc. may not be used in furtherance of any political or campaign intervention activities (as those terms are currently defined by the IRS)." Despite these representations, **Householder's Enterprise** used **GENERATION NOW** funds provided by the grantor to benefit **Householder's Enterprise** members personally and to support political campaigns in furtherance of **Householder's Enterprise's** interests after laundering the funds through related entities.

### "GENERATION NOW is the Speaker's (c)(4)"

63.     Although **Householder's Enterprise** represented that **GENERATION NOW** was a nonprofit 501(c)(4) organized for a social welfare purpose consistent with IRS regulations, **HOUSEHOLDER** controlled **GENERATION NOW**, and **Householder's Enterprise** used funds into **GENERATION NOW** to benefit **HOUSEHOLDER** and **Householder's Enterprise** members and associates personally. As **CLARK** made clear during a recorded meeting in or around July 2019: "*Generation Now is the Speaker's (c)(4), that's the one I work for.*"

64.     On or about July 24, 2019, in regards to **Householder's Enterprise** HB 6 efforts, **CLARK** told individuals he was **HOUSEHOLDER's** "*proxy*" when **HOUSEHOLDER** was

unavailable. **CLARK** referenced "*Gen Now*" as a (c)(4) that works like a PAC but there's "*no reporting.*" **CLARK** stated that he was "*not on any documents*" connected to **GENERATION NOW**, but they call him "*the overseer*" of **GENERATION NOW**, explaining further, "*I'm the Speaker's appointed guy to do that. Okay, so, it's like having him in the room.*" **CLARK** then explained an upcoming **GENERATION NOW** meeting that would be attended by **HOUSEHOLDER** as: "*When I, so like, we have a meeting on Friday, he's going to be in the room, so I'll be just like everyone else, I'll be, I'll be another fucking staffer. When he's out of the room, I'm the guy.*"

65.    In a recorded meeting on or about September 13, 2019, **BORGES** similarly described **CLARK** as **HOUSEHOLDER's** "proxy": "*Neil sits in meetings and he'll say 'I'm the proxy for the Speaker in this meeting . . . so anything you tell me,' and you kind of think it's typical Neil bullshit stuff except it is not; he's really acting as his proxy.*"

66.    **CLARK** indicated in recorded conversations that funds into **GENERATION NOW** were really payments to **HOUSEHOLDER**. For example, in advising individuals to contribute to **GENERATION NOW** on or about July 23, 2019, **CLARK** explained that the individuals could write a check—a "*noticeable number . . . $15-20-25,000*"—to "*Gen Now and hand deliver the check to the Speaker.*" **CLARK** did not disclose in the meeting that, earlier in July 2019, he had received through his company account $100,000 from **GENERATION NOW** via a **LONGSTRETH**-controlled account.

67.    Similarly, on or about September 13, 2019, in a recorded conversation, **BORGES** confirmed **HOUSEHOLDER's** management of **GENERATION NOW**, explaining, "*Like [Associate 3] who has to, who has to, answer to the press obviously, he wants to quit so bad 'cause*

he's like '*this is my reputation now' you know . . . <u>but he can't because the Speaker won't let him</u>,* *but he, god, he hates this shit."* Associate 3 is a paid spokesperson for **GENERATION NOW**.

68.    During the conspiracy, **HOUSEHOLDER** personally solicited money for **GENERATION NOW**. The following conversation between **HOUSEHOLDER** and **CLARK** during a recorded call in January 2018 showed **HOUSEHOLDER's** role with respect to soliciting money into **GENERATION NOW**:

> **HOUSEHOLDER**: *Now switching gears. So we are looking at the payday lenders. And we are expecting big things in (c)(4) money from payday lenders....*
>
> **CLARK**: *Right. Right.*
>
> **HOUSEHOLDER**: *So far, I think we are what, fifty? I think* [speaking to someone else in the room]
>
> **CLARK**: *Are you, you're checking now with Jeff right?*
>
> **HOUSEHOLDER**: *Right.*
>
> **CLARK**: *You should have gotten twenty-five or fifty from* [name redacted], *correct?*
>
> **HOUSEHOLDER**: *Yes.*
>
> . . . .
>
> **HOUSEHOLDER**: [After confirming with someone in the background] *Twenty five total . . . Twenty-five total is what we've got.*

At the time of the call, **Householder's Enterprise** had received a check for $25,000 into a **GENERATION NOW** account that matched the payor described during the call.

69.    During the same conversation, **HOUSEHOLDER** confirmed to **CLARK** that another corporate entity gave $30,000 to "the (c)(4)." Bank records show a $30,000 "contribution"

from that corporate entity was deposited into the **GENERATION NOW** account on or about October 19, 2017.

70. During a recorded conversation between **HOUSEHOLDER** and **CLARK** on or about February 5, 2018, **HOUSEHOLDER** again inquired about "(c)(4) money." Specifically, **HOUSEHOLDER** stated, "*I'm sitting here with [Associate 2]. . . . We're talking about (c)(4) money, and we're trying to figure out where the payday lenders were going to be at. Can you help me with that?*" **Householder's Enterprise** listed Associate 2 on a **GENERATION NOW** Contribution Form as a contact for donors.

71. During the conspiracy, **HOUSEHOLDER's** actions also show that **GENERATION NOW** was **HOUSEHOLDER's** 501(c)(4). For example, on or about June 12, 2019, **HOUSEHOLDER** and **LONGSTRETH** communicated about the **GENERATION NOW** commercials airing on television. **HOUSEHOLDER** told **LONGSTRETH** that he was "*sick of seeing that poor sum bitch drive that pickup truck down the road and cry about losing his job,*" a reference to their **GENERATION NOW** television ad about HB 6 featuring an employee of one of the Nuclear Plants describing job loss if the plant closes. **LONGSTRETH** responded that "*it'll change out later this week.*" During the conspiracy, other actions taken by **HOUSEHOLDER** show his control and management of **GENERATION NOW**, including:

        A.     **HOUSEHOLDER** participated in **GENERATION NOW** meetings with **LONGSTRETH** and other **Householder's Enterprise** members;

        B.     **HOUSEHOLDER** maintained an office, along with **LONGSTRETH**, within **GENERATION NOW's** headquarters;

C.     **HOUSEHOLDER's** campaign staff and associates were paid directly through **GENERATION NOW** and by **GENERATION NOW** money passed through **LONGSTRETH's** accounts.

D.     **HOUSEHOLDER** controlled who was associated with and/or employed by **GENERATION NOW**.

E.     **HOUSEHOLDER** directed **GENERATION NOW's** messaging.

F.     Complaints about **GENERATION NOW** from other public officials were made directly to **HOUSEHOLDER** and were referred to **HOUSEHOLDER**.

**GENERATION NOW is HOUSEHOLDER's Vehicle for Receiving "Secret" Payments**

72.     **CLARK** and **HOUSEHOLDER** discussed the benefits of using a 501(c)(4) to collect money on or about January 25, 2018, in a recorded call: *"what's interesting is that there's a newer solution that didn't occur in, 13 years ago, is that they can give as much or more to the (c)(4) and nobody would ever know."*

73.     Similarly, on or about May 1, 2019, **CLARK** described **GENERATION NOW** during a recorded conversation as **HOUSEHOLDER's** "secret" (c)(4): *"it's secret, a (c)(4) is secret. Nobody knows the money goes to <u>the Speaker's account</u>, it is controlled by his people, one of his people, and it's not recorded. A (c)(4) is non-recorded."*

74.     Consistent with this, **GENERATION NOW** contribution forms soliciting donations into **GENERATION NOW** stated that the IRS does not make contribution information public and that *"Generation Now, Inc.'s policy is not to disclose its donors to the general public."*

**Householder's Enterprise Received Millions in Bribe Payments from Company A**

75.     Between in or around March 2017 and March 2020, **HOUSEHOLDER** and **Householder's Enterprise** received over $64 million in secret payments into **GENERATION NOW**, the vast majority of which—approximately 93%—came from Company A-1, Company A Service Co., and Energy Pass-Through.

76.     Between in or around March 2017 and March 2020, **Householder's Enterprise** received from Company A-1, Company A Service Co., and Energy Pass-Through over $59.9 million into **GENERATION NOW** in return for legislation that would save the operation of the Nuclear Plants.

77.     During the period of the conspiracy, **Householder's Enterprise** began referring to Company A as their "*bank*" because of the volume of money paid to **HOUSEHOLDER** into **GENERATION NOW**. As **CLARK** explained during a recorded conversation in July 2019: "*We call [Company A] 'the Bank' because they can do, they can do, they can fund these things for 20 years if they want to. . . . They've got too much money, too much power.*" **CLARK** remarked that the amount of money from Company A into **GENERATION NOW** was "*unlimited.*" **CLARK** further stated that **HOUSEHOLDER** "*gets checks from 'the Bank'; remember, I told you what the 'the Bank' is, you know, $1.5 million dollars, $2 million dollars.*"

**Householder's Enterprise Used Company-A-to-GENERATION-NOW Payments to Benefit and Enrich the Enterprise, and its Members and Associates**

78.     Between on or about February 6, 2017 and to on or about April 28, 2020, **Householder's Enterprise** used the Company-A-to-**GENERATION-NOW** payments to fund the operating costs of **Householder's Enterprise**, including rent for office space, wages to associates and other individuals employed by **Householder's Enterprise**, lodging, meals, and parking.

79.     Between on or about February 6, 2017 and to on or about April 28, 2020, **Householder's Enterprise** transferred at least $14.9 million in Company-A-to-**GENERATION-NOW** payments to other **LONGSTRETH**-controlled accounts.  (Approximately $4.4 million of that total passed through Front Company before being deposited into **LONGSTRETH's** accounts.)  **Householder's Enterprise** then used the money transferred into **LONGSTRETH's** accounts to pay additional operating costs of **Householder's Enterprise**, pay third parties, and pay benefits to members and associates of **Householder's Enterprise**.

80.     **Householder's Enterprise** funneled payments from **GENERATION NOW** to **LONGSTRETH**-controlled accounts to conceal personal benefits paid to **HOUSEHOLDER**, which **Householder's Enterprise** disguised in the IRS 990 Form for tax year 2017 as "Management Fees" paid to JPL & Associates.  For example, in 2017, after transferring money from **GENERATION NOW's** bank account to a JPL & Associates' bank account for what **Householder's Enterprise** characterized to the IRS as "Management Fees," **Householder's Enterprise** paid approximately $60,000 to a law firm that was then representing **HOUSEHOLDER** in a civil lawsuit.  Because of JPL & Associate's low bank account balance at the time, **Householder's Enterprise's** $60,000 transfer to the law firm was only possible because of **GENERATION NOW's** infusion of money into the JPL & Associates account.

81.     As the payments into **GENERATION NOW** increased, **Householder's Enterprise's** subsequent money transfers from **GENERATION NOW** to JPL & Associates—which, according to the 2017 990 Form, controlled the "Management" of **GENERATION NOW** and was the sole voting member—also increased.  For example, in 2018, **GENERATION NOW** received over $3.2 into its bank account and then paid over $1.8 to a JPL & Associates account.

In 2019, **GENERATION NOW** received over $57.3 million into its bank account and then paid over $7.9 a JPL & Associates account.

82. Between on or about February 6, 2017 and to on or about April 28, 2020, **Householder's Enterprise** used more than $400,000 in **GENERATION NOW** payments, that account being funded by Company A, which were funneled through **LONGSTRETH**-controlled accounts to benefit **HOUSEHOLDER** personally, including:

      A.    Approximately $300,000 paid through multiple **LONGSTRETH**-controlled accounts, to settle a lawsuit (mentioned above) and pay legal fees related to a civil judgment against **HOUSEHOLDER** for more than a million dollars;

      B.    More than $100,000 passed through a **LONGSTRETH**-controlled account to pay for repairs and costs associated with **HOUSEHOLDER's** Florida home;

      C.    Approximately $20,000 passed through a **LONGSTRETH**-controlled account to pay credit card debt held by **HOUSEHOLDER**; and

      D.    At least $97,000 spent on campaign expenses for **HOUSEHOLDER** during his 2018 campaign.

83. Between on or about February 6, 2017 and to on or about April 28, 2020, **LONGSTRETH** used for his own benefit at least $2 million in Company-A-to-**GENERATION-NOW** payments that were transferred to accounts that he controlled, including a wire of $1,000,000 to his brokerage account and hundreds of thousands of dollars spent on mortgage payments, car payments, and credit card payments.

84.     Between on or about February 6, 2017 and to on or about April 28, 2020, **CLARK** received at least $290,000 in Company-A-to-**GENERATION-NOW** payments, which passed through at least one other account controlled by **Householder's Enterprise** before reaching **CLARK's** bank account.

85.     Between on or about February 6, 2017 and to on or about April 28, 2020, **BORGES** received at least $350,000 in Company-A-to-**GENERATION-NOW** payments, which were transferred to him through the 17 Consulting bank account.

86.     Between on or about February 6, 2017 and to on or about April 28, 2020, **CESPEDES** received at least $600,000 in Company-A-to-**GENERATION-NOW** payments, which passed through the 17 Consulting bank account before reaching his bank account.

87.     Between on or about February 6, 2017 and to on or about April 28, 2020, **Householder's Enterprise** paid Associates 1, 3, 4, and 5 a total of at least $725,000 in Company-A-to-**GENERATION-NOW** payments, many of which passed through at least one other account controlled by **Householder's Enterprise** before reaching the associate's bank account.

88.     On or about November 13, 2019, **LONGSTRETH** signed under penalty of perjury the IRS Form 990 for the tax year 2017, claiming **GENERATION NOW** was a 501(c)(4). According to the filing, **GENERATION NOW's** largest program service accomplishment, measured by expenditures, was $500 spent on building "a grassroots infrastructure and online campaign to educate the public about the need for clean, reliable energy generation in Ohio."

### The Enterprise Also used Company-A-to-GENERATION-NOW Payments to Obtain, Preserve, and Expand HOUSEHOLDER's Political Power

89.     Throughout the conspiracy, **Householder's Enterprise** used **GENERATION NOW** money to increase **HOUSEHOLDER's** political power by helping **HOUSEHOLDER** become the Ohio Speaker and develop a loyal group of representatives.    **CLARK** and

**HOUSEHOLDER** discussed this strategy during a recorded call in or about January 2018. Specifically, **CLARK** and **HOUSEHOLDER** discussed the budget in the context of their plan to "orchestrate (c)(4) checks" to help **HOUSEHOLDER** fund campaigns for House members. **CLARK** estimated that **HOUSEHOLDER** would "*need a hundred and twenty thousand per race,*" to which **HOUSEHOLDER** responded, "*I'd say one fifty, but yeah, you're in the ballpark.*" They then discussed how to raise the amount they needed in 501(c)(4) checks to fund candidate campaigns. **CLARK** mentioned that, "*some people decided to help [Speaker Candidate 1]*" for Speaker, to which **HOUSEHOLDER** responded, "*yeah, we can fuck them over later.*"

90.    In 2017, as **Householder's Enterprise** began receiving wires from Company A Service Co., **Householder's Enterprise** built a list of candidates for the 2018 elections—candidates who, at times, **Householder's Enterprise** referred to as "Team Householder," and who **Householder's Enterprise** used **GENERATION NOW** funds to help elect.

91.    In or around April 2018, after having received approximately $1.3 million in Company-A-to-**GENERATION-NOW** payments between on or about March 15, 2017 and March 15, 2018, **Householder's Enterprise** sent wires totaling $1 million from **GENERATION NOW** to PAC, which purchased in PAC's name, advertisements benefiting **HOUSEHOLDER** and **Householder's Enterprise** candidates for the May 8, 2018 Ohio primary election.

92.    On or about May 8, 2018, **Householder's Enterprise** successfully executed their primary election strategy, as the majority of the candidates supported by **Householder's Enterprise** won their primary elections.

93.    Between on or about August 1, 2018 and on or about October 29, 2018, **Householder's Enterprise** received $1 million in Company-A-to-**GENERATION-NOW** payments. Between on or about October 19, 2018 and October 29, 2018, **GENERATION NOW**

wired $670,000 to Dark Money Group 1, which also had received a $500,000 wire directly from Energy Pass-Through. With this money, **Householder's Enterprise** used Dark Money Group 1 to purchase over $1 million in advertisements in the name of Dark Money Group 1 that benefited **Householder's Enterprise's** candidates in the final weeks before the November 2018 general election.

94.     Between in or about March 2017 and November 2018, after receiving Company-A-to-**GENERATION-NOW** payments, **Householder's Enterprise** wired and electronically transferred money from **GENERATION NOW** to a **LONGSTRETH**-controlled bank account, which made payments to benefit **Householder's Enterprise** and enrich and benefit its members and associates.

95.     On or about November 8, 2018, **Householder's Enterprise** successfully executed its strategy, demonstrated by the election of the majority of the "Team Householder" candidates.

96.     On or about January 7, 2019, **HOUSEHOLDER** was elected Speaker, in part, by receiving votes from representatives whose races were supported by **GENERATION NOW**.

97.     Between on or about January 22, 2020 and on or about February 7, 2020, after having received approximately $38.7 million in Company-A-to-**GENERATION-NOW** payments between on or about August 2, 2019 and on or about October 22, 2019, **Householder's Enterprise** wired $1,010,000 from **GENERATION NOW** to Coalition, which then wired roughly the same amount to PAC, which then purchased advertisements in PAC's name before the scheduled May 2020 primary. The advertisements purchased by PAC benefitted **Householder's Enterprise** and its candidates.

**Householder's Enterprise Pushes Legislation in Return for Payments**

98.     In or about 2019, **Householder's Enterprise**, through **HOUSEHOLDER**, delivered a legislative solution for the Nuclear Plants in the form of HB 6.   In a recorded conversation on or about May 31, 2019, **CLARK** characterized HB 6 as a "nuclear power plant bailout."

99.     In a text message exchange on or about June 10, 2019, while HB 6 was pending in the Ohio Senate, **HOUSEHOLDER** revealed his intent with regards to HB 6 and his official action for the benefit of the Company A Nuclear Plants.   In the exchange, **LONGSTRETH** told **HOUSEHOLDER** that one of the "biggest issues we've heard from the Senate" was "Does [Company A-1] really need the money?"  After referencing the "subsidy" for "[Company A-1,]" **HOUSEHOLDER** responded:  *we only put in what they need.*"

100.     **CLARK** described **Householder's Enterprise's** corrupt arrangement with Company A in recorded conversations on or about July 23 and 24, 2019.   **CLARK** stated:  "*on HB 6, [Company A] got $1.3 billion in subsidies, free payments, . . . so what do they care about putting in $20 million a year for this thing, they don't give a shit.*"  (At the time **CLARK** made this statement, **Householder's Enterprise** had received approximately $20 million from Company A Service Co., Company A-1, and Energy Pass-Through into **GENERATION NOW**.)  **CLARK** stated on:  "*[Company A] is deep pockets.*"  **CLARK** explained:  "*I did this campaign.  All we cared about was getting the subsidy.*"

101.     In a recorded conversation on or about June 6, 2019, in the context of discussing contributing to **HOUSEHOLDER** through **GENERATION NOW**, **CLARK** referenced **HOUSEHOLDER's** corrupt exchange with Company A, explaining that **HOUSEHOLDER** took millions from Company A and "*he went to war for them.*"  **CLARK** concluded that he wanted to

be around politicians like **HOUSEHOLDER** who "*will go to the wall, but those guys that go to the wall can only do it once a year because if they do it all the time underbody knows they're pay to play.*" **CLARK** explained that the way politicians get exposed for "*pay to play*" is through "*stupidity*" or "*people who get aggrieved leak it.*"

102. Similarly, during a September 2019 recorded conversation about the Ballot Campaign's effort to repeal HB 6 with CHS-1(who was an employee/agent for the Ballot Campaign), **BORGES** characterized the corrupt relationship between **HOUSEHOLDER** and Company A as follows:

> And, and Larry also, you know, *so it's this unholy alliance between Larry and [Company A] and [Borges' firm]*. . . . *[Borges' firm] doesn't care about Larry; he's helping with the issue our single largest client cares a lot about and . . . so unless you are somehow affiliated directly to [Company A] or work for one of their interests or you just want to suck up to Larry, you're on your side.*

103. Company A-1 lobbyist **CESPEDES** planned the timeline for **HOUSEHOLDER** to take the official action for Company A's benefit even before **HOUSEHOLDER** became Speaker. On or about November 20, 2018, weeks after the 2018 general election, **CESPEDES** drafted a document titled "[Company A-1] Ohio 1st Draft Timeline." In this document, **CESPEDES** wrote that although the next Speaker remained unclear at that time, there would be "Speaker's race clarity mid-December" 2018, and "[i]f Householder is successful, *the effort will likely be led from his Chamber*," with "potential legislative introduction" for Company A-1 in early 2019.

104. Consistent with **Householder's Enterprise's** strategy, **HOUSEHOLDER** became Speaker of the Ohio House of Representatives on or about January 7, 2019, with the "Team Householder" candidates who won their campaigns—aided by **Householder's Enterprise**,

through payments from Company A—voting in favor of **HOUSEHOLDER**. On that day, **HOUSEHOLDER** pledged to create a standing committee on energy generation.

105. On or about February 6, 2019, weeks after his election as Speaker, **HOUSEHOLDER** announced the creation of a subcommittee of the House Energy and Natural Resources Committee—the Energy Generation Subcommittee. **HOUSEHOLDER** later stated that the Energy Generation Subcommittee was created for HB 6.

106. On or about April 12, 2019, the House introduced HB 6—roughly three months after **HOUSEHOLDER** became Speaker. That day, **HOUSEHOLDER** held a press conference, during which he stated he "*crafted*" the legislation with two other representatives (both of whom **Householder's Enterprise** supported with **GENERATION NOW** funds in 2018). When asked where the amount of the subsidy contained in the proposed legislation came from, **HOUSEHOLDER** responded, "*it's based on our brains. For me, I look back, for two years I've had this in my head, and I've had various versions on that white board over the last several months.*" **Householder's Enterprise** received its first $250,000 payment from Company A Service Co. in March 2017, roughly two years prior to introduction of HB 6.

107. Between in or around April 2019 to July 2019, while HB 6 was pending before the Ohio House of Representatives and the Ohio Senate, **Householder's Enterprise** received into **GENERATION NOW** approximately $16.8 million from Company A Service Co. and Company A-1. With this money, **Householder's Enterprise** paid for direct mail and radio and television advertisements supporting HB 6, paid the operating costs of **Householder's Enterprise**, and laundered the money through **LONGSTRETH's** bank account to pay members and associates of **Householder's Enterprise** and third parties.

108. While HB 6 was pending before lawmakers, **LONGSTRETH** and **CESPEDES** coordinated Company A payments to **GENERATION NOW**. For example, on June 4, 2019, **CESPEDES** texted to **LONGSTRETH**, "*Text me the # I need an invoice for $2M*"; **LONGSTRETH** responded, "*working on it now.*" On June 10, 2019, **CESPEDES** texted, "*Make sure I get the invoice for this week as early as possible, please. Thanks.*" **LONGSTRETH** responded, "*Yeah, I'm thinking it will be lower this week. Probably 1.3 ish.*" **CESPEDES** replied, "*Ok, thanks. I appreciate everything that you are doing. Let's keep pushing this group.*"

109. Through the advertisements, paid for by **GENERATION NOW**, **Householder's Enterprise** provided "cover" and "protect[ed]" legislators who planned to vote in favor of HB 6 and applied pressure to unsupportive legislators and those who were undecided. **Householder's Enterprise** planned and designed the advertisements, as evidenced by direct mail pieces, budgets, drafts transcripts for advertisements, and communications with **LONGSTRETH**.

110. **HOUSEHOLDER** acknowledged the importance of "protecting" the representatives who voted in favor of HB 6 in the following text message thread on or about June 16, 2019:

>**HOUSEHOLDER**: *Are we running positive radio in [redacted]'s district?*
>
>**LONGSTRETH**: *Not right now. It ended with the vote.*
>
>**HOUSEHOLDER**: *Got to protect the troops – especially make sure they believe we are protecting them.*

111. In or around May 2019, **HOUSEHOLDER's** proxy, **CLARK**, advised a representative of the consequences from **HOUSEHOLDER** if the representative did not vote for HB 6, which included, loss of committee assignments and stalling of his/her legislation. **HOUSEHOLDER** personally attempted to pressure and advise the same representative through a text messages that stated: "*[Representative], I really need you to vote yes on HB 6, it means a lot*

*to me. Can I count on you?*" After the representative responded by indicating the representative would vote against HB 6, **HOUSEHOLDER** replied by texting: "*I just want you to remember – when I needed you – you weren't there. twice.*"

112. On or about May 29, 2019, **Householder's Enterprise**, its members and associates, celebrated the Ohio House of Representatives' passage of HB 6. Text message communications among Enterprise members and associates indicate that **HOUSEHOLDER**, **LONGSTRETH**, **CESPEDES**, a Company A Corp. lobbyist, and "*10-12 Reps . . . All yes votes*" were in the "*back room*" of a Columbus restaurant having dinner the night after HB 6 passed the Ohio House.

113. On or about May 31, 2019, after receiving negative publicity about HB 6's passage in the Ohio House and while HB 6 was pending in the Ohio Senate, **HOUSEHOLDER** asked **LONGSTRETH**, "*Does [Associate 3] do a fucking thing? Has there been a plan you guys are following or is the plan just to spend money.*" Following a phone call from **HOUSEHOLDER**, **LONGSTRETH** sent a follow up text message to **HOUSEHOLDER** later that day that explained, "*the whole HB6 team [is] coming into the office on Monday . . . I don't ever want to get another call from you like I got this morning. Let's go win!*"

114. The same day, following the initial text message and follow-up call from **HOUSEHOLDER**, **LONGSTRETH** texted Company A-1 lobbyist **CESPEDES**: "*Speaker has asked me to pull together the whole HB 6 team on Monday. Are you available?*" **LONGSTRETH** added, the "*Speaker is on a rampage*." **CESPEDES** responded, "*Understood. Just let me know what I should be prepared for. I want to make sure I have answers and do not want the speaker's rage directed at me lol.*" After **LONGSTRETH** stated that **HOUSEHOLDER** "*was pissed*" about a newspaper article, **CESPEDES** replied, "*Aw fuck. Sorry*

*to hear that. I've got your back. You have been great. Let's just regroup and get the rest of the deal done*."

115.    Consistent with these text messages between **LONGSTRETH** and **CESPEDES**, on or about June 3, 2019, **Householder's Enterprise** members and associates met regarding the strategy to pass HB 6 in the Senate.  The members and associates discussed a targeted media campaign including direct mail, direct cable, and direct radio that mentioned the senators by name. **Householder's Enterprise** members and associates also discussed a contingency plan, by which "*the Nukes*" would be "*stripped out and put into the budget*."

116.    As it did when HB 6 was pending before the Ohio House of Representatives, **Householder's Enterprise** crafted and paid for advertisements, in the name of **GENERATION NOW** while the legislation was pending in the Ohio Senate in or about June and July 2019. **Householder's Enterprise** documented its strategy and budget in this regard.  **Householder's Enterprise** members and associates determined that the television commercials needed to reference the senators by name.  They also discussed that "*on the fence*" legislators had reported "*feeling the heat*" from constituent calls, presumably prompted by targeted advertisements urging constituents to call their legislator.  The new television commercials conveyed a sense of urgency, imploring constituents to contact their respective senators and ask him/her "to pass HB 6 before summer break" to save jobs.  **Householder's Enterprise's** media campaign was funded by the more than $7 million that Company A Service Co. and Company A-1 paid to the **GENERATION NOW** account from on or about June 5, 2019 through July 5, 2019, while HB 6 was pending before the Ohio Senate.

117.    **HOUSEHOLDER** also pressured and advised Ohio senators to pass legislation through his proxy.  On or about June 4, 2019, **CLARK** and **HOUSEHOLDER** had the following exchange:

> **CLARK**: *I have talked to 7 members so far.*
>
> **HOUSEHOLDER**: *Are you doing any good?*
>
> **CLARK**: *Yes*
>
> **CLARK**: *Out of 7 calls I got 6 yes votes and 1 no vote*

118.    As a lobbyist for Company A-1, **CESPEDES** operated as a middleman between Company A-1 and **Householder's Enterprise's** efforts to enact into law HB 6.  On or about June 3, 2019, **CESPEDES** texted "*gen now mail is still dropping.  We are getting reports that's [sic] it's been hitting late,*" to which **LONGSTRETH** responded that "*90% was delivered by the vote*" and "*Members like seeing the mail because voters don't know when the vote was.*"  Several days later, **CESPEDES** texted **LONGSTRETH**, "*Mail and radio looks good to me.*"

### Defeating the HB 6 Ballot Campaign

119.    On or about, July 23, 2019, when the Senate passed HB 6, the House concurred in amendments and the Governor signed HB 6, **Householder's Enterprise** began executing its strategy to defeat a reported Ballot Campaign so that HB 6 would become effective on or about October 22, 2019.

120.    On or about July 30, 2019—the day after the Ballot Campaign submitted proposed ballot language to the Ohio Attorney General—**Householder's Enterprise** caused Front Company to register as a for-profit limited liability company with the Secretary of State of Ohio.  A law firm, which received payments both from **GENERATION NOW** and Front Company, filed the documents on behalf of Ohioans for Energy Security.  The creation of Front Company came after

media reports began connecting **GENERATION NOW** to HB 6, and after **HOUSEHOLDER** told **LONGSTRETH** in a text message that members have had issues with **GENERATION NOW**: "*Gen Now has had issues as well. I've had several members – including members of House leadership come in privately and discuss their concern over next year's House campaigns based on HB 6 messages, mail, TV and radio.*"

121.    Two weeks later, on or about August 12, 2019, **Householder's Enterprise** caused Front Company to open a bank account at the bank used by **GENERATION NOW**.

122.    Between on or about August 2, 2019 and October 21, 2019, **Householder's Enterprise** received approximately $35.7 million in wires from Company A Service Co. and Energy Pass-Through into **GENERATION NOW**. During that same timeframe, **Householder's Enterprise** laundered approximately $23 million of the $35.7 million received by **GENERATION NOW** through Front Company, before paying for direct mail, media ads, and other services to defeat the Ballot Campaign.

123.    During the fall of 2019, among other things, **Householder's Enterprise** used the Company-A-to-**GENERATION-NOW** money paid through Front Company to bribe and attempt to bribe signature collectors working for the Ballot Campaign, via Petition Services Co. 2.

124.    **Householder's Enterprise** discussed the tactic of bribing the signature collectors to defeat the Ballot Campaign during recorded conversations. On or about September 23, 2019, **CLARK** explained, with **HOUSEHOLDER** present, "*so we have to go out on the corners and buy out their people every day. We started doing that today and everybody's having a fucking shit fit.*" **CLARK** continued, "*if we knock off 25 people, collecting signatures, it virtually wipes them out in next 20 days; this ends the whole fucking thing, ends in, that's how hard it is, in addition to the TV, the direct mail, and everything else. . . .*" It was at this point in the conversation, when

**HOUSEHOLDER** interrupted, and added, "*It is so important, it is so important, that they are not successful, because when the legislature votes on something it needs to stay law.*"  After this recording, **CLARK** went on to have over 40 telephone contacts with an individual from Petition Services Co. 2, who was contacting the Ballot Campaign's signature collectors.

125.    Householder's Enterprise also laundered money through **BORGES'** 17 Consulting Group bank account to defeat the Ballot Campaign.  Between on or about August 2, 2019 and on or about October 21, 2019, **Householder's Enterprise** laundered approximately $1.6 million in payments received by **GENERATION NOW** from Energy Pass-Through and Company A Service Co. through **BORGES'** 17 Consulting bank account to pay for services to defeat the Ballot Campaign, including a bribe payment to a Ballot Campaign insider for information and multiple payments to a private investigations firm.  The 17 Consulting Group account also made payments to **BORGES** and **CESPEDES** during this time period.

126.    On or about September 2, 2019, **BORGES** offered CHS-1, an employee and/or agent of the Ballot Campaign, bribe money for inside information about the Ballot Campaign to further **Householder's Enterprise's** efforts.  **BORGES** made this offer approximately two days after the Ohio Attorney General approved the ballot language submitted by supporters of the Ballot Campaign.

127.    On or about September 13, 2019, using funds from the 17 Consulting account, which was funded solely by wires from **GENERATION NOW**, **BORGES** paid CHS-1 $15,000 for inside information about the Ballot Campaign.  Following the exchange, **BORGES** asked the employee/or agent on a number of occasions for the number of total signatures the Ballot Campaign had collected so **Householder's Enterprise** knew whether it needed to enhance its efforts to defeat the Ballot Campaign.  For example, on or about September 20, 2019, **BORGES**

texted CHS-1: "*We were told you guys had 120,000 signatures. Any idea if that's right?*" On or about September 27, 2019, **BORGES** texted CHS-1: "*Any idea how many total signatures you guys have? We were told 80,000 today.*" **Householder's Enterprise** documented its strategy in notes, stating: "→[CHS-1's name] →**BORGES**"; and "Employ – 25K – pend" for 17 Consulting expenditures, which was an original bribery offer to CHS-1 from **BORGES**.

128.    **Householder's Enterprise** also laundered money through **LONGSTRETH's** bank accounts to defeat the Ballot Campaign and benefit **Householder's Enterprise**. Between on or about August 2, 2019 and October 21, 2019, **Householder's Enterprise** laundered approximately $1.15 million in payments received by **GENERATION NOW** from Energy Pass-Through and Company A Service Co. through **LONGSTRETH's** x9192 account, which **Householder's Enterprise** members and associates used to benefit themselves personally during the same period, including over $42,000 for costs associated with **HOUSEHOLDER's** Florida home, $50,000 to **LONGSTRETH's** brokerage account, and $45,000 to **CLARK** during the same time period. **LONGSTRETH's** account also was used to pay for direct mailers.

129.    When the Ballot Campaign failed to collect the requisite number of signatures, **HOUSEHOLDER** celebrated enactment of the law through an October 21, 2019 press release, in which he noted expressly that the new law would bail out Company A-1's failed nuclear power plants. Specifically, **HOUSEHOLDER** stated: "*I am pleased that House Bill 6 will go into effect at midnight tonight and am confident it will produce positive results for Ohio.*" Among the benefits of the bill, **HOUSEHOLDER** highlighted, "*First, HB 6 will save the operation of two Ohio nuclear power plants.*

**Continued Benefits to Householder's Enterprise**

130.    On or about October 22, 2019, the day after the Ballot Campaign failed and HB 6 officially became law, **Householder's Enterprise** received a $3 million wire and a $4,330.86 cashier's check into **GENERATION NOW** from Company A Service Co. by way of Energy Pass-Through.

131.    On or about October 24, 2019, **Householder's Enterprise** wired from the **GENERATION NOW** account $2,921,000 to **LONGSTRETH's** x9192 account, which only contained approximately $28,000 at the time.  Thereafter, **Householder's Enterprise** transferred the Company-A-to-**GENERATION-NOW** money from the x9192 account to various **LONGSTRETH**-controlled accounts and then paid to various members and associates of **Householder's Enterprise**:

A.      On or about October 25, 2019, **Householder's Enterprise** paid $50,000 each to Associate 1 and Associate 5 from a **LONGSTRETH**-controlled account.  In or around January 2020, **Householder's Enterprise** paid Associate 1 and Associate 5 another $25,000 and $100,000, respectively, from a **LONGSTRETH**-controlled account.

B.      Between on or about October 24, 2019 and January 13, 2020, **Householder's Enterprise** paid **CLARK** $45,000 from a **LONGSTRETH**-controlled account.

C.      In or around December 2019, **Householder's Enterprise** paid $59,050 in costs associated with **HOUSEHOLDER's** Florida house from a **LONGSTRETH**-controlled account.

D.    On or about October 22, 2019, after the Ballot Campaign failed, **BORGES'** 17 Consulting account contained approximately $975,000. **Householder's Enterprise** used the vast majority of the remaining money to pay **CESPEDES** and **BORGES**. Specifically, **Householder's Enterprise** paid **CESPEDES** $500,000 and **BORGES** approximately $188,000. **BORGES** then spent the account down to approximately $12.20 by on or about January 27, 2020, largely through personal expenditures.

E.    In or around December 2019 and January 2020, **Householder's Enterprise** paid **LONGSTRETH** $1.1 million in the form of a wire to **LONGSTRETH's** brokerage account from a **LONGSTRETH**-controlled account.

132.    Between January 2020 and April 28, 2020, after having received Company-A-to **GENERATION-NOW** payments, **Householder's Enterprise** wired and electronically transferred money from **GENERATION NOW** to **LONGSTRETH's** x9192 account, which made payments to third parties to benefit **Householder's Enterprise** candidates and to enrich **Householder's Enterprise** members and associates.

**In violation of Title 18, United States Code, Section 1962(d).**

## FORFEITURE ALLEGATION

133.    The allegations contained in Count One of this Indictment are hereby incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963.

134.    Upon conviction of the offense set forth in Count One of this Indictment, the defendants, **LARRY HOUSEHOLDER**, **JEFFREY LONGSTRETH**, **NEIL CLARK**,

**MATTHEW BORGES**, **JUAN CESPEDES**, and **GENERATION NOW**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963:

      a.     any interest acquired or maintained in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

      b.     any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Tile 18, United States Code, Section 1963(a)(2); and

      c.     any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

The property subject to forfeiture to the United States, pursuant to Title 18, United States Code, Section 1963(a)(1), (a)(2), and (a)(3) includes, but is not limited to, the following property:

      a.     At least $59,996,835.86, said amount being the total of interests acquired and the gross proceeds obtained through the violation of Title 18, United States Code, Section 1962;

      b.     Contents of Fifth Third Bank Account No. 7284503310 in the name of

Generation Now Inc.;

  c.  Contents of Fifth Third Bank Account No. 7903726847 in the name of Generation Now Inc.;

  d.  Contents of Charles Schwab Account No. 5429-8830 in the name of Exchange Investment Realty, LLC; and

  e.  Contents of Charles Schwab Account No. 8974-9238 in the name of Jeffrey Philip Longstreth.

## **SUBSTITUTE ASSETS**

135. If any of the property described above, as a result of any act or omission of the defendants:

  a.  cannot be located upon the exercise of due diligence;

  b.  has been transferred or sold to, or deposited with, a third party;

  c.  as been placed beyond the jurisdiction of the court;

  d.  has been substantially diminished in value; or

  e.  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of the defendants, up to the value of the property described above.

  **All pursuant to Title 18, United States Code, Section 1963(a) and (m) and Rule 32.2(a) of the Federal Rules of Criminal Procedure.**

A TRUE BILL

_____

**GRAND JURY FOREPERSON**

**DAVID M. DEVILLERS**
**UNITED STATES ATTORNEY**

**EMILY GLATFELTER/ MATTHEW SINGER**
**ASSISTANT UNITED STATES ATTORNEYS**