# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:20-cr-77 |
| | : | |
| vs. | : | Judge Timothy S. Black |
| | : | |
| LARRY HOUSEHOLDER (1), | : | |
| | : | |
|     Defendant. | : | |

## ORDER RESOLVING
## THE PARTIES' MOTIONS TO EXCLUDE/LIMIT
## THE TESTIMONY OF EXPERT WITNESSES (Docs. 129, 131)

This criminal case is before the Court on: (A) the Government's motion to limit the testimony of Defendant Larry Householder's proposed expert witness (Doc. 129) and the parties' responsive memoranda (Docs. 133, 135); and (B) Defendant Householder's motion to exclude/limit the testimony of two of the Government's proposed expert witnesses (Doc. 131), and the parties' responsive memoranda (Docs. 132, 136).

## I. BACKGROUND

On July 30, 2020, a federal Grand Jury returned a single-count Indictment, charging Defendant Larry Householder and five co-defendants with participating in a Racketeer Influenced and Corrupt Organizations ("RICO") conspiracy, in violation of 18 U.S.C. § 1962(c), (d).  (Doc. 22 at 10, 40).[1]

---

[1] The Indictment identifies the following as the RICO predicate offenses: honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346; interference with commerce, robbery, or extortion, in violation of 18 U.S.C. § 1951; racketeering, including multiple acts of bribery under Ohio Rev. Code § 35 l 7.22(a)(2), in violation of 18 U.S.C. § 1952; money laundering, in violation of 18 U.S.C. § 1956, 1957; and multiple acts involving bribery, in violation of Ohio Rev. Code § 2921.02.  (Doc. 22 at 10-11).

Specifically, the Indictment alleges that Defendants Larry Householder, Jeffrey Longstreth, Neil Clark, Matthew Borges, Juan Cespedes, and Generation Now (collectively, the "Co-Defendants"), constituted an enterprise (the "Householder Enterprise"), the purpose of which enterprise was to grow Defendant Householder's political power, to enrich the Householder Enterprise and its members and associates, and to conceal these activities from public exposure and potential prosecution. (*Id*. at 1, 10).[2]

The Indictment states that Generation Now "was a self-titled 501(c)(4), organized under the laws of Delaware, registered in Ohio, and purported to be organized primarily for a social welfare purpose under the Internal Revenue Code." (*Id*. at 2). As a 501(c)(4) entity, Generation Now benefited from tax-exempt status, but was also subject to the statutory requirements that the entity operate exclusively for the promotion of social welfare, and that the entity neither be organized for profit nor that the entity's earnings "inure[] to the benefit of any private shareholder or individual." (*Id*.) (quoting 26 U.S.C. § 501(c)(4)(B)). However, the Indictment alleges that the Householder Enterprise created Generation Now "to solicit, receive, and disburse money obtained in furtherance of [the Householder Enterprise's] purposes" and that Generation Now was used "as a mechanism to receive and conceal bribe payments for the benefit of Householder's Enterprise members, Householder's Enterprise associates, and others, both directly and indirectly." (Doc. 22 at 11-12). The Indictment details the Co-Defendants' alleged use

---

[2] Defendants Longstreth, Cespedes, and Generation Now have pleaded guilty and will be sentenced at the conclusion of the case. (Min. Entries, Oct. 29, 2020, Feb. 9, 2021). Defendant Neil Clark died and, accordingly, the case against him was dismissed. (Doc. 88). Therefore, Defendants Larry Householder and Matthew Borges are the only remaining defendants.

of Generation Now in furtherance of the charged conspiracy, as well as Co-Defendants'
purported use of other companies, political action committees, and 501(c)(4) entities, all
to accomplish the alleged purposes of the Householder Enterprise.  (*Id*. at 2-40).

At the heart of the allegations is the Householder Enterprise's activities relating to
Ohio's House Bill 6 ("HB 6").  Specifically, HB 6 was proposed legislation, introduced
in the Ohio House of Representatives in April 2019, during Defendant Householder
tenure as Speaker of the House.  (*Id*. at 8).  The Indictment states, in sum, that HB 6 was
aimed at benefiting one of Ohio's public utility companies ("Company A Corp." and,
collectively with its subsidiaries, "Company A"), by offering a financial "bail out" to one
of Company A Corp.'s otherwise bankrupt subsidiaries, and thereby avoiding closure of
Company A's nuclear power plants in Ohio.  (*Id*. at 4-8).

Specifically, the Indictment alleges that, from March 2017 to March 2020, the
Householder Enterprise agreed to accept and did accept millions of dollars in bribes from
Company A, which bribes were paid in order to influence and reward Defendant
Householder, "in return for Householder taking specific official action for the benefit of
Company A, namely, to help enact into law legislation that would go into effect and save
the operation of the Nuclear Plants."  (*Id*. at 12-13).  The Indictment further alleges that
the Householder Enterprise ensured that the bribe payments were passed through and
paid to and/or from various entities, including Generation Now, in an effort to launder
and conceal the nature of the bribe payments.  (*Id*. at 12-15).  The Indictment also details
the numerous ways that the Householder Enterprise allegedly used the bribe payments in
furtherance of the conspiracy, including, *inter alia*, to promote and ensure the passage of

HB 6 and to defeat contrary legislative initiatives, to support the campaigns of Defendant Householder and others who would support HB 6, to pressure public officials to support HB 6, and to retain and gain political power on behalf of Defendant Householder, all with the intent to enrich and benefit, and to continue enriching and benefitting, the Co-Defendants and other associates of the Householder Enterprise. (*Id.*)

This case is set to proceed to *voir dire* on January 20, 2023, and to jury trial on January 23, 2023. (Doc. 118). At trial, the parties anticipate calling various expert witnesses—three of whom are the subject of the parties' instant motions. (Docs. 129, 131). The Court will address each party's motion in turn.[3]

## II. STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The trial judge must serve a "gatekeeping role," to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

For expert testimony to be admissible, the Court must find that: (1) the expert is qualified; (2) the expert's testimony is reliable; and (3) the expert's testimony is relevant. *United States v. LaVictor*, 848 F.3d 428, 441 (6th Cir. 2017) (citing *Daubert*, 509 U.S. at 589); Fed. R. Evid. 702.

---

[3] The defense requested a *Daubert* hearing on its motion. (Doc. 131). However, after reviewing the pleadings thoroughly, the Court determined that the record was complete to issue rulings, and thus a hearing was unnecessary. *See United States v. Reynolds*, 626 F. App'x 610, 614 (6th Cir. 2015) ("A district court is not required to hold a *Daubert* hearing before admitting expert testimony") (citing *Clay v. Ford Motor Co.,* 215 F.3d 663, 667 (6th Cir. 2000)).

## III. ANALYSIS

Both the Government and Defendant Householder seek to limit or exclude the anticipated testimony of the opposing party's expert witness(es). (Doc. 129, 131). Notably, neither party questions the qualifications of the proposed witnesses, nor the reliability of the anticipated testimony. Thus, the focus of both motions is on the relevance of the anticipated testimony.

As an initial matter, the opinion testimony of a qualified expert is relevant if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Thus, the Court may consider "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) (quoting Fed. R. Evid. 702, Adv. Comm. Notes). However, it is "well settled that 'necessity' is not a condition precedent for the admissibility of opinion testimony under Federal Rule of Evidence 702 …." *United States v. Brawner*, 173 F.3d 966, 969 (6th Cir. 1999).

Indeed, "[t]he relevancy bar is low, demanding only that the evidence 'logically advances a material aspect of the proposing party's case.'" *LaVictor*, 848 F.3d at 442 (quoting *Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1196–97 (9th Cir. 2014)). The proponent of the expert testimony merely needs to make a preliminary showing, by a preponderance of the evidence, that the proffered testimony "is 'sufficiently tied to the

facts of the case that it will aid the jury in resolving a factual dispute….'" *United States v. LeBlanc*, 45 F. App'x 393, 400 (6th Cir. 2002) (citations omitted).

Nevertheless, "expert testimony is subject to the same relevancy constraints as all other kinds of evidence." *Id.*; *Daubert*, 509 U.S. at 595 (1993) ("a judge assessing a proffer of expert [] testimony under Rule 702 should also be mindful of other applicable rules"). Needless to say, "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. But even relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

### A. The Government's Motion to Limit Expert Testimony

At trial, Defendant Householder intends to call Caleb P. Burns as an expert on "political involvement by tax-exempt 501(c)(4) organizations." (Doc. 129-1 at 1). As stated in Defendant Householder's disclosure, Mr. Burns is expected to testify regarding the following:

> (1) Federal law governing 501(c)(4) activities. … [P]rovide background on the federal laws that govern the political activities of a 50l(c)(4) organization. … [E]xplain that a 501(c)(4) organization may engage in candidate-related activities provided that doing so is not the organization's primary purpose. Though there are no bright-line standards for measuring primary purposes, Mr. Burns will share that relevant federal authorities suggest 40% is an appropriate threshold, but in practice, the threshold may increase to 49%. … [E]xplain that lobbying on legislation and engaging in ballot measure activities can be a 501(c)(4) organization's primary purpose and, therefore, constitute 100% of the organization's activities.

(2) Officeholder alignment with 501(c)(4) organizations. … [W]ill explain how officeholders can be aligned with 501(c)(4) organizations. That is, policy goals and will work collaboratively to achieve their mutual goals. … [P]rovide examples including: One Nation which is aligned with U.S. Senate Minority Leader Mitch McConnell, and Majority Forward which is aligned with U.S. Senate Majority Leader Chuck Schumer.

(3) Background on federal "leadership" PACs and private support for an officeholder's legislative leadership aspirations. [E]xplain that a federal "leadership" PAC is an entity that an officeholder maintains to raise money from private sources to then contribute to the campaigns of allied candidates and officeholders. [E]xplain the original intent of "leadership" PACs – and the derivation of the name. That is, an officeholder would establish a "leadership" PAC and raise funds from private sources to then contribute the funds to colleagues who, presumably, would vote for the officeholder in the legislature's leadership elections (*e.g.*, for positions like Majority Leader or Speaker of the House). [E]xplain that "leadership" PACs remain a fixture of the current political system and demonstrate that private support for an officeholder's legislative leadership aspirations is commonplace.

(*Id.* at 1-2).

The Government argues that, while it does not seek to exclude Mr. Burns's testimony in its entirety, some of Mr. Burns's anticipated testimony should be excluded as it is irrelevant and/or otherwise inadmissible. (Docs. 129, 135). Specifically, the Government argues that the Court should: (1) limit anticipated testimony regarding the law to ensure that such testimony does not intrude upon the province of the Court; (2) exclude testimony asserting that certain fundraising activities are "commonplace" in politics; and (3) exclude testimony regarding "leadership" PACs, as it is irrelevant in this case.

### 1. Testimony Regarding the Law

The Government argues that while Mr. Burns's anticipated testimony regarding "[f]ederal law governing 501(c)(4) activities" is "potentially permissible," such testimony risks intruding upon the Court's province to instruct jurors on the law. (Doc. 129 at 5). The Government further argues that the testimony would invade the province of the jury if Mr. Burns were to opine on the propriety of the alleged conduct or on a defendant's intent. (*Id*.) Accordingly, the Government asserts that Mr. Burns's testimony "must be limited to background testimony of the regulatory scheme to provide context for the jury," but "may not attempt to explain the law in these areas or suggest that the defendant's conduct comported, or did not comport, with these laws." (*Id*. at 5-6).

Defendant Householder, in effect, responds that providing background and context regarding the regulations governing 501(c)(4) entities is precisely what Mr. Burns intends to do. (Doc. 133 at 3-5). In sum, Defendant contends that Mr. Burns's anticipated testimony will neither invade the province of the jury nor the Court.

"[I]t is not for the witnesses to instruct the jury as to applicable principles of law, but for the judge." *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984) (quoting *Marx & Co., Inc. v. Diner's Club*, 550 F.2d 505, 509-510 (2d Cir. 1977)). Moreover, the expert witness "may not 'define legal terms' or state 'impermissible legal conclusions.'" *United States v. Mazumder*, 800 F. App'x 392, 395 (6th Cir. 2020) (quoting *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 592-93 (6th Cir. 2014)). Further, an expert witness's opinion may "embrace[] an ultimate issue," but "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state

8

or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704; *see United States v. Maya*, 966 F.3d 493, 506 (6th Cir. 2020) (holding that experts may opine "in general terms" on conduct that is typically seen from a person who *does* possess the requisite intent, "so long as the expert leaves 'unstated the inference that the defendant, having been caught engaging in more or less the same practices, also possessed the requisite intent'") (quoting *United States v. Combs*, 369 F.3d 925, 940 (6th Cir. 2004)).

In short, an expert witness walks a fine line anytime the witness's testimony embraces ultimate issues or attempts to explain a legal framework. And whether the testimony crosses the line can be controlled, in no small part, by the form of the questions posed and the scope of the expert's responses.[4] Thus, the Court need not exclude an entire category of testimony just to ensure compliance with the Rules of Evidence.

But, as the Government notes, "the defendants are not charged with any campaign finance or regulatory violations." (Doc. 129 at 2). Thus, some of Mr. Burns's anticipated testimony can and should be limited—not simply because it risks violating the rules, but because that risk arises in the context of irrelevant testimony. To the extent that Mr.

---

[4] In *Mazumder*, the Sixth Circuit held that the defendant's expert's "testimony [in a wire fraud case] constitutes a legal conclusion that improperly intruded on the court's responsibility to explain the law to the jury … [when the expert] invoked the word 'material,' attempted to define the materiality standard, and concluded that the bank statement 'would not be material.'" *Mazumder*, 800 F. App'x at 395. The Sixth Circuit went on to distinguish the *Mazumder* case from a Fifth Circuit case cited by the appellant, noting that "the Fifth Circuit … allowed expert testimony by an independent consultant and certified financial examiner because the defendant 'sought to ask [the expert] the factual question of whether the false statements in this case would have the capacity to influence a loan officer, … not the legal question of whether the statements were material.'" *Mazumder*, 800 F. App'x at 396 (quoting *United States v. Lueben*, 812 F.2d 179, 184-85 (5th Cir. 1987)).

Burns intends to <u>accurately</u> explain 501(c)(4) entities and how they may <u>generally</u> function in the political arena, such testimony is unlikely to run afoul of the Court's instructions. However, because the Government has not charged campaign finance or regulatory violations in this case, and as the Court will explain in the following subsection of this Order, *see infra*, some of Mr. Burns's more detailed testimony regarding campaign finance regulations is simply irrelevant and would be confusing to the jury.

Accordingly, the Court will allow Mr. Burns's testimony to the extent that it provides accurate and helpful background and context for the jurors. Notably, there appears to be no genuine disagreement between the parties as to whether the testimony is permissible for such a purpose. The Court notes, however, that even such general testimony (from either party's witnesses, frankly) *could* stray into the territory of offering legal conclusion. Accordingly, <u>the Court reminds counsel that **the Court** (not the expert witnesses) will instruct the jury on the relevant law.</u> The expert witnesses "may not 'define legal terms' or state 'impermissible legal conclusions,'" nor may the expert opine on a defendant's state of mind or intent. *Mazumder*, 800 F. App'x at 395; Fed. R. Evid. 704(b).[5]

---

[5] Given the Government's intent to call expert witness(es) to provide similar background and context, defense counsel may find that they have elicited sufficient testimony through cross-examination, such that Mr. Burns's testimony is no longer required. Moreover, given the charge in this case, coupled with the Court's ruling regarding Dr. Wood's testimony (*infra*), Mr. Burns's elaboration regarding regulations is irrelevant and unhelpful to the jury. However, in the event that such evidence becomes relevant after the Government's case in chief, the Court will revisit its ruling. Additionally, if Defendant Householder chooses to call Mr. Burns to testify during the defense's case in chief, the Court may, at that time, *voir dire* Mr. Burns, outside the jury presence, to determine if his testimony requires further limitation regarding the law.

### 2. Testimony About "Common" Fundraising Activities

Next, the Government argues that the Court should exclude Mr. Burns's anticipated testimony regarding "common" uses of unrelated 501(c)(4) organizations that are aligned with various politicians.  (Doc. 129 at 7-11).

The Government states that, based on the expert disclosure and the identified areas of Mr. Burns's anticipated testimony, it would appear that "Defendant Householder plans on presenting evidence through Mr. Burns that other public officials have engaged in 'x' conduct, and because they have not been prosecuted, Householder's conduct must therefore be legal and/or this prosecution is unfair."  (*Id.* at 7).  The Government argues that such testimony is irrelevant and misleading because: (1) "[t]he defendants are not charged with violating campaign finance laws, nor is their compliance with those laws a defense to the charges in this case"; (2) the conduct of unrelated individuals, or whether certain conduct is typical or commonplace, has no bearing on the guilt or innocence of the charged defendants; (3) testimony regarding what other politicians do or have done "is a backdoor selective prosecution argument"; and (4) the testimony "functions as a proxy for Householder's own testimony about his intent … [and] [i]t is impermissible for the defense to use Mr. Burns's testimony to suggest that Householder lacked the requisite intent because his actions were 'typical' in American politics or 'common' of other politicians."  (*Id.* at 7-11).

Defendant Householder responds that the Government intends to introduce testimony regarding 501(c)(4)s and campaign finance, and therefore he should be permitted to introduce the same.  (Doc. 133 at 5).  Defendant Householder also argues

that the Government will "no doubt portray [Defendant Householder's connection to Generation Now] as unusual and/or illicit," thereby necessitating Mr. Burns's testimony to "rebut" said evidence. (*Id*. at 5-6). Defendant further argues that testimony regarding what constitutes common practice will help the jury assess whether the alleged conduct is "something more" than permissible campaign actions. (*Id*. at 6-7). Finally, Defendant Householder asserts that Mr. Burns will not testify about Defendant's mental state, nor is the testimony intended to serve as a selective prosecution argument. (*Id*. at 8-9).

To start, the Court has already ruled, *supra*, that it will not permit expert witnesses to opine on a defendant's state of mind. Additionally, the Court already excluded evidence and argument relating to selective prosecution, as set forth in the Court's prior Order resolving the parties' motions *in limine*.[6] (Doc. 161 at 5-6). Thus, expert testimony that opines on a defendant's state of mind, as well as expert testimony that addresses or implicates selective prosecution, will not be permitted.

Additionally, Defendant Householder is correct that the Government intends to offer background testimony to assist the jury in understanding the context of campaign finance and 501(c)(4)s. And, indeed, the Government does not begrudge Defendant Householder the same opportunity (cumulative as the testimony may be). The Court has already held, *supra*, that it will permit such testimony to assist the jury.

---

[6] Notably, in their responses to the Government's motion *in limine*, Defendants Householder and Borges confirmed that they have no intention to argue selective prosecution. (Doc. 150 at 3-4; Doc. 152 at 2-5).

However, as this Court noted in its prior Order resolving the parties' motions *in limine*, the Court will not permit the argument that "the alleged conduct is common practice and should therefore be excused."  (Doc. 161 at 7).  Thus, in the (unlikely) event that Defendant intends to admit the allegations but argue that the jury should simply ignore unlawful conduct, such argument is precluded.  *United States v. Vasilakos*, 508 F.3d 401, 409 (6th Cir. 2007) (noting "the manifest illogic of the argument that because 'others did it too, and [because relevant] policies condoned [the conduct], [defendants] therefore had no specific intent to defraud'").  On the other hand, to the extent that Defendant Householder will argue that he neither knew about nor engaged in the alleged conduct at all, or if he intends to argue that the Government is misconstruing his intent, testimony regarding what is common practice is irrelevant.  In other words, the fact that countless others may engage in the same conduct that is alleged in the Indictment has no relevance to the case if Defendant is <u>denying</u> that he engaged in that alleged conduct. Nor does the conduct of unrelated politicians undermine the Government's allegation that Defendant Householder conspired and acted in this case with knowledge and intent.  *Id*. ("it is obvious that the defendants' proffered evidence of similar fraud by other managers was not relevant … because the evidence had no tendency to show that it was less probable that the defendants acted with intent to defraud").

Finally, the Court disagrees with Defendant Householder's contention that offering testimony regarding lawful campaign practices by other politicians and other 501(c)(4)s will "rebut" the Government's evidence regarding Defendant Householder's alleged conduct.  As an initial matter, Defendant intends to offer Mr. Burns's testimony

to explain <u>campaign finance regulations</u>. Thus, the anticipated testimony would not "rebut" the Government's argument <u>unless</u> the Government were to argue that 501(c)(4)s play no lawful role in campaign financing. But the Government is not alleging campaign finance violations, nor is the Government asserting that Generation Now could not have been used for any lawful purpose—the allegation is that Defendant Householder used Generation Now for unlawful purposes. Thus, the issue the jury will need to consider is not the lawful uses of unrelated 501(c)(4)s, but rather Defendant Householder's alleged misuse of Generation Now to accomplish unlawful purposes.

For instance, Mr. Burns's intends to testify that "501(c)(4) organization may engage in candidate-related activities provided that doing so is not the organization's primary purpose," and that "federal authorities suggest 40% is an appropriate threshold, but in practice, the threshold may increase to 49%." (Doc. 129-1 at 1). But the Government is <u>not</u> alleging that Defendant Householder's use of Generation Now constituted 51% candidate-related activities. The Government is alleging that Defendant Householder and the remaining Co-Defendants conspired to use Generation Now to launder bribe money—the "appropriate threshold" in that instance is 0%. Therefore, the proposed expert testimony would accomplish nothing other than to throw out unrelated regulatory facts and figures, and then validate that information by explaining that other politicians adhere to those regulations. Such evidence is confusing to the jury and irrelevant to the case.

Accordingly, the Court **GRANTS** the Government's motion to exclude testimony relating to common campaign finance practices and unrelated candidates.

### 3. Testimony Regarding "Leadership" PACs

Finally, the Government argues that the Court should exclude Mr. Burns's testimony regarding "leadership PACs." (Doc. 129 at 11-12). Specifically, the Government notes that a "leadership PAC" is a federally defined and regulated committee for Federal candidates and Federal officeholders, and "[t]here is *no evidence* that the defendants in this case had or operated *any* federal leadership PACs during the relevant time period." (*Id.*)

Defendant Householder acknowledges that, indeed, "none of the defendants had or operated a federal leadership PAC during the time period at issue in the Indictment." (Doc. 133 at 9). However, Defendant argues that the testimony is nevertheless relevant because "Generation Now functioned as a kind of leadership PAC." (*Id.* at 10).

Defendant Householder's argument is entirely without merit. There is no probative nor instructional value in presenting the jury with an explanation of an entity that never existed, simply for the sake of analogy. Such testimony is inadmissible, as it is entirely irrelevant and would only serve to confuse the jury. *See* Fed. R. Evid. 402, 403.

The Government's motion to exclude testimony regarding "leadership PACs" is **GRANTED**.

### B. Defendant Householder's Motion to Exclude/Limit Expert Testimony

Defendant Householder moves to exclude the testimony of the Government's expert witness, Noah Dormady, Ph.D., as well as to limit the testimony of the Government's expert, Abby Wood, J.D., Ph.D. (Doc. 131). Defendant argues that the

proposed testimony of the Government's two expert witnesses is irrelevant, unfairly prejudicial, and cumulative. (Doc. 131).

The Government opposes Defendant's motion, asserting that the arguments as to admissibility are meritless and that any attack on the anticipated testimony must be presented through cross-examination. (Doc. 132).

The Court will address the arguments as to each expert witness in turn.

### 1. *Dr. Noah Dormady*

The Government summarizes Dr. Dormady's proposed testimony as follows:

> Dr. Dormady, a professor at The Ohio State University, will provide background information and context about energy policy; he will testify regarding energy markets, generally, including how energy is generated, distributed, priced and sold to consumers in Ohio. Dr. Dormady will explain how energy generation, distribution and pricing are regulated. He will also testify about important context leading up to HB 6, including Ohio's attempt to deregulate (or "restructure") energy generation and distribution in Ohio, and how that, coupled with natural gas prices, led to distribution utilities, like FirstEnergy, recovering lost profits for their affiliated generation companies through riders and surcharges on utility bills. Through his testimony, he will explain energy terminology that the jury will need to have a basic understanding of HB 6.

(Doc. 132 at 3-4).

Defendant Householder asserts that Dr. Dormady's proposed testimony should be excluded, because an understanding of energy markets and policy is irrelevant and unhelpful to the jury. (Doc. 131 at 6-9). Specifically, Defendant acknowledges that "HB 6 is a piece of energy legislation," but argues that "the trial is not about the merits [of]

HB 6," and "the government cannot win a conviction by proving that … the passage of HB 6[] was undesirable or detrimental to the public." (*Id*. at 7).

The Government responds that it will not ask Dr. Dormady to opine on the wisdom of HB 6, unless the defense opens the door to such testimony. (Doc. 132 at 7). Moreover, the Government argues that Dr. Dormady's testimony will provide helpful background to the jury, particularly with regard to terms and concepts that will be used frequently during the trial. (*Id*. at 6-7). For instance, the Government states that the testimony will "explain the difference between energy generation (such as FirstEnergy Solutions) and distribution (such as FirstEnergy and its affiliates), who regulates generation and distribution, and how Ohioans pay for energy." (*Id*. at 7). Additionally, the testimony will provide jurors with definitions for technical terms such as "riders" and "subsidies," which terms are relevant to and will come up when discussing the HB 6 legislation. (*Id*.) Accordingly, the Government argues that the testimony is admissible and, indeed, that "[i]t would be unfair to the government and the jurors themselves to expect jurors to understand an alleged agreement about a billion-dollar nuclear bailout without ensuring jurors have a basic understanding of energy policy and energy markets in Ohio." (*Id*.) The Court agrees.

While the charged offense is not about energy policy in Ohio, the alleged conduct did not occur in a vacuum. In other words, the Government will need to present its evidence with the correct context and, in this case, that context is far from self-explanatory. The Government cannot present its case without referencing nuclear power plants, energy markets, energy-related legislative policies, *etc.*, nor can the jurors be

17

expected to understand such references without some assistance. Given the specialized nature of the relevant background and context, the jury will benefit from the guidance that Dr. Dormady's testimony offers. Accordingly, Dr. Dormady's testimony is relevant and helpful.

In the alternative, Defendant Householder argues that the Court should, at minimum, exclude Dr. Dormady's proposed testimony regarding the negative consumer impact that resulted from the restructuring of Ohio's energy markets in 1999 and 2008. (Doc. 131 at 8). Specifically, Defendant asserts that this testimony is irrelevant because it involves legislation predating the charged conspiracy and that Defendant Householder "was not even a member of the General Assembly in 2008." (*Id*. at 8, n.1). Defendant also argues that the testimony is unfairly prejudicial, and that such testimony could lead jurors to improperly convict based on their judgment regarding "the wisdom of legislation passed years before HB 6." (*Id*. at 8-9).

The Government responds that, while Defendant Householder did not serve as a member of the Ohio House of Representatives in 2008, he did serve "between 1997 and 2004 when the deregulation (or 'restructuring') of energy systems and markets began." (Doc. 132 at 8, n.6.). Further, the Government argues that "the previous deregulation[] of the energy markets in Ohio had a direct impact on energy policy in 2016-2017 when FirstEnergy sought a legislative solution for its nuclear plants as alleged in the Indictment." (*Id*. at 8). Thus, the Government asserts that the testimony serves as "significant background and foundational evidence for the jury, and provides motive evidence about the need for the illicit agreement." (*Id*.) (citing *United States v. Reifler*,

446 F.3d 65, 92 (2nd Cir. 2006)).  The Government further argues that "'official action' [is] an element of the federal bribery predicate acts," and thus Dr. Dormady's "testimony adds valuable context [] for the jury [to] understand[] who regulates energy markets in Ohio and how they are regulated."  (Doc. 132 at 8).

"[P]roper background evidence has a causal, temporal <u>or</u> spatial connection with the charged offense … [including evidence that] <u>is a prelude to the charged offense, is directly probative of the charged offense</u>, arises from the same events as the charged offense, forms an integral part of a witness's testimony, <u>or completes the story of the charged offense</u>."  *United States v. Holley*, 57 F. App'x 639, 640-41 (6th Cir. 2003) (quoting *United States v. Hardy,* 228 F.3d 745, 748 (6th Cir. 2000)) (emphasis added).  Moreover, "[p]rosecutors are permitted to provide the jury with a 'natural narrative of events,' and are not limited to a 'sanitized recounting of the facts.'"  *United States v. Littles*, 688 F. App'x 321, 324 (6th Cir. 2017) (quoting *United States v. Gibbs*, 797 F.3d 416, 424 (6th Cir. 2015)).  Nevertheless, the Court "may exclude relevant evidence if its probative value is <u>substantially</u> outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403 (emphasis added).

As discussed, *supra*, the Court agrees that the testimony provides relevant background and context.  Specifically, the testimony serves as a prelude, explaining the history of the energy market in Ohio and how that history set the stage (*i.e.*, created opportunity and motive) for the Co-Defendants to allegedly engage in the conduct

described in the Indictment.  The Government must be permitted "to provide the jury with a 'natural narrative of events,'" and Defendant is not entitled to a "sanitized" version of the story.  *See Littles*, 688 F. App'x 321, 324.

That said, the Court must still weigh the probative value of the testimony under Rule 403.  In particular, the Court must consider whether testimony regarding the negative consumer impact of deregulation is unfairly prejudicial.  Notably, "[u]nfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest [the jurors'] decision on an improper basis."  *United States v. Ford*, 761 F.3d 641, 648 (6th Cir. 2014) (quoting *United States v. Gibbs*, 182 F.3d 408, 430 (6th Cir. 1999)).

Here, the probative value of Dr. Dormady's anticipated testimony is significant, whereas Defendant Householder's concern that the jury will essentially run amok with the evidence is speculative, at best.  To start, defense counsel will have the opportunity to cross-examine Dr. Dormady, to establish Defendant Householder's involvement, or lack thereof, in the historical deregulation.  Moreover, the Court will properly instruct the jury on the purpose of the testimony being presented and will further instruct the jurors that their consideration of the evidence is limited to that purpose.  *United States v. Adams*, 722 F.3d 788, 812-13 (6th Cir. 2013) (finding that background testimony "was not pretty, but it was not unfairly ugly either," and the district court did not abuse its discretion by admitting the testimony with an appropriate instruction to the jurors) (citing *United States v. Merriweather,* 78 F.3d 1070, 1077 (6th Cir. 1996)).

20

Accordingly, Defendant Householder's motion to exclude Dr. Dormady's testimony is **DENIED**.

### 2. Dr. Abby Wood

Defendant Householder also moves to limit the testimony of Dr. Abby Wood. (Doc. 131). Specifically, Defendant agrees that Dr. Wood "may testify about the different entities through which political candidates receive financial support," but asserts that the remainder of Dr. Wood's anticipated testimony is irrelevant and cumulative. (*Id.* at 9-11).

As stated in the expert disclosure, Dr. Wood's testimony is intended to provide "context and background about the American system of campaign finance, the features and operation of political spending, and the regulation of political spending." (Doc. 132-2 at 8). The specific testimony to which Defendant Householder objects is summarized in Dr. Wood's expert disclosure, as follows:

> … The disclosure requirements associated with [] non-traditional entities vary depending upon the type of entity. For example, 501(c)(4) entities generally are not required to publicly disclose contributors. These 501(c)(4) entities are often referred to as sources of "dark money" because of their lack of transparency to the public, compared to traditional entities such as a candidate's campaign committee. The lack of transparency is amplified when non-traditional entities are used in conjunction with one another. Some believe that the lack of transparency of these dark money entities make them [] ripe vehicles to use to circumvent limits set for the traditional entities. Moreover, because many of these non-traditional entities do not disclose the sources of their contributions, they prevent the public from detecting when public officials favor the preferences of their donors over the preferences of their broader constituency.

21

> Dr. Wood will educate the jury generally about the concept of campaign finance disclaimers, which are the "stand by your ad" requirements that appear with political messages. These disclaimers identify the entity that paid for the ad. Disclaimers have the feature of appearing immediately with the message, though in the video context, they have the disadvantage of being displayed only very briefly. Dr. Wood will explain that disclaimers have consistently been shown to affect voter perceptions.

(*Id.*)

To start, Defendant Householder takes issue with the statement that: "Some believe that the lack of transparency of these dark money entities make them [] ripe vehicles to use to circumvent limits set for the traditional entities." (Doc. 131 at 9-10). Defendant argues that the statement does not constitute Dr. Wood's expert opinion, but rather her restatement of what others think. (*Id.*) Defendant also argues that the opinion is irrelevant, as Defendant is not charged with campaign finance violations. (*Id.* at 9).

The Court agrees with Defendant's argument regarding Dr. Wood's "ripe vehicles" statement. To be sure, the Government could easily cure the objection as to form. But the Court has agreed to limit Defendant's expert from testifying regarding the appropriate uses of 501(c)(4)s for campaign finance purposes. It would therefore be unfair to allow the Government's expert to gratuitously opine on 501(c)(4)s as "ripe vehicles" for fraud.

Defendant Householder also takes issue with the statement: "because many of these non-traditional entities do not disclose the sources of their contributions, they prevent the public from detecting when public officials favor the preferences of their donors over the preferences of their broader constituency." (Doc. 131 at 10). Defendant

22

argues that it does not require an expert to deduce that "if an entity does not disclose its contributors, the public will not know whether a public official favors those contributors." (*Id*.)

The Government responds that Defendant Householder takes Dr. Wood's statement out of context and, moreover, that Dr. Wood's conclusion is not within the scope of common knowledge. (Doc. 132 at 10).

The Court agrees that Dr. Wood's anticipated testimony is not as straightforward as the defense claims it to be. Dr. Wood's anticipated testimony starts by explaining various non-traditional entities, and transitions to her explanation of the real-world drawbacks to using such entities. Of course, after reading a full summary of Dr. Wood's anticipated testimony, and with the full benefit of that explanation and its context, Dr. Wood's conclusion *seems* obvious. But the Court declines to cut off Dr. Wood's permissible testimony in the hope that jurors will intuitively make the leap of logic for themselves.[7]

Defendant Householder also argues that the testimony is cumulative, and that the Government's other proposed expert, Charles Walker, is already expected to testify regarding 501(c)(4) contributions. (Doc. 131 at 11-12). Defendant argues that the cumulative testimony is unfairly prejudicial, as the jury may resort to "counting heads" to weigh competing expert testimony. (*Id*.)

---

[7] Unlike the "ripe vehicle" opinion, which opinion spoke to circumventing campaign finance regulations, Dr. Wood's anticipated testimony regarding lack of disclosure in contributions speaks directly to the charges in this case.

The Government responds by stating that while both experts will discuss 501(c)(4) entities, the scope of that discussion will be unrelated.  (Doc. 132 at 11).  The Government notes that Mr. Walker will be testifying based on his training and experience as an IRS employee, and will describe the traditional uses of 501(c)(4) entities.  (*Id*.)

The Court agrees that the anticipated testimony of the two experts is not cumulative.  Of course, there will undoubtedly be some initial overlap in explaining 501(c)(4) entities (and the Court would appreciate the Government's efforts to minimize this repetition to the extent possible).  But a brief restatement that simply reminds jurors about the gist of a 501(c)(4) entity, before the witness launches into more in-depth testimony, is hardly cumulative or prejudicial.

Finally, Defendant Householder argues that the Court should also exclude Dr. Wood's opinion about "the concept of campaign finance disclaimers."  (Doc. 131 at 12).  Defendant argues that the opinion is neither relevant, "[n]or does it help the jury to know 'that disclaimers have consistently been shown to affect voter perceptions.'"  (*Id*.)  Defendant further argues that "the jury does not need an expert to tell them what effect, if any, a campaign finance disclaimer may have on [voters]," and further notes that the campaign disclaimers are shown on the advertisements themselves.  (*Id*.; Doc. 136 at 5).

The Government argues that the testimony is relevant to proving the existence of an "enterprise," which in turn requires the Government to show the existence of a "continuing unit that functions with a common purpose."  (Doc. 132 at 12) (quoting *Boyle v. United States*, 556 U.S. 938, 948 (2009)).  The Government notes that, "[o]ne way the Enterprise worked together was to expand Householder's power by using dark

24

money advertisements that obscured the source and funding of the advertisements," *i.e.*, "they bore the name of Generation Now or other dark money entities funded by Generation Now to further obscure from the public the source and funding of the advertisements." (*Id.* at 12-13).  Accordingly, the Government argues that "Dr. Wood's background testimony about campaign finance disclaimers will be helpful to the jury in contextualizing the advertisements they see and hear during trial, which will aid them in determining the existence of an enterprise under RICO." (*Id.* at 13).

The Court agrees that Dr. Wood's anticipated testimony regarding campaign finance disclaimers is entirely relevant to the evidence in the case and that the anticipated testimony will be helpful to the jury.  While Defendant is correct in noting that the campaign disclaimers are displayed at the bottom of the advertisements and will be seen by the jury when those advertisements are entered into evidence, the defense must bear in mind that not every juror will understand the significance of these disclaimers.  A brief explanation of the significance of such disclaimers will assist the jury and provide context for the evidence the Government intends to present.

Accordingly, Defendant Householder's motion to limit Dr. Abby Wood's testimony is well-taken in part, but otherwise denied.  (Doc. 131).  Specifically, the motion is **GRANTED** as to the "ripe vehicles" opinion, but is **DENIED** in all other respects.

## IV.  CONCLUSION

Based upon the foregoing, the Government's *Daubert* motion (Doc. 129) is

**GRANTED**.  And Defendant Householder's *Daubert* motion (Doc. 131) is **GRANTED**

**IN PART and DENIED IN PART**.

**IT IS SO ORDERED.**

Date:  12/19/2022

Timothy S. Black
United States District Judge