**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. 20-CR-77** |
| | : | |
| | : | **JUDGE TIMOTHY S. BLACK** |
| **v.** | : | |
| | : | **UNITED STATES' SENTENCING** |
| | : | **MEMORANDUM FOR DEFENDANT** |
| **LARRY HOUSEHOLDER et al.,** | : | **LARRY HOUSEHOLDER** |
| | : | |
| **Defendants.** | : | |
| | : | |

On June 29, 2023, Defendant Larry Householder will stand before the Court for sentencing having been convicted by a jury of his peers. Householder once occupied one of the three most powerful offices in the State of Ohio. He now faces a substantial prison sentence for causing immeasurable damage to the institution of democracy in Ohio, through his direction of a criminal enterprise.

Householder's guideline range recommends life imprisonment. No mitigating factor tempers the seriousness of Householder's criminal conduct. Rather, the only limiting factor is the statutory maximum of twenty years. The United States requests that the Court impose a sentence of 16 to 20 years imprisonment. As set forth below, such a sentence reflects the seriousness of the offense, will provide deterrence, and is consistent with the sentences imposed by other courts for similar conduct. Such a sentence also will communicate to the public that the rule of law applies to everyone, including prominent public officials.

1

## ARGUMENT[1]

The Court's task at sentencing is to impose a sentence that is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a). The Court should begin by correctly calculating the applicable Guidelines range. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). However, the Guidelines represent a starting point – not the Court's sole consideration. Rather, the Court crafts an appropriate sentence by considering the Guidelines along with the § 3553(a) factors. *Id*. In so doing, the Court may not presume that the Guidelines range is reasonable, but should make an individualized assessment based on the facts. *Id*.

### United States Sentencing Guidelines

In this case, the probation officer correctly calculated Householder's Guidelines range in the Presentence Investigation Report ("PSR"). Householder objected to numerous aspects of the PSR. The United States responded to Householder's objections, and its response is quoted in the addendum to the PSR. Doc. 277, PageID 10981-94; s*ee also* Ex. A (attached). Rather than duplicate that response, the United States incorporates it here by reference. *See* Ex. A.

### Section 3553(a) Factors

After calculating the Guidelines range, the Court must analyze the section 3553(a) factors to determine an appropriate sentence. These factors underscore the need for a substantial sentence.

#### The Nature of the Offense

Householder was the mastermind and leader of a criminal enterprise responsible for one of the largest public corruption conspiracies in Ohio history. The scope of the conspiracy was unprecedented – approximately $60 million over a three-year period. Gov. Ex. 15. So was the

---

[1] Due to the Court's extensive experience sentencing defendants in federal criminal cases, the United States dispenses with a recitation of the general law applicable to the sentencing guidelines and section 3553(a).

damage it left in its wake, both in terms of its potential financial harm to Ohioans and its erosion of public trust.

The Court presided over a six-week jury trial that included over 1000 exhibits and more than 25 witnesses. The United States will not attempt to summarize the trial evidence here, but rather, will focus on factors that contextualize the nature of the offense for purposes of sentencing.

*Sophistication*

The complexity and sophistication of the conspiracy in this case was stunning. Householder and his conspirators exploited the lack of transparency in 501(c)(4)s to bury their corrupt scheme. They then laundered the money in their 501(c)(4) through layers of entities to further hide evidence of their corruption. Gov. Exs. 180, 300, 316, 352. Householder's name was not disclosed on bank records and business registrations, and therefore, he was not publicly connected to the various entities he and his conspirators controlled and used to launder the payments. Because of this concealment, the public had no knowledge of – and thus no way to hold Householder accountable – for the FirstEnergy payments he received. Indeed, it took the FBI hundreds of grand jury subpoenas, dozens of interviews, more than twenty search warrants, undercover agents, a CHS, and analysis of intercepted communications to unravel the scheme and connect it to Householder and his conspirators.

*Money, Greed, and Power*

FirstEnergy and its affiliates paid Generation Now and other enterprise-controlled entities more than 30 times between 2017 through 2020, totaling approximately $60 million.[2] Gov. Ex. 15; Gov. Ex. 316. That amount of money dwarfs any public corruption scandal in recent memory. In fact, even if the scheme were limited to a few payments, the scheme would still dwarf almost

___

[2] The payments were made either directly, or indirectly, by funneling the money through another entity first.

any other public corruption case.  While the amount of money itself is significant, perhaps more important is the power the money conferred.  The payments from FirstEnergy allowed Householder to fund his political operations, pay his staff, reward "casket carriers" and enrich himself and his conspirators.  For Householder, the money was the vehicle to political power, and it enabled to him to build and maintain his political machine, and ultimately become Speaker.  The amount of money also signified the extent and nature of the corrupt bargain between FirstEnergy and Householder.  As Clark told undercover agents, "those guys are only doing it because they get, you know, on that HB 6, the FirstEnergy got $1.3 billion in subsidies, free payments . . . . so what do they care about putting in $20,000,000 a year for this thing."  Gov. Ex. 528B, p. 5 (recording on July 24, 2019 – the day after HB 6 was signed into law).

*Threat of Continued Corruption*

Householder's corrupt scheme ended in 2020 with his arrest.  However, the trial evidence showed that but for that arrest, the conspirators planned to continue the corrupt scheme and their operation for decades to come.  For example, in 2020, the conspirators were pushing a ballot initiative, which would amend the Ohio Constitution and enable Householder to remain Speaker for 16 years, effectively tripling his tenure.[3]  Gov. Ex. 330G; Doc. 217, PageID 7714-18.  To fund the initiative, the conspirators leaned on FirstEnergy and FirstEnergy Solutions, dangling future official action by Householder in return.  Doc. 212, PageID 6921-40; Doc. 217, PageID, 7714-18.  After Householder contacted the FirstEnergy CEO about the ballot initiative, the CEO commented that Householder is "an expensive friend."  Gov. Ex. 330A.  FirstEnergy ultimately made a "significant" contribution – $2 million to Generation Now from FirstEnergy's 501(c)(4) – while at the same time the CEO noted:  "He told me he'll retire from there but get a lot done in 16 more

---

[3] The ballot initiative would have grandfathered in Householder's current term.

4

years." Gov. Ex. 330A, C, E, G. The conspirators thereafter registered a new 501(c)(4) and had an associate open a bank account called Coalition for Term Limits. Gov. Exs. 172-74. Householder was arrested a few months later.

*Impact on Ohioans and Industry*

The scope of the racketeering conspiracy should also be measured in terms of its effect or potential effect on Ohioans and industry. As described below in terms of the seriousness of the offense, between H.B. 6's subsidy and decoupling provision, H.B. 6 would have affected all Ohio ratepayers. Moreover, the money paid by ratepayers was not in the form of a loan that would have been repaid. Rather, Ohioans would have been responsible for a billion-dollar bailout to a particular industry. In this way, with the passage of H.B. 6, Householder also put his thumb on the scale in favor of certain industries that funded his political machine.

### History and Characteristics of the Defendant

The combination of Householder's actions and recorded communications compared to his trial testimony provides a unique window into Householder's history and characteristics, and supports the need for a substantial sentence.

Householder's goal of becoming Speaker was not about serving constituents[4] or ending divisiveness, as he testified. It was about power, plain and simple. And, when vested with the power of the Speakership, Householder displayed his transactional, this-for-that, mentality. While FirstEnergy is the most significant example, other evidence before the Court shows that this was not an isolated incident. For example, less than a week after H.B. 6 passed the House, in discussing

---

[4] Householder spoke about saving jobs, but his internal communications showed that was not the driving force behind his conduct. Gov. Ex. 502E, p. 29-30 (asking Longstreth "[w]hen does the Gen Now TV message change?" because "I'm just sick of seeing that poor sum bitch drive that pickup truck down the road and cry about losing his job.").

5

future contributions to support sports gaming legislation, Householder's proxy, Clark, described him as "pay to play": "when a politician's heart is right, that is, when you know that someone's going to be a champion, you go all out. . . .  the Speaker took a million and a half, two. But he went to war for them . . . . Only a few, who go to the wall."  Gov. Ex. 525B, p. 6-7.  Householder then shared an expensive dinner with undercover agents in the fall of 2019, knowing they were interested in making a payment to his 501(c)(4).  Gov. Exs. 536B, 537B, 538B.  In the summer of 2019, Householder also sought a line item of $6 million in the state budget for an educational institution that gave him an alumni award -  an honor Clark and Householder reportedly viewed as prestigious.[5]  Householder then sought vengeance against a staffer he perceived as having created an issue relating to the line item by telling Clark the staffer would never work in the state of Ohio and again and directing Clark to "f--- him until he's dead."  Gov. Ex. 527B, p. 20.

The evidence at trial also exposed the characteristics of Larry Householder.  He acted as the quintessential mob boss, directing the criminal enterprise from the shadows and using his casket carriers to execute the scheme.  This allowed him what he thought was plausible deniability for the crimes committed at his direction.  This part of Householder was not only displayed in the historical evidence, but in real time during the trial itself.  His self-serving, prevaricating testimony was full of implausible denials of responsibility.  *See, e.g.*, Doc. 228, PageID 8554 (denying participating in the creation of advertisements from Growth & Opportunity PAC and Hardworking Americans); *id*., PageID 8564 (denying directing how Generation Now spent its money).

---

[5] The evidence shows that Clark attended a nominations meeting to ensure Householder received the award. In appreciation for the award, Householder promised the institution $6 million out of the state budget for various projects.  He did exactly that, and was enraged when the Senate took the line item out of the budget. According to Clark, Householder resolved the budget by ensuring everyone got their line items.  Gov. Ex. 527B, p. 19 (recorded meeting that occurred less than a week after the Ohio legislature passed a two-year budget).[5]  Householder reported receiving the alumni award on his 2019 ethics disclosure – one of the few pieces of required information that Householder provided.

Through his testimony, Householder also displayed a well-developed comfort with deception. For example, Householder misled the jury about his 2017 trip to Washington, D.C., in terms of his whereabouts, his interactions and discussions with FirstEnergy executives, and the payment of his accommodations. Gov. Exs. 215B, 216B, 217, 911, 911A; Doc. 217, PageID 7635-36; Householder Ex. 479. He told the jury that he returned to the Ohio House of Representatives because of the divisiveness in politics. Doc 228, PageID 8494. But the trial evidence showed that Householder did not build bridges – he burned them. *E.g.*, Gov. Ex. 913 (Householder, "We like war, you know that, Neil?" and " Do you think we should go ahead and make some kind of a movement on Lipps and Greenspan just to set there and say that if you are going to f--- with me, I'm going to f---- with your kids."); Gov. Ex. 906 (Householder saying "We can f---- them over later" in discussing people who contribute to his opponent); Doc. 219, PageID 7968-69 (holding up legislation because of "no" vote); Gov. Ex. 523B, p. 5 (same). And, he told the jury that he was unaware that FES was working on draft legislation – despite the fact a copy was recovered from his office. Doc. 219, PageID 8714, 8790-92; Gov. Ex. 915.

Householder's history and characteristics, including his dishonesty before the Court, demonstrate the need for a substantial sentence. "The perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened as compared with the defendant charged with the same crime who allows judicial proceedings to progress without resorting to perjury." *United States v. Dunnigan*, 507 U.S. 87, 97-98 (1993).

### Need for a Sentence to Reflect the Seriousness of the Offense and to Provide Just Punishment

Section 3553(a) also directs the Court to consider the need for the sentence to reflect the seriousness of the offense and to provide just punishment. These factors are among the most

important factors a court considers in a public corruption case. They counsel in favor of a substantial sentence.

Elected officials owe a duty to provide honest services to constituents, and officials violate that duty by soliciting and accepting bribe payments. *Skilling v. United States*, 561 U.S. 358, 368 (2010). "This country['s] . . . proper functioning requires elected officials to serve the common good, not illicit personal gain. Our citizens place faith in the honesty and integrity of elected officials." *United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015). As one court explained, corruption by a public official:

> demean[s] the integrity and work ethic of the many public servants in his community who strive each day to improve life and governance . . . . And [the corrupt official] has damaged the political morale of his constituency . . . and of all Americans. The deviant acts of the corrupt public official are of course horrific, "*but a hundred times worse is the demoralization of our people which results*."

*United States v. Sorenson*, 233 F. Supp. 3d 690, 700 (S.D. Iowa), *aff'd,* 705 F. App'x 481 (8th Cir. 2017) (quoting Justice Louis Brandeis, *Speech to the Good Government Association* (1903)) (emphasis added). More pointedly, President Theodore Roosevelt explained to Congress in 1903 the effect of corruption on society: "*There can be no crime more serious than bribery*. Other offenses violate one law while *corruption strikes at the foundation of all law*." Theodore Roosevelt, *Third Annual Message to the Senate and House of Representatives* (Dec. 7, 1903) (emphasis added).

Likewise, the Sentencing Commission also has emphasized the seriousness of bribery and public corruption offenses. For example, in amending the corruption Guidelines in 2004 to increase punishment for public officials who corrupt their office, the Sentencing Commission indicated that substantial sentences are appropriate for the types of crimes committed in this case.

In particular, the Sentencing Commission sought to increase corruption sentences based on "the [Sentencing] Commission's conclusion that, in general, public corruption offenses previously did not receive punishment commensurate with the gravity of such offenses."  See U.S. Sentencing Guidelines Manual, Supplement to Appendix C, Amendment 666, pg. 82.   The Sentencing Commission also determined higher base offense levels for public officials are appropriate because "offenders who abuse their positions of public trust are inherently more culpable than those who seek to corrupt them, and their offenses present a somewhat greater threat to the integrity of governmental process." *Id.*

One can assess the seriousness of Householder's offense in this case by examining the damage caused by Householder's actions.  First, Householder's conduct resulted in the enactment of a sweeping piece of legislation – H.B. 6 – that would have financially affected virtually all Ohioans.[6]  H.B. 6 created a mechanism through which FirstEnergy Solutions could receive a subsidy worth more than a billion dollars – borne on the backs of Ohio ratepayers.  In addition, the legislation created a "decoupling" mechanism through which FirstEnergy's Ohio utilities were guaranteed a fixed revenue stream, providing approximately $20 to $50 million a year, and making the company partially recession-proof.  Doc. 194, PageID 4783-84; Doc. 217, PageID 7712; Doc. 229, PageID 8752-54.  Again, a cost borne by ratepayers.  But for the discovery of Householder's corrupt arrangement, his actions would have financially impacted Ohioans.

Second, Householder's concealment of his activities damaged foundational principles of democracy – transparency and accountability.  While Householder publicly touted the need for and the benefits of H.B. 6, he never disclosed his corrupt arrangement with FirstEnergy and its affiliates or the fact that his 501(c)(4) had received millions of dollars while H.B. 6 was pending

---

[6] According to recent data from the U.S. Census Bureau, Ohio has more than 11.7 million people and 4.7 million households. *See* https://www.census.gov/quickfacts/fact/table/OH/PST045222.

before the Ohio House. Householder's concealment of the FirstEnergy payments prevented the public from scrutinizing Householder's actions and H.B. 6. As Judge Edmunds noted in sentencing former Detroit mayor Kwame Kilpatrick, this lack of transparency is dangerous to the underpinnings of democracy:

> In a democracy, the principle of accountability holds that government officials, whether elected or appointed by those who have been elected, are responsible to the citizenry for their decisions and actions. Transparency requires that the decisions and actions of those in government are open to public scrutiny and that the public has a right to access such information. Both concepts are central to the very idea of democratic governance. Without accountability and transparency, democracy is impossible. In their absence, elections and the notion of the will of the people have no meaning, and the government has the potential to become arbitrary and self-serving.

*United States v. Kilpatrick*, 2:10-CR-20403, Doc. 492, PageID 16230 (E.D. Mich.) (sentencing transcript). Other courts have similarly described the damage to public trust and democratic governance inflicted by public corruption cases:

> Government corruption breeds cynicism and mistrust of elected officials. It causes the public to disengage from the democratic process because . . . the public begins to think of politics as 'only for the insiders.' Thus corruption has the potential to shred the delicate fabricate of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government through legitimate channels.

*United States v. Ganim*, 2006 WL 1210984, at *5 (D. Conn. May 5, 2006) (order denying resentencing of former mayor of Bridgeport).

> [The Defendant] entered into extensive, long-lasting, substantial bribery schemes that, frankly, were like daggers at the heart of honest government. It's really difficult to overstate the evils that are wrought when a government official comes to bribery, let alone one of [the Defendant's] power and province. We have only to look at other countries to see that once corruption takes hold, democracy itself becomes a charade, justice becomes a mere slogan camouflaging a cesspool of self-interest. When a legislator accepts bribes, he not only betrays his constituents' trust, he strikes a blow against every principle on which a democracy is founded."

10

*United States v. Kruger*, No. 1:11-CR-300, Doc.264-2, p. 46-47 (S.D.N.Y. 2012), (sentencing transcript related to state senator).

Here, Householder's use of secret 501(c)(4) entities to receive millions of dollars from FirstEnergy to secure his own power, while promising—and then passing—a billion-dollar taxpayer funded bailout for FirstEnergy in return, is precisely the type of corruption that citizens fear, but feel powerless to stop.  Like the above courts recognized, in circumstances like this, deep-pocketed insiders profit over the public, transparent government is a farce, and democracy becomes a charade camouflaging the "cesspool of self-interest."  *Kruger*, No. 1:11-CR-300, Doc.264-2, p. 46-47.

Yet, the damage to democracy was not limited to the corrupt passage of H.B. 6. Householder's conduct during the ballot initiative eroded a core value of the Ohio Constitution – that is, the veto power of the citizens of Ohio.  Article 2, Section 1 of the Ohio Constitution enables Ohio citizens to place an issue directly before voters on a statewide ballot.  The origins of the provision are ironic – it was added to the Ohio Constitution in response to systemic corruption. Specifically, the amendment occurred after the 1912 Ohio Constitutional Convention as a mechanism to "break industry's stronghold on the state political machine and expand individual liberty."[7]  Former President Theodore Roosevelt spoke at the 1912 Convention and addressed the need for citizen-led initiatives, stressing that, "a prime duty of the people [is] to free our government from the control of money in politics," and stated, initiatives and referendums should be used "to correct" the legislature whenever "it becomes misrepresentative."[8]  As Roosevelt

---

[7] Grayson Keith Sieg, A Citizen's Guide to Redistricting Reform Through Referendum, 63 Clev. St. L. Rev. 901, 921 (2015).

[8] https://ehistory.osu.edu/exhibitions/1912/1912documents/CharterofDemocracy, A Charter of Democracy.

explained: "if the representatives fail truly to represent the people on some matter of sufficient importance to rouse popular interest, then the people shall have in their hands the facilities to make good the failure."[9]

From August to October 2019, the enterprise's corrupt scheme aimed to prevent Ohio citizens from exercising this important Constitutional right. Enterprise members knew that if the ballot campaign collected enough signatures, Ohioans would reject the unpopular nuclear bailout. *See* Gov. Ex. 620C (Borges to Fehrman: "I mean, obviously from, from the FirstEnergy Solution's side, you know, their whole thing was if it makes the ballot we're dead. So their whole . . . campaign was not, not to win, you know state issue one next year. It was to keep state issue one from ever happening at all.") This is the reason FirstEnergy and its affiliates coordinated over $38 million dollars to Householder through Generation Now during the referendum period—to ensure Ohioans never got the chance to overturn H.B. 6.

Householder—an elected public official who swore an oath to support the Ohio Constitution—was eager to continue his corrupt relationship with FirstEnergy and prevent Ohioans from exercising their Constitutional right. In response to news of the ballot initiative, Householder texted to Longstreth: "Stay on the good side of FES and we'll do the defend." Gov. Ex. 502E. That is exactly what he did. From August to October 2019, FirstEnergy and its affiliates paid Householder to defeat the ballot campaign by any means necessary. The criminal enterprise launched a misleading advertising campaign and a fake petition. The opposition's petition workers were harassed and bought off. And, Householder hatched a plan to introduce additional legislation making H.B. 6 "referendum proof" by declaring the subsidy a "tax." Doc. 211, PageID 6844–50; Doc. 213, PageID 7072; Gov Ex. 601C (7/24/2019 Kiani text message to Dowling: "We are taking

---

[9] *Id.*

Householder's lead on fighting the referendum."); Gov. Ex. 601D (7/26/2019 Dowling text message to Kiani: "I had a good conversation with Speaker H today re: the referendum issue.  I think you're in excellent hands.  I know more about his personal involvement and engagement.  We should all be following his lead."); Gov. Ex. 635A (draft legislation); Gov. Ex. 634B (Jones text message to Dowling: "Just spoke to the big guy.  He's got the 'tax' bill ready to go").

The jury's verdict confirms that H.B. 6 was corrupt legislation—the result of "money in politics" causing legislation "misrepresentative" of the people's will.[10]  But, by violating his duty to Ohio citizens, Householder not only corrupted the passage of H.B. 6, but he corrupted the Constitutional process through which Ohio citizens could have "made good" the legislative failure.  The Court's sentence should appropriately account for this conduct.

Indeed, appellate courts have affirmed sentences and found that district courts properly considered the effects on democratic governance in determining an appropriate sentence in corruption cases.  *See United States v. Fattah*, 813 F. App'x 808, 813–14 (3d Cir. 2020) (district court properly supported sentence in finding defendant's "flagrant conduct undermines the confidence of the citizenry in the integrity of all public institutions and public officials.  This cynicism saps the strength of [ ] our democracy"); *Sorenson,* 705 F. App'x at 483 (affirming district court consideration of "los[t] confidence in the integrity of its system of government" when an official "abuses his position by using it to facilitate the offense"); *Morgan*, 635 F. App'x at 448–52 (noting the proper consideration at sentencing for bribery offenses of the "harm to the reputation of honest public servants and the public faith in legitimate state government"); *United States v. White*, 663 F.3d 1207, 1217–18 (11th Cir. 2011) (affirming district court's application of § 3553(a) factors where district court explained, "when someone's elected to a position of trust as an elected

---

[10] https://ehistory.osu.edu/exhibitions/1912/1912documents/CharterofDemocracy, A Charter of Democracy.

13

official, . . . they just don't have a right to have a bag that they can carry around stuff they get from people that are involved with them in this process"); *United States v. Anderson*, 517 F.3d 953, 966–67 (7th Cir. 2008) (affirming sentence where the district court "stressed the corrosive effect that corruption has on the public trust and expressed his belief that the scandals will not end unless they are treated 'appropriately hard'"). This Court should do the same.

### Need to Deter Criminal Conduct, Promote Respect for the Law, and Protect the Public

Along with seriousness of the offense, deterrence may be the most important factor in sentencing defendants in a public corruption case. As the above makes clear, corruption crimes are serious offenses that threaten the core values of our country. For this reason, courts have found general deterrence to be a particularly important factor in sentencing corruption cases. *See United States v. Watkins*, 691 F.3d 841, 853 (6th Cir. 2012); *United States v. Anderson*, 517 F.3d 953, 966–67 (7th Cir. 2008); *Sorenson,* 705 F. App'x at 483. "[T]he need for a general deterrence is a priority, and a significant sentence would likely deter those in high places . . . from abusing the public trust." *Fattah*, 813 F. App'x at 813–14 (internal quotation marks and brackets omitted); *Morgan*, 635 F. App'x at 450 ("Deterrence is a crucial factor in sentencing decisions for economic and public corruption crimes") (citing Senate Report). "'[O]ne of the primary objectives' of sentencing elected officials convicted of bribery is 'to send a message to other public officials that bribery is a serious crime that carries with it a correspondingly serious punishment.'" *Morgan*, 635 F. App'x at 450–51 (quoting *United States v. Kuhlman,* 711 F.3d 1321, 1328 (11th Cir. 2013)); *Sorenson*, 233 F. Supp. 3d at 699 ("It must be made plain to the public at large that behavior such as that exhibited by Defendant is categorically unacceptable and will not be tolerated by a self-respecting and functional democratic government.").

14

Aside from general deterrence, the evidence before the Court also shows a need for local deterrence in Ohio. Here, the scope of Householder's corrupt scheme—in terms of the millions of dollars received by the enterprise, and the significance of the nuclear-bailout legislation passed in return—is breathtaking. Also troubling, however, was evidence suggesting those in power knew about Householder's and FirstEnergy's corruption and did nothing while it was happening, leaving Bob and Betty Buckeye in the dark. *See* Doc. 211, PageID 6828 (Cespedes testimony that Householder's relationship with Generation Now "was pretty widely known by this time"); Gov. Ex. 451C (Borges text message to Cespedes describing Borges' recount of a public official's position relating to the referendum because of FirstEnergy's "support" and Borges' involvement); Gov. Ex. 525B, p. 6 (Clark stating in recording to undercovers that a public official received $3,000,000 from FirstEnergy "on HB6" for "his soft dollar (c)(4))".)

Further, the trial evidence made clear that a politician may not use or exert influence over a 501(c)(4) for his "private benefit." Doc. 194, PageID 4729–30, 4744. Here, the enterprise used a 501(c)(4) to fund Householder's political rise, as recommended by FirstEnergy (Doc. 217, PageID 7636), *because* it was the ideal mechanism for receiving unlimited and unreported payments—in other words, a 501(c)(4) is the perfect vehicle for bribery. Gov. Ex. 522B (recording, Clark to undercovers: "It's secret, a (c)4 is secret, nobody knows. The money goes to the Speaker's account. It is uh, controlled by his people, I'm one of his people."); Gov. Ex. 271A (recording, Clark to Householder: "they could give as much or more to the (c)4 and nobody would ever know"). This is important because the trial evidence referenced multiple other public officials in Ohio who were coordinating with and using 501(c)(4) entities to receive financial payments. *See, e.g.,* Gov. Ex. 521A (Clark advising undercovers to pay money to (c)(4)s of three Ohio public officials (including Householder) to advance legislation); Doc. 229, PageID 8738 (Householder

15

testimony that tracking donations is important "because you need to know who's out there as far as 501(c)(4)s. There's so many of them."); Doc. 228, PageID 8602 (Householder testimony about a previous speaker's 501(c)(4)).

And yet, despite the jury's verdict in this case, 501(c)(4)s remain a tool for Ohio politicians to receive unlimited payments – which are hidden from the public's view – and potential vehicles for bribery.[11] The Court should thus consider the need for general deterrence, here, given the widespread risk of politicians misusing 501(c)(4)s for their personal benefit. This risk appears particularly prevalent in Ohio. *See Watkins*, 691 F.3d at 853 ("Regarding general deterrence, the court additionally explained that the widespread corruption problem facing the county and surrounding areas called for a harsher sentence."); *Anderson*, 517 F.3d 953, 966 (affirming district court's reference "to a number of recent public corruption scandals" as an appropriate sentencing consideration given the need for general deterrence); *United States v. Krause,* No. 1:10CR235, 2011 WL 2637184, at *4 (N.D. Ohio July 6, 2011), *aff'd*, 513 F. App'x 482 (6th Cir. 2013) (sentence appropriate "given the rampant corruption scandal that still plagues Cuyahoga County").

In addition to those arguments of general applicability, the punishment must promote *the defendant's* respect for the rule of law. At no point in the investigation or trial did the defendant express remorse for his actions, and to the government's knowledge he has not expressed remorse at any time. In fact, through his sworn testimony, Householder showed his disrespect for the rule of law. *See Watkins*, 691 F.3d at 853 (affirming sentence where district judge found the "ease with which [the defendant] accepted the bribe and then lied about it under oath" was relevant to both specific and general deterrence).

---

[11]     *See*     https://www.thecentersquare.com/ohio/article_c8c2caba-dec6-11ed-ae90-2324428aff5c.html (noting proposed anti-corruption legislation was reintroduced in Ohio but that it failed to move in prior General Assembly).

**Need to Avoid Unwarranted Sentencing Disparities**

Aside from deterrence, the Court also must consider the need to provide consistent sentences for similarly situated defendants.  This is not an easy task because the type of criminal conduct in this case was unprecedented.  While it may be tempting to compare corruption cases where the defendant occupied a similar position of trust, such cases may not fully encompass the breadth and scope of the RICO conspiracy here.  The sentences imposed in public corruption RICO cases, which were similar in terms of longevity and/or scope, represent a more apt comparison.  As described below, federal courts have sentenced public officials in such cases to *substantial* terms of imprisonment to account for the seriousness of the offense and the need for deterrence.  Accordingly, while the Court must sentence Defendant Householder based on the conduct specific to this case and his individual circumstances, in order to fully account for the seriousness of the defendant's offenses, the acute need to deter others, as well as to avoid "unwarranted sentence disparities" with similarly situated defendants, 18 U.S.C. § 3553(a)(6), a more detailed review of the sentences in several RICO public corruption prosecutions is warranted.  What follows is a table summarizing several different cases and a more in-depth analysis of each case.

Defendants Convicted of Similar Conduct

| Defendant | Position | Offense(s) | Case Type | Role Adjust.[12] | U.S.S.S. Range[13] | RICO Conspiracy Sentence | Overall Sentence |
|---|---|---|---|---|---|---|---|
| Blagojevich, Rod 1:08-CR-888 (N.D. Ill.) | Governor | RICO conspiracy + others | Trial | + 4 | 151-188 months | N/A[14] | 168 months (14 years); same at resentencing[15] |
| Ciavarella, Mark 3:09-CR-272 (M.D. Pa.) | President Judge - Luzerne County | RICO conspiracy + others | Trial | unknown | Life imprison. | 240 months | 336 months (28 years) |
| Dimora, James 1:10-cr-387 (N.D. Ohio) | Commissioner of Cuyahoga County | RICO conspiracy + others | Trial | + 4 | 292-365 (2012) 235-293 (2022) | 240 months 240 months | 336 months (28 years) - 2012 276 months (23 years) - 2022 resentencing |
| Kilpatrick, Kwame 2:10-CR-20403 (E.D. Mich.) | Mayor of Detroit | RICO conspiracy + others | Trial | + 4 | life imprison. | 240 months | 336 months (28 years) |
| Hills, Edward 1:16-CR-329 (N.D. Ohio) | COO of public hospital in Cuyahoga County | RICO conspiracy + others | Trial | + 4 | 188 to 235 months | 188 months | 188 months (15.7 years) |

[12] The courts' discussions of role adjustment in these cases are found in the following places: *Blagojevich*, 794 F.3d 729, 743 (7th Cir. 2015); *Dimora*, Doc. 1000, PageID 20522-24 (sentencing transcript) and Doc. 1237, PageID 33508 (resentencing transcript); *Kilpatrick,* Doc. 492, PageID 16173 (sentencing transcript); *Hills*, 27 F.4th 1155, 1199 (6th Cir. 2022) (affirming conviction and sentence).

[13] The courts' discussions of the final guideline range are found in the following places: *Blagojevich*, 854 F.3d 918, 920 (7th Cir. 2017); *Civarella*, 716 F.3d 705, 735 (3d Cir. 2013); *Dimora*, Doc. 1237, PageID 33512 (resentencing transcript); *Kilpatrick,* Doc. 492, PageID 16220-21 (sentencing transcript); *Hills*, Doc. 541, PageID 24162, 24239 (sentencing transcript – it appears initial range was 40, which would be 292-365 months, and court later varied to a level 36).

[14] After the second trial, when the court imposed a sentence on multiple counts, including conspiracy counts, the United States dismissed the RICO counts.

[15] Blagojevich's sentence was commuted in 2020 by then-President Trump.  Blagojevich appeared on "The Celebrity Apprentice" in 2010 in between his two jury trials.

*United States v. Blagojevich*, No. 1:08-CR-888 (N.D. Ill.)

A jury convicted Rod Blagojevich, the governor of Illinois, of numerous offenses, including conspiracy, bribery, and extortion that he was charged with committing while in office. *United States v. Blagojevich*, 854 F.3d 918 (7th Cir. 2017).  The district court imposed a sentence of 168 months – twice – concluding that "the sentence [wa]s justified by the gravity of Blagojevich's offenses and the need to deter other public officials from acting as Blagojevich did. *Id.* at 920.[16]  The Seventh Circuit affirmed the district court's resentencing.  *Id.* at 920-21.  In imposing the same 168-month sentence, the district court explained that "the fabric of Illinois is torn and disfigured and not easily or quickly repaired."  No. 1:08-CR-888, Doc. 1255, PageID 28262.  Regarding the seriousness of the offense, the court rejected Blagojevich's claim that he was less culpable than other politicians, noting "I don't draw such a clear[] moral distinction between the abuse of office for personal gain and the abuse of office for political purposes, like campaign raising.  The defendant remains convicted of activities that were plainly beneficial to him both politically and personally."  *Id.* at PageID 28263.  Reflecting on the importance of deterrence in a case that has a "grave impact" on the people of Illinois "who already tax faith in their government," the court stated: "One role of the trial court is to impose a sentence that we hope deters would-be law breakers from engaging in illegal activity, and in a case such as this one with high stakes, that affect the entire State, deterrence can justify a significant sentence."  *Id.* at PageID 28267.

---

[16] The Seventh Circuit vacated several counts on appeal and remanded the case for retrial or resentencing. The district trial resentenced Blagojevich on all but the vacated charges and imposed the same sentence. *United States v. Blagojevich*, 854 F.3d 918 (7th Cir. 2017).

*United States v. Ciavarella*, No. 3:09-CR-272 (M.D. Pa.)

A jury convicted Pennsylvania judge Mark Ciavarella of RICO and other offenses related to the "kids for cash" scandal, whereby the judge and another received more than $2 million from a builder and attorney in exchange for helping to construct a juvenile detention center and placing juvenile offenders at the center. *United States v. Ciavarella*, 716 F.3d 705, 713 (3d Cir. 2013). The trial judge sentenced Ciavarella to 336 months. *Id.* at 717. Ciavarella's conspirator, Mike Conahan, who pled guilty before trial but did not cooperate with the United States, received a 210-month sentence. No. 3:09-CR-272, Doc. 293, PageID 19. During Conahan's sentencing, the trial court stated, "one of the greatest dangers of public office . . . [is] [w]e conclude that different standards seem to apply to us than the average person on the street." No. 3:09-CR-272, Doc. 293, p. 16. The court went on to explain that "a lot of people had suffered" and "that all of the Defendants associated with the mess that existed in Luzerne County were part of a cabal." *Id.* at 17. In affirming Ciaveralla's sentence on appeal, the Third Circuit note that the 336 months, which was below the guidelines' recommendation of life imprisonment, was "substantively reasonable." *Ciavarella*, 716 F.3d at 736.[17]

*United States v. Dimora*, No. 1:10-CR-387 (N.D. Ohio)

James Dimora, an elected Cuyahoga County Commissioner, operated a large-scale and far-reaching corruption scheme. "Dimora's tenure as commissioner was rife with *quid pro quo* arrangements . . . . [h]e handed out public jobs, influenced Cleveland decision-makers and steered

---

[17] In 2018, the district court vacated three of Ciavaralla's convictions, including his RICO conspiracy conviction, due to a potential statute of limitations issue. 2018 WL 317974 (M.D. Pa. 2018). However, the district court declined to resentence Ciavaralla, explaining "[o]ur subsequent legal determination that Counts 1, 2, and 21 *may* have been time barred has no impact on what the jury, the sentencing judge, and the court of appeals have all said about the sufficiency of the evidence supporting Ciavarella's racketeering and conspiracy convictions" . . . . "[t]o be abundantly clear, [even] if we were authorized to reduce Ciavarella's sentence, we would decline to do so." No. 3:09-CR-272, Doc. 403, p. 21-23 (emphasis in original).

public contracts in exchange for approximately 100 bribes worth more than $250,000." *United States v. Dimora*, 750 F.3d 619, 623 (6th 2014). A jury convicted Dimora of RICO conspiracy and other offenses, such as bribery and extortion, and the district court sentenced Dimora to 336 months imprisonment. *Id.* at 624 (affirming conviction and sentence). After the Supreme Court's ruling in *McDonnell* and ensuing litigation, the district court resentenced Dimora in 2022, after vacating two, non-RICO counts. The district court again imposed a guideline sentence, this time of 276 months imprisonment.[18] No. 1:10-CR-387, Doc. 1237, PageID 35566. In resentencing Dimora, the district court described the "breadth and depth" of the corruption as "staggering," noting that "the destruction their corruption left in its wake is not fully calculable. It's the type that certainly results in harm and a profound loss in public confidence in the system of government." No. 1:10-CR-387, Doc. 1237, PageID 33563. In imposing a guideline sentence, the court explained that "any less of a sentence would diminish the seriousness of Mr. Dimora's conduct" and "further erode the public's faith in our system of government." *Id.* at PageID 33564-65.

### *United States v. Hills*, No. 1:16-CR-329 (N.D. Ohio)

Dr. Hill was the "long-serving Chair of the Dental Department and COO of a county-owned hospital" in Cuyahoga County, Ohio. *United States v. Hills*, 27 F.4th 155, 1175 (6th Cir. 2022). A jury convicted Dr. Hill of a RICO conspiracy involving seven different bribery, kickback, and obstruction schemes, and the district court found Dr. Hill was responsible for $550,000 to $1.5 million of loss. *Id.* at 1170, 1194-95. The district court sentenced Dr. Hill to 188 months, the equivalent of a multi-level variance. *Id.* at 1200. In imposing the 188-month sentence, the district court described the reach of the corruption as "extensive and complete," and described how Dr.

---

[18] In resentencing Dimora, the Court noted that Dimora had benefited from a change in the U.S.S.G. 2B1.1 loss table, which decreased his applicable guidelines. *Id.* at 33564.

Hill had "developed a culture at Metrohealth where his rule was absolute." No. 1:16-CR-329, Doc. 541, PageID 24232-33. The court noted that based on his leadership position, "Dr. Hills was in a unique position to control, direct, and influence the functions of MetroHealth Hospital and did so by some accounts through fear and intimidation." *Id.* The Sixth Circuit affirmed the sentence. *Id.* at 1200 ("When, as here, a defendant argues that his below-Guidelines sentence is substantively unreasonable, a presumption of reasonableness applies and the 'task of persuading us that the more lenient sentence is unreasonably long is even more demanding.'").

*United States v. Kilpatrick*, No. 2:10-CR-20403 (E.D. Mich.)

"Mr. Kilpatrick was convicted of running a criminal enterprise using the office of the Mayor of the City of Detroit." No. 2:10-CR-20403, Doc. 492, PageID 16223. The corruption spanned the six years he served as mayor and began during his time in the state legislature and involved bribery, fraud, and extortion, among other things. *Id.* at PageID. 16233-26.[19] In describing the seriousness of the offense, the trial court stated:

> It is difficult to quantify the total cost of the devastating corruption instigated by Kilpatrick and others who acted with him . . . . But one thing is certain. It was the citizens of Detroit who suffered when they handed over their hard-earned tax dollars to the city but failed to receive the best services at the best price in return . . . . Moreover, Mr. Kilpatrick's abuse of the public trust was a corrosive factor in itself, eroding confidence in city government and breeding cynicism and apathy among those who might otherwise be advocates for city growth.

*Id.* at PageID 16228-29. With respect to deterrence, the trial court reasoned that, "[s]entences for public corruption cases have been increasing over the last few years with the hope that significant

---

[19] "Although he expressed contrition here in his allocution this morning, he has generally shown little remorse with respect to any of the activity for which he was indicted, tried and found guilty, maintaining for the most part that this entire course of events is nothing more than a media witch hunt." *Id.* at PageID. 16227.

sentences will deter similar conduct in elected officials . …. At the very least, a significant sentence in this case will send the message that this type of conduct will not be tolerated. Hopefully, this will begin to foster a more positive attitude about the transparency and accountability of city government so that more good people will be inclined to participate." *Id.* at PageID 16229.  After noting that public corruption sentences have spanned approximately 14 to 28 years, the Court imposed a sentence of 28 years, and explained, "we're demanding transparency and accountability in our government; that we expect it; that if there has been corruption in the past, there will be corruption no more.  That way of business is over. We're done. We're moving forward." *Id.* at PageID 16231-33.

The above cases make clear that a sentence of 16 to 20 years imprisonment is consistent with the types of sentences imposed in similar cases, where public officials led far-reaching and/or long-term corruption conspiracies and had similar guideline ranges.  While these cases differed in terms of the type of public office held, the defendants were responsible for a similar degree of damage to democracy.  In other words, while some defendants led smaller corruption schemes at the local level, their schemes either lasted longer than Householder's (such as the corruption scheme in *Kilpatrick*) or involved an arguably worse harm (kids for cash scheme in *Ciavarella*), which balances out to some equivalency in the form of harm to the public.  Moreover, like the defendants in these cases, Householder used his position to control a government agency or function to further a criminal enterprise engaged in a pattern of racketeering.  In imposing sentences, all these courts found the seriousness of the offense or the need to promote deterrence, or both, warranted substantial sentences of imprisonment.

### RECOMMENDATION

The United States submits that 16 to 20 years imprisonment is an appropriate sentence

under the section 3553(a) factors.  Should the Court find that the sentence imposed is appropriate regardless of its resolution of certain guidelines disputes, the United States requests that the Court make specific findings to support its conclusion.[20]

        Respectfully submitted,

        KENNETH L. PARKER
        United States Attorney

        *s/Emily N. Glatfelter*
        EMILY N. GLATFELTER (0075576)
        MATTHEW C. SINGER (IL 6297632)
        MEGAN GAFFNEY PAINTER
        (NY 4849220)
        Assistant United States Attorneys
        221 East Fourth Street, Suite 400
        Cincinnati, Ohio 45202
        (513) 684-3711

---

[20] The government recognizes that the parties disagree substantially over the guideline calculation, particularly the applicable loss amount.  *See United States v. Morrison*, 852 F.3d 488, 491 (6th Cir. 2017) (recognizing that resentencing due to guidelines error is unnecessary "[i]f the record shows that the district court would have imposed its sentence regardless of the Guidelines range").

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Sentencing Memorandum was filed electronically this 22th of June, 2023, and served upon all counsel of record via the Court's CM/ECF system.

_s/Emily N. Glatfelter_
EMILY N. GLATFELTER
Assistant United States Attorney
