

**U.S. Department of Justice**

*United States Attorney*
*Southern District of Ohio*

*221 East Fourth Street*  *Telephone: 513-684-3711*
*Suite 400*  *Fax: 513-684-6385*
*Cincinnati, Ohio 45202*

June 5, 2023

<u>Via E-mail</u>
Charles A. Steed
United States Probation Officer
110 Potter Stewart U.S. Courthouse
100 East Fifth Street
Cincinnati, OH 45202
Charlie_steed@ohsp.uscourts.gov

      Re: <u>United States v. Larry Householder</u>
          Criminal No. 1:20-CR-77 (1)

Dear Mr. Steed,

    Defendant Householder submitted various objections for your consideration. For ease of reference, we have included those objections in the table below, along with our response.

|   | **Defendant's Objection** | **United States' Response** |
|---|---|---|
| 1 | Mr. Householder objects to paragraph 12 of the PSR, which states, among other things, that FirstEnergy Solutions "provided" various "legal, financial, and other corporate services" to FirstEnergy Corp. That is inaccurate. The entity that provided those services was FirstEnergy Service Co.—not FirstEnergy Solutions. The references to FirstEnergy Solutions in this paragraph should thus be struck and replaced with FirstEnergy Service Co. | **The United States identified this mistake in its letter dated May 25, 2023 and proposes that the PSR include the suggested edits outlined in the letter.** |
| 2 | Mr. Householder objects to paragraph 15 of the PSR. That paragraph states that Jeff Longstreth "also paid Householder's personal expenses in the same manner," meaning (we assume) by using funds from Generation Now. | **Paragraph 15 is correct.** Mr. Householder's objection is a literal one. The money Mr. Longstreth used to pay Householder's personal expenses was not paid *directly* from the Generation Now bank accounts. Rather, the money was first *laundered* through other accounts used by |

1

| | **Defendant's Objection** | **United States' Response** |
|---|---|---|
| | The evidence at trial showed that Longstreth and Mr. Householder agreed and understood that Longstreth's payments of various expenses on Mr. Householder's behalf were part of loan and business agreements the two had made. *See, e.g.*, Tr. 2578 (Longstreth). That evidence was undisputed. What was also undisputed is that Longstreth advanced these expenses using his personal financial accounts—not using monies directly from Generation Now. | the enterprise – specifically the business accounts of Mr. Longstreth, such as JPL & Associates x9192.[1]<br><br>Mr. Longstreth testified that a) he managed the bank accounts related to the Speakership goal (goal of conspiracy),[2] b) that his business accounts were used to further that goal,[3] c) that the money in his accounts came from Generation Now,[4] and d) money that did not come directly or indirectly from Generation Now was related to the fact that Householder was his client.[5] Mr. Longstreth used the money in these accounts to pay for various personal expenses for Householder at Householder's request.[6] While Longstreth initially thought he was loaning the money to Householder, Householder never signed loan documents and never paid him.[7] Regardless of whether the monies paid for Householder's personal expenses were loans, however, the salient point is that they were paid for Householder's benefit with FirstEnergy to Generation Now money that was transferred to Longstreth's accounts. Indeed, this is precisely what Householder meant when he asked Longstreth if he was whole.[8] |
| 3 | Mr. Householder objects to paragraph 18 of the PSR. He was not—as the PSR indicates—Longstreth's only client. *See, e.g.*, Tr. 2777-78 (Longstreth acknowledging that Team Householder—around 20 candidates—were also his clients). | **The United States identified this mistake in its letter dated May 25, 2023 and proposes that the PSR include the suggested edits outlined in the letter.** |
| 4 | Mr. Householder objects to paragraph 36 of the PSR. The evidence did not show that FirstEnergy Corp. "paid $59,996,835.86 in return for specific official action." This is wrong for at least two different reasons. | **Paragraph 36, which is a summary paragraph, is correct.** The United States encourages the probation officer to edit Paragraph 36 consistent with its May 25, 2023 letter.<br><br>Householder's first objection is, again, a literal one. The approximate $60 million paid by FirstEnergy Corp. and its |

---

[1] *See* Gov. Ex. 812 (house payments made from x9192) and 806 (credit card payments made from x9192).
[2] Doc. 217, PageID 7592-93.
[3] Doc. 217, PageID 7592-93.
[4] The evidence at trial showed that roughly 86% of the money in Longstreth's business accounts -- or roughly $15.3 million out of $17million -- came either directly or indirectly (via Ohioans for Energy Security, which was funded by Generation Now) from Generation Now. *See* Gov. Ex. 34, p. 3. The remaining $2.6 million came from numerous sources, which each compromised 2% or less of the total $17 million. *Id.*, p. 1.
[5] *E.g.* Doc. 217, PageID 7603; Doc 219, PageID 7903-907.
[6] Doc. 217, PageID 7698-7600, 7615.
[7] Doc. 217, PageID 7613-14, 7617-18.
[8] Doc. 217, PageID 7614. On the single occasion when he paid for the legal settlement out of multiple accounts in July 2018, Generation Now money was used to replenish the x9192 account. *See* Gov. Ex. 818 (payments related to lawsuit) and Gov. Ex. 18, p. 2 (showing $230,000 in Generation Now transfers to JPL between July and August 2018).

| | **Defendant's Objection** | **United States' Response** |
|---|---|---|
| | *First*, FirstEnergy Corp. did not contribute $60 million to Generation Now. Instead, as the evidence at trial showed, it directly contributed only $1 million—the first four $250,000 wires in 2017. Partners for Progress, which was admittedly funded entirely by FirstEnergy Corp., contributed $15,904,330.86. FirstEnergy Solutions funded the remaining $43,092,505 that was contributed to Generation Now. (Attached, as Ex. A, is a summary of these contributions; Ex. B is a document FirstEnergy Corp. produced to the government that itemizes the contributions attributed to FirstEnergy Solutions).[1] It is improper to conflate FirstEnergy Corp. and FirstEnergy Solutions.

*Second*, and as discussed more below, the evidence did not show that all these contributions were "in return for specific official action."

Mr. Householder also objects to the statement that "Longstreth also paid for Householder's personal expense from Generation Now, Inc." for the reasons stated above. | affiliates[9] was paid both directly to Generation Now and indirectly through its own 501(c)(4), Partners for Progress. Regardless of the specific path traveled – the money began at FirstEnergy and its affiliates and was paid into Generation Now.

Householder's second objection is meritless and is an attempt to relitigate the jury's verdict. Householder's objection to the statement that "Longstreth also paid for Householder's personal expense from Generation Now, Inc." should be rejected as explained in the response to Defendant's Objection 2. |
| 5 | Mr. Householder objects to paragraph 51 of the PSR. Under § 2C1.1(b)(1), the offense level is increased based on the value of the payment. While we recognize that FirstEnergy Corp. and FirstEnergy Solutions contributed around $60 million to Generation Now, we do not think it is appropriate for that entire amount to constitute the value of the bribe payments and to result in a 22-level increase under the Guidelines. Instead, it is more appropriate to analyze—on a contribution-by-contribution level—whether a specific contribution was made in return for specific official action. *See, e.g.,* | **Defendant Householder's objection to paragraph is meritless and an attempt to litigate the jury's verdict in the context of the PSR.** Defendant Householder says "the key point is whether Mr. Householder understood that these $60 million of contributions were made in return for specific official action. . . .The government must establish that these contributions were bribes and that Householder understood as much. On this fulcrum point, the government's evidence fell short."

Householder's objection is nothing more than an attempt to relitigate the jury's verdict that Householder knowingly and voluntarily joined a RICO conspiracy involving bribery and money laundering predicates. With respect to the bribe payments, the trial evidence showed that Generation Now was a 501(c)(4) created for |

---

[9]FESC and FES were both wholly owned subsidiaries of FirstEnergy Corp. at the time of the conduct in this case. Indeed, FES only became Energy Harbor in 2020. The trial evidence also showed that factually the distinction was meaningless as the entities coordinated their payments to Householder. For example, after receiving a hand-delivered check for $400,000 from FES representatives in October 2018, Householder contacted FirstEnergy CEO Jones to thank him. Gov. Ex. 290B.

| | **Defendant's Objection** | **United States' Response** |
|---|---|---|
| | U.S.S.G. § 2C1.1 cmt. n.2 ("[T]he applicable amounts under subsection (b)(2) … are determined separately for each incident and then added together."); *see also United States v. Ring*, 811 F. Supp. 2d 359, 378 (D.D.C. 2011) ("Bribery requires the corrupt intent to exchange things of value for official acts, while an illegal gratuity need only be given 'for or because of' an official act. The Guidelines reflect this distinction not only with different base offense levels for bribery (10) and illegal gratuities (7), but also by allowing for an enhancement based on 'benefit received or to be received' under § 2C1.1 (bribery), but not under § 2C1.2 (illegal gratuities)").<br><br>The key point is whether Mr. Householder understood these $60 million of contributions were made in return for specific official action. This conclusion follows from the Guidelines' definition of relevant conduct: the scope of a defendant's jointly undertaken activity "is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." U.S.S.G. § 1B1.3, cmt. n.3(B). The government must establish that these contributions were bribes and that Mr. Householder understood as much. On this fulcrum point, the government's evidence fell short.<br><br>Alternatively, the evidence at trial established, at best, that only a $400,000 October 2018 contribution made by FirstEnergy Solution and hand delivered by Juan Cespedes and others to Mr. | Householder's benefit and functioned as a repository of the bribe money from FirstEnergy. Householder was involved in the creation of Generation Now[10], discussed the name of entity with Longstreth,[11] and, as discussed in detail below, directly solicited money from the FirstEnergy CEO Chuck Jones during the course of the scheme, in exchange for specific official action.<br><br>Yet, even if one examined the FirstEnergy payments at a micro level, the evidence at trial demonstrated that Householder knew and even solicited, himself, the payments in exchange for specific official action. For example, in 2017, FirstEnergy promised to give Householder $1 million by year's end, and this was communicated directly to Householder by FirstEnergy CEO Jones.[12] In fact, Longstreth learned about the $1 million from Householder.[13] This followed shortly after the D.C. trip, where Householder flew on the FirstEnergy jet and dined with FirstEnergy executives who explained the legislative solution they sought while agreeing to financially support Householder.[14] The commitment and agreement was confirmed again at the Greenbrier in August 2017, where Jones told Longstreth that they had "to get Larry over the line because I know he won't anything bad happen to us."[15]<br><br>The following year, 2018, was a continuation of the previous one – whenever the Generation Now bank account balance was low, Householder solicited more money from FirstEnergy. FirstEnergy then funded the account for Householder's speakership run, who would then pass a legislative solution once elected. Consistent with this, in recorded meetings, co-conspirator Neil Clark stated, "We call FirstEnergy the bank," because they could continue to go back to FirstEnergy for more money.[16] Clark also stated that Householder took millions from FirstEnergy and "went to war for them," later characterizing his actions as "pay to play."[17]<br><br>For example, in early August 2018, Generation Now's account balance fell to just $2022.[18] Householder met with Jones around the same time.[19] Prior to the meeting with |

---

[10] Doc. 217, 7643.
[11] Doc. 217, 7643-44.
[12] Doc. 217, PageID 7640.
[13] Doc. 217, PageID 7640.
[14] Doc. 217, PageID 7636-38.
[15] Doc. 217, PageID 7624.
[16] Gov. Ex. 527B, p. 13.
[17] Gov Ex. 525B, p. 6-7.
[18] Gov. Ex. 14C, pages 37-38.
[19] Gov. Ex. 286B.

| | **Defendant's Objection** | **United States' Response** |
|---|---|---|
| | Householder was made in return for specific official action.  For these reasons, we object to paragraph 51 of the PSR and request that you apply no increase or only a 12-level increase. *See* U.S.S.G. § 2B1.1.(b)(1). | Householder, Jones texted FirstEnergy executive Michael Dowling, asking, "Householder looking for more money?"[20] Dowling responded, "You know the answer to the Householder question, but I don't know for how much he'll ask. . . . He'll want hard money first and then C(4) money for sure."[21] Following the meeting, FirstEnergy wired $500,000 to Generation Now through Partners for Progress.[22] Afterwards, Householder texted Jones, "Thank you for your help," to which Jones said, " We are rooting for you and your team."  Householder replied, "I'm rooting for you as well . . . we are on the same team."[23]  Similarly, Householder requested more money from FirstEnergy in October 2018.  Longstreth testified about a particular stark example in October 2018, close to the 2018 general election, when Householder needed more money and traveled to Akron to meet with the FirstEnergy CEO (Chuck Jones) to solicit money. Shortly after the meeting, FirstEnergy sent additional funds for Householder. Text messages between Householder and Jones, and Jones and Dowling corroborate Longstreth's testimony. [24] Specifically, Dowling texted Jones about the $700,000 after Jones met with Householder in October 2018, stating "we believe in Larry and think he can and will be Ohio's next Speaker."[25]  In addition, Cespedes testified about two checks totaling $500,000 that he hand delivered in separate meetings with Householder and Longstreth to advance the legislation.  The payments in 2017 and 2018 gave Householder the financial means to win the Speaker's race, including by paying for infrastructure like staff and rent, and personal benefits. The understanding was that once Householder was elected Speaker, he would pass a legislative solution for FirstEnergy and its affiliates. FirstEnergy and its affiliates continued to make payments to Generation Now in 2019. These payments continued to pay for Householder's infrastructure, political staff, and personal benefits, and for Householder to use to pass and preserve HB 6. As Clark stated in a recorded meeting, the money from FirstEnergy was "unlimited." Regarding the payments made while H.B. 6 was pending before the House in the spring of 2019, Cespedes testified that FirstEnergy Solutions had to pay $15 million into Generation Now "if we expected to . . . have continued |

---

[20]Gov. Ex. 286A.
[21]Gov. Ex. 286A.
[22]Gov. Ex. 14E.
[23]Gov. Ex. 286C.
[24]Gov. Ex. 295A, 295B, 295D.
[25]Gov Ex. 295E.

| | **Defendant's Objection** | **United States' Response** |
|---|---|---|
| | | support, you know, of our legislation." [26] Cespedes explained, "we had no choice" but to pay $15 million through Generation Now, at Householder's direction. [27] While these payments were being made, Clark explained in a recorded meeting: "FirstEnergy got $1.3 billion in subsidies, free payments. . . . So yeah, so what do they care about putting in $20,000,000 a year for this thing."[28]<br><br>In August 2019, FirstEnergy Solutions paid $38,738,581 into Generation Now to defeat the ballot campaign, which included a plan for Householder to introduce alternate legislation, if necessary.[29] The plan also included efforts to convince Attorney General Yost to take official action that would help them defeat the ballot campaign. [30] Cespedes confirmed that they put a lot of effort into getting Yost to interpret HB 6 as a tax because of Yost's history with the FirstEnergy (*i.e.*, his receipt of payments from FirstEnergy) and Yost's relationship with Borges. [31] Borges and Householder worked together in their efforts to convince Yost to take the action they were seeking as part of a "two-prong approach."[32]<br><br>After the ballot campaign, FirstEnergy continued to pay Generation Now following a solicitation by Householder. For example, in February 2020, Householder contacted Jones about Householder's term limits initiative. Following the conversation, Jones referred to Householder as "an expensive friend" [33] and FirstEnergy caused Partners for Progress to wire $2 million to Generation Now. [34] Regarding Householder's solicitation, Dowling remarked "it extends and stabilizes existing leadership – good for the home team." [35] Clark made a similar solicitation of Cespedes for Energy Harbor (formerly FirstEnergy Solutions) to support Householder's term limits initiative. Cespedes testified that Clark was clear that his conversations were about exchanging Energy Harbor's support for official action by Householder relating to additional years of the House Bill 6 subsidy.[36] |

---

[26] Doc. 211, PageID 6811–12.
[27] Doc. 211, PageID 6813–17.
[28] Gov. Ex. 528B, pages 4-5.
[29] Doc. 211, PageID 6844–50; Doc. 213, PageID 7072; Gov Ex. 601C (7/24/2019 Kiani text message to Dowling ("We are taking Householder's lead on fighting the referendum."); Gov. Ex. 601D 7/26/2019 Dowling text message to Kiani ("I had a good conversation with Speaker H today re: the referendum issue. I think you're in excellent hands. I know more about his personal involvement and engagement. We should all be following his lead.").
[30] Doc. 212, PageID 6870.
[31] Doc. 211, PageID 6840-41.
[32] Doc. 212, PageID 6867–70.
[33] Gov. Ex. 330A.
[34] Gov. Ex. 330E.
[35] Gov. Ex. 330G
[36] Doc. 212, PageID 6922.

|   | **Defendant's Objection** | **United States' Response** |
|---|---|---|
| 6 | Mr. Householder objects to paragraphs 55-56 of the PSR. To apply this enhancement for perjury, "the court must 1) identify those particular portions of defendant's testimony that it considers to be perjurious; and 2) either make a specific finding for each element of perjury or, at least, make a finding that encompasses all of the factual predicates for a finding of perjury." *United States v. Kennedy*, 714 F.3d 951, 961-62 (6th Cir. 2013) (cleaned up). But "confusion, mistake, or faulty memory" are not sufficient to justify the enhancement. *Id.* Mr. Householder's testimony—in late February and early March 2023—about a dinner in Washington, D.C. ***six years earlier*** was not perjurious.<br><br>Indeed, even Longstreth testified inconsistently about who attended this January 18, 2017 dinner in Washington, D.C. He insisted that Charles Jones attended the dinner, but the evidence showed that Jones was in Florida at the time and did not arrive in Washington, D.C. until the following day. *See* HX 468; HX 479 at 9. Does that amount to perjury, or does it simply show that these witnesses may have been confused or mistaken about who exactly attended a dinner six years earlier? Mr. Householder's testimony was not perjurious. | **The PSR correctly applied the adjustment for obstruction of justice in paragraphs 55 and 56. Mr. Householder willfully made numerous false, material statements during his testimony.** *United States v. Kennedy*, 714 F.3d 951, 962 (6th Cir. 2013)(elements of perjury related the obstruction enhancement are "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."). For example:<br><br>**January 2017 Trip to Washington, D.C.**<br><br>Householder testified falsely regarding his trip to Washington, D.C. in 2017 in several respects. First, Householder testified that on January 18, 2017, he arrived in D.C. with his son, Luke, and they went to a Marcus Luttrell event.[37] When asked, "what did you do next," Householder testified that he walked around D.C. with his son; they were then tired, so they went back to their hotel room and unpacked their bags because his wife and two other sons were arriving the next day.[38] Householder testified that he never had dinner with Chuck Jones, Mike Dowling, and Jeff Longstreth while in D.C.;[39] and he testified that he did not have dinner at the Charlie Palmer Steakhouse on January 18, 2017.[40] Householder also testified that he only saw Dowling while flying to and from D.C. and briefly at a luncheon[41] which was in the early afternoon on January 19, 2017.[42]<br><br>A combination of testimony and exhibits show Householder's account was false. For example, although Householder testified that he stayed in his hotel for the rest of the evening on January 18, 2017, following the Luttrell event, metadata from photographs taken that night show a) Householder and his son in a limousine with FirstEnergy executive Mike Dowling and Mike Cary, and b) Householder later at a bar with Mike Carey and others until at least 10:30 p.m.[43]<br><br>In terms of the dinner at Charlie Palmer steakhouse, which Householder testified he did not attend, metadata, |

---

[37] Doc. 228, PageID 8514-15. The Luttrell event occurred from 4:30p.m. to 6:30p.m. according to an itinerary (Gov. Ex. 216B) and metadata from photos taken at the event (Gov. Ex. 911 – photos taken at 4:52 p.m. and 4:53 p.m.); *see also* Doc. 229, PageID 8657-60 (Householder testimony about Gov. Ex. 911).
[38] Doc. 228, PageID 8515.
[39] Doc. 228, PageID 8523.
[40] Doc. 228, PageID 8527.
[41] Doc. 228, PageID 8530.
[42] Doc. 228, PageID 8515-17; Gov. Ex. 215B is a FirstEnergy itinerary, which shows the Amer-I-can luncheon was from 11:00am-1:00p.m. on Jan. 19, 2017.
[43] Gov. Ex. 911 (group of photos from January 18, 2017 showing Householder and his sone at the Luttrell event at 4:52 p.m. and Householder at the Dubliner bar at 10:30 p.m., and a photo taken in a limousine where Householder's pants' leg is visible, along with his son, who is wearing the same clothes as he was earlier at the Luttrell event.); 911A.

| **Defendant's Objection** | **United States' Response** |
|---|---|
| | again, from the limousine photograph with Dowling, shows that the photograph was taken from January 18, 2017 at 10:20p.m. *outside the Charlie Palmer steakhouse*.[44] Householder attending the dinner at the Charlie Palmer Steakhouse with Dowling is further corroborated by Longstreth's testimony that Householder attended the event at the Charlie Palmer Steakhouse on January 18, 2017. Moreover, an itinerary received from FirstEnergy, lists a dinner reservation "for 6 ppl under Larry Householder" at the Charlie Palmer steakhouse on January 18, 2017.[45] In addition, an expense report for Dowling received from FirstEnergy shows that, on January 18, 2017, a dinner group (which included Longstreth and Carey) went from the Charlie Palmer Steakhouse to a bar in a "Taxi, Limo."[46] <br><br>This evidence shows that Householder's testimony about what he and his son did on Jan. 18, 2017 was false— on January 18, he did not go back to his hotel with Luke after the Luttrell event; rather, they were at the Charlie Palmer steakhouse, they road in a limousine with Mike Dowling and others at 10:20p.m., and Householder was at a event with these same individuals from the limousine at 10:30p.m., later that night. This also means Householder's testimony that his only interaction with Dowling was on the flights and briefly at the luncheon was false—he and his son were with Dowling on January 18. <br><br>Householder also provided false testimony regarding his accommodations. Householder testified that the Republican party paid for his hotel room in Washington, D.C., but emails sent to him from Tony George -- the friend who flew on the FirstEnergy jet with him who had the connections to FirstEnergy, booked and paid for rooms for him and Chuck Jones at the same hotel, just minutes apart in early January 2017.[47] These accommodations were not disclosed on Householder's ethics disclosure.[48] <br><br>Householder's falsehoods about his January 2017 trip to Washington, D.C. were material because the evidence showed that significant discussions about FirstEnergy's funding of Householder's 501(c)(4) occurred during the trip. Householder's misstatements were designed to minimize his interactions with FirstEnergy executives during the trip and thus his knowledge regarding any discussions of FirstEnergy payments into the 501(c)(4). |

---

[44]Gov. Ex. 911A.
[45]Gov. Ex. 215B.
[46]LH Ex. 478.
[47]Doc. 219, PageID 8670-8674; Def. Ex. 479, p. 5.

[48]Doc. 219, PageID 8778-79; Gov. Ex. 901.

| | **Defendant's Objection** | **United States' Response** |
|---|---|---|
| | | **Generation Now**<br>   During his testimony, Householder attempted to minimize his knowledge and involvement in Generation Now. Among other things, he claimed "that Generation Now was formed to make the public – to educate the public on issues and to support candidates who support those issues.[49] Householder refused to answer whether Generation Now was a 501(c)(4) created for his benefit.[50] Yet, the evidence at trial showed that Householder was intimately involved in Generation Now, even though his name was not on the paperwork. Householder was one of three people who attended weekly staff meetings about Generation Now's goals, fundraising, messaging, and budget.[51] Householder worked out of an office space subleased by Friends of Larry Householder and Generation Now,[52] and knew enough about Generation Now's finances to have a phone call with Neil Clark about a specific check Generation Now had received from Clark's clients.[53] Moreover, during the call, Householder referred to Generation Now as "we", as in "we've got two checks," showing that he regarded himself as part of Generation Now.[54] In addition, the evidence showed that Householder had contacted Jones about Generation Now. For example, Government Exhibit 222B, is an email Longstreth sent to FirstEnergy executive Michael Dowling on February 6, 2017, a few weeks after the D.C. trip, stating, "Attached, please find the wiring instructions for Generation Now, Inc. that we discussed on Thursday. This is the organization that *Chuck and Larry discussed*." (emphasis added).<br><br>**Draft Legislation**<br>   Householder testified that he didn't know FES was working on drafts of legislation (what became HB 6) and that he had never seen them.[55] However, his testimony was contradicted by Government Exhibit 915, which was an FES draft of legislation that the FBI recovered from his office.[56] In addition, Government Exhibit 204E, showed a calendar entry for a meeting between FES and Householder in January 2019, close in time to the date of the draft legislation recovered from his office.[57] This evidence was material because it was evidence the jury |

---

[49] Doc. 229, PageID 8688.
[50] Doc. 229, PageID 8689.
[51] Gov Ex. 201H; Doc 229, PageID 8703-8705 (testimony about staff meeting document).
[52] Doc. 229, PageID 8692-8694.
[53] Gov. Ex. 271A (2:44 to 3:31 recorded call of Householder referencing specific $10,000 check from Generation Now account that "we got.").
[54] Gov. Ex. 271A.
[55] Doc. 219, PageID 8714.
[56] Doc. 219, PageID 8790-92 (Agent Wetzel testimony regarding Exhibit 915).
[57] *See* Gov. Ex. 204E, p. 152.

| | **Defendant's Objection** | **United States' Response** |
|---|---|---|
| | | could consider in determining the existence of a bribery agreement with FirstEnergy and its affiliates: the evidence showed that less than a month after Householder became Speaker, he met with FES about what became H.B. 6 a few months later. **Deletion of Messages about H.B. 6** In May 2020, shortly before H.B. 6 came before the House for a vote, Householder was worried he didn't have the votes necessary to secure passage. In the days leading up the vote, Householder texted Representative Greenspan to vote for H.B. 6. Householder testified that he "did not ask Jeff Longstreth to get those messages [text messages with Dave Greenspan] deleted."[58] This was contradicted by three pieces of evidence. First, Longstreth testified that Householder asked him to have a third-party contact Greenspan to delete his text messages [59] Second, Longstreth's testimony was in turn corroborated by Government Exhibit 483(c)[60], which was a text message between Longstreth and the third party about a "homework assignment," *i.e.,* getting Greenspan to delete the messages. Third, Greenspan corroborated this evidence, testifying that the third party that Longstreth had texted, was the person who called him and instructed him to delete his text messages with Householder.[61] At a minimum, the request to delete the text messages constituted obstruction and consciousness of guilt – that Householder knew what he was doing was wrong and didn't want the public to find out. In addition, the text messages to Greenspan themselves were evidence of an illegal bribery agreement in that they demonstrated the importance of HB 6 to Householder – such that Householder was willing to pressure representatives for their votes on HB 6. |
| 7 | Mr. Householder objects to paragraph 60 of the PSR. The total offense level should be a level 24 or 36. | **Defendant Householder's objection to paragraph 60 of the PSR should be rejected for the same reasons as objection 5.** |
| 8 | Mr. Householder objects to paragraph 79 of the PSR. That paragraph indicates that the Perry County Auditor estimated the | **Defendant Householder's objection is meritless.** In fact, the PSR *undervalues* his farm -- to his benefit – as shown by Householder's own Exhibit C. Defendant |

---

[58] Doc. 229, PageID 8779-80.
[59] Doc. 217, PageID 7691 (Longstreth explaining that Householder "asked me to have a mutual friend of ours ask Mr. Greenspan to delete his text messages between Mr. Householder and Mr. Greenspan so that they weren't available for a public records request.").
[60] The text message Longstreth sent to the third party said, "SLH was so funny after you left. He said, yeah, that guy is going to be great. He took a homework assignment and went out on a mission. I really like that guy. He's going to be great for the team"; Doc. 217, PageID 7693 (testimony about exhibit).
[61] Doc 219, PageID 7965 (Greenspan's testifying that, "I was instructed to delete all of the text messages between Speaker Householder and myself").

|  | **Defendant's Objection** | **United States' Response** |
|---|---|---|
|  | value of Mr. Householder's farm at $539,550. According to the Auditor's website, the appraised value is $341,890. (Ex. C).<br><br>That adjustment also reduces the value of Mr. Householder's assets by nearly $200,000. | Householder's proposed value ($341,890) is comprised of the Improvements Value ($259,680) and the Land Value ($82,210). *See* Ex. C, p. 5. However, the Land Value amount of $82,210 on page 5 is actually the CAUV value from page 2. This is a rate set by the Ohio Department of Taxation to lower the tax bill for farmers. According to the Ohio Department of Taxation, "(f)or property tax purposes, farmland devoted exclusively to commercial agriculture may be valued according to its current use rather than at its 'highest and best' potential use. This provision of Ohio law is known as the Current Agricultural Use Value (CAUV) program. By permitting values to be set well below true market values, the CAUV normally results in a substantially lower tax bill for working farmers." *See* https://tax.ohio.gov/government/real-state/cauv. Thus, the actual value of Householder's farm land is $328,000, Exhibit C, p. 2, resulting in a total of $587,680. |
| 9 | Mr. Householder objects to paragraph 81 of the PSR. He does not have the ability to pay a fine. As the PSR notes, Mr. Householder has a negative monthly cash flow, is unemployed, and faces, among other things, a civil lawsuit filed by the Ohio Attorney General in Franklin County.4 *See State ex rel. Yost v. FirstEnergy Corp. et al.*, Nos. 20-cv-6281 & 20-cv-7386 (consolidated) (Franklin C.P.). In short, Mr. Householder's liabilities exceed his assets (most of which he jointly owns with his wife anyway), and at 64 years old, a convicted felon, and facing a potentially lengthy custodial sentence, he does not have many, if any, prospects to make money going forward. He does not have the ability to pay a fine. | **The income and assets listed in paragraphs 77, 78, and 79 suggest the ability to pay a fine. The United States defers to the sound judgment of the probation officer in this regard.** |
| 10 | Mr. Householder objects to paragraphs 90 and 92 of the PSR. The maximum fine is not almost $120 million. The RICO statute permits the Court to impose a fine of "not more than twice the gross profits or other proceeds." 18 U.S.C. § 1963(a). The Seventh Circuit has held that this means "profits net of the costs of the criminal business," not simply gross receipts. *United States v. Genova*, 333 F.3d 750, 761 (7th Cir. 2003). While admittedly a few other circuit courts disagree with that | **The United States submits that paragraphs 90 and 92 of the PSR are accurate.** |

11

| **Defendant's Objection** | **United States' Response** |
|---|---|
| reasoning, *see United States v. Christensen*, 828 F.3d 763, 822 (9th Cir. 2016) (collecting cases), the Sixth Circuit has not yet weighed in. We submit that the Court adopt the *Genova* court's rationale. *See United States v. Santos*, 553 U.S. 507, 514 (2008) (holding that the word "proceeds" in a different criminal statute meant "profits," not receipts). As a result, the government must show profits, not simply what Generation Now received. It has not done so.<br>The maximum fine is not $120 million. | |

Very truly yours,

KENNETH L. PARKER
United States Attorney

*/s/ Emily N. Glatfelter*
EMILY N. GLATFELTER
MATTHEW C. SINGER
MEGAN GAFFNEY PAINTER
Assistant United States Attorneys

cc: counsel for Larry Householder