**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:20-cr-77 |
| | ) | |
| Plaintiff, | ) | Judge Timothy S. Black |
| | ) | |
| v. | ) | **LARRY HOUSEHOLDER'S** |
| | ) | **SENTENCING MEMORANDUM AND** |
| LARRY HOUSEHOLDER, | ) | **MOTION FOR DOWNWARD** |
| | ) | **DEPARTURE** |
| Defendant. | ) | |

**INTRODUCTION**

Defendant Larry Householder submits this sentencing memorandum for the Court's consideration in determining, as it must, a sentence that is "sufficient but not greater than necessary" to serve the purposes of federal sentencing. In contrast to the evidence presented at trial, this memorandum, together with the letters of support attached as exhibits, provide a more complete picture of his personal life and character—one that dedicated close to two decades to public office and public service. As these letters submitted to the Court reflect, Mr. Householder's involvement in his community benefits and can continue to benefit society in many immeasurable ways. The question before the Court is whether to sentence him to decades in federal prison—what will likely amount to a life sentence—or to impose a sentence that will allow Mr. Householder to see his wife of almost 40 years, his five children, and his (soon to be) two grandchildren again. We submit that a sentence of 12-18 months will amply meet the purposes of federal sentencing.

We acknowledge that may seem like a tall order—especially given the astronomical advisory Guidelines sentence, driven largely by the oft-criticized loss table, and the public perception and media accounts that have followed this matter over the last nearly three years. But

{01890175-2}

the Court's task at sentencing is look beyond all that. In doing so, we ask that the Court consider the principle that "no defendant should be made a martyr to public passion." *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012).

Sentencing is the appropriate time, we submit, to weigh the good with the bad. And all the good Mr. Householder has done and is doing must be weighed against the conduct that gave rise to the conviction.[1] And, at sentencing, it is appropriate—indeed, mandatory—for the Court to consider "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

Mr. Householder stands before the Court after exercising his right to a jury trial. We acknowledge the jury in this case sat through nearly two months of trial and rendered a guilty verdict on a serious charge. Our purpose here is not to relitigate the facts presented to the jury— that will be a task for the appellate lawyers and the appellate courts—but to present a perspective of Mr. Householder that was not reflected in his portrayal at trial and in the news media. At bottom, the Court is tasked with imposing "a sentence sufficient, but not greater than necessary, to comply with the purposes" of federal sentencing. 18 U.S.C. § 3553(a). For the reasons set forth below, we submit that such a sentence is one that is well below the range proposed by the Guidelines.

### MR. HOUSEHOLDER'S HISTORY AND CHARACTERISTICS

Larry Householder, who turned 64 years old earlier this month, was born and raised in Perry County, Ohio. His family's roots run even deeper in central Ohio. In the early 1800s, before Ohio was a state, the first Householders matriculated to what eventually became Perry

---

[1] The references to "offense," "conduct," or "offense conduct" do not constitute an admission that Mr. Householder actually committed any offense, and, in fact, Mr. Householder continues to maintain his innocence.

{01890175-2}

County. They were farmers and men and women of the earth. From before Ohio's statehood to today, a Householder tilled and plowed the fields in Perry County.

Larry was no different. He grew up on the old Householder family farm. As a young man, Larry was taught that there were three important commitments that he had to make in his life. The first was to God. The second was to his family. And the third was to his community. That's how he tried to live his life.

Even as young man, he was interested in politics. He recalls going to the local gas station and debating the issues of the day with his fellow citizens.

After he graduated from Ohio University, Larry returned to Perry County. Shortly after returning, he was introduced to Taundra—a schoolteacher in New Lexington. They fell in love and have been married for the last 38 years. They have spent nearly every night together over the last nearly four decades.

While in Perry County, Larry operated a successful insurance agency for many years. Eventually, however, public service called, and in the early 1990s, Larry ran for a seat as Perry County Commissioner. At the time, Peabody Coal, the largest employer in Perry County, had just shut down its mining operation, which devasted the local community. After searching for someone else to run for that seat, Larry was convinced by his fellow citizens that he should run instead. Over the next two years, he proudly served his community as commissioner.

But when he was unable to make the changes he believed his county needed as commissioner he ran for state representative in 1996. Due to the closure of the Peabody mine, there were environmental issues associated with his community's drinking water that Mr. Householder felt the current representative, a three-term incumbent, was not addressing this

{01890175-2}

issue. So, Mr. Householder decided to run. He and his family went door to door rallying up support. And Larry ultimately won.

One of the first bills that he sponsored, Am. Sub. H.B. 321 (122nd Gen. Assembly), addressed this water issue. That piece of legislation authorized the Director of Environmental Protection to develop and implement a drinking water assistance loan program consistent with the federal Safe Drinking Water Act Amendments of 1996 and to receive and disburse federal capitalization grant moneys for the purposes of that program, and to make other changes in the state's safe drinking water program in accordance with that act.

During his first stint as a state representative, Larry focused "on several issues of critical importance to the Appalachian region of Ohio." (Padgett Ltr.).[2] Those included "school funding and school facilities legislation, issues that were his motives for initially running for office." (*Id.*). "His passion for helping people and understanding of the region made him an outstanding leader where his voice was listened to and respected. I am proud that I was one of several House members that convinced Larry early on in his career to run for Leadership as the Assistant Majority Whip which he won." (*Id.*).

And as Speaker of the Ohio House in the early 2000s, he continued to focus on school funding reform—an important issue for him, in part, because his wife is a schoolteacher and has been one for the last 40 years. Larry then left the Statehouse in 2004 after he was term limited.

Twelve years later, Larry returned to the Statehouse. He wanted to address school funding issues, transportation, and energy policy.

After the government's indictment here, Larry's personal and professional life were destroyed. He was removed as Speaker of the Ohio House of Representatives, and in summer

_____

[2] The letters of support are attached collectively as Exhibit A. They are organized in alphabetical order.

2021, he was expelled from House—only the second member to be expelled in Ohio's history. He now faces at least one civil lawsuit because of the government's criminal charges. *See State ex rel. Yost v. FirstEnergy Corp. et al.*, Nos. 20-cv-6281 & 20-cv-7386 (consolidated) (Franklin C.P.).

Larry's dedication to his community is what drove him to public office—he believed that he could help his community by serving in the legislature. But that's not all he's done. He and Taundra are active in their community. They volunteer at "Food Banks, 4H, Youth Sports, County Fairs, Autistic Children Programs, Special Olympics, Kids Vocational Programs, [and] Disabled Veterans Charities." (Steve Baker Ltr.). Larry and Taundra are a "dynamic duo when it comes to local charities and volunteer work." (*Id.*). Larry and Taundra are, frankly, "inseparable." (*Id.*).

The other pillar of his life has been his family. He and Taundra are fortunate to have raised 5 children, Derek, Adam, Matthew, Nathan, and Luke. Their daughter, Kaley, passed away in a tragic accident when she was 4 in 1992. Despite this tragedy, they "never quit serving their community. I admire their ability to persevere through tragedy." (Padgett Ltr.). Larry and Taundra currently have one grandchild with a second due in August 2023.

*     *     *

Larry turned 64 years old earlier this month. He's at the age when most people consider retirement and reflect on a life well lived with their loved ones. That will not happen for him. He will spend his retirement years in federal prison, while his wife will spend them alone.

## ARGUMENT

Post-*Booker*, the Sentencing Guidelines are now purely advisory. *United States v. Booker*, 543 U.S. 220, 226 (2005). Even though the Guidelines are purely advisory, "a district

5

court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). After calculating the applicable Guidelines range, the Court should then consider all the sentencing factors in 18 U.S.C. § 3553(a). *See id.* at 50. In formulating a sentence that is sufficient, but not greater than necessary to accomplish the purposes of sentencing, the district court "must make an individualized assessment based on the facts presented" and "may not presume that the Guidelines range is reasonable." *Id.*

I.      **The Advisory Guidelines Sentencing Range**

We begin, as we must, with calculating the correct advisory Guidelines range. Probation calculated the total offense level under the advisory Guidelines as:

| | |
|---|---|
| **Base Offense Level** | **14** |
| **More than one bribe** | **+2** |
| **Value of the bribe** | **+22** |
| **High-ranking public official** | **+4** |
| **Money laundering conviction** | **+2** |
| **Sophisticated money laundering** | **+2** |
| **Adjustment for Role in the Offense** | **+4** |
| **Obstruction of Justice** | **<u>+2</u>** |
| **Total Offense Level** | **<u>52</u>** |

PSR ¶¶ 51-62. Because the total offense level exceeds 43, the total offense level is calculated at level 43. *Id.* ¶ 62. That yields a Guidelines sentence of life imprisonment. U.S.S.G. § 5 pt. A (sentencing table). But because the statutory maximum is 20 years' imprisonment (240 months), the Guidelines' recommended sentence is 240 months. U.S.S.G. § 5G1.1(a).

{01890175-2}

Before turning to Mr. Householder's objections to the advisory Guidelines range, we pause to emphasize the enormously high offense level—driven largely by the loss table—Probation found here. This offense level—52—is higher than the base offense level for murder (43, U.S.S.G. § 2A1.1), kidnapping when the victim was sexually exploited (38, U.S.S.G. § 2A4.1(a), (b)(5), and drug trafficking that results in death from use of the substance (38, U.S.S.G. § 2D1.1(a)(2)). And its higher than the offense level a judge found for two individuals who kidnapped two individuals and sexually assaulted one of them after a drug deal went bad. *See United States v. Messer*, -- F.4th – (6th Cir. June 21, 2023), slip op. 4.[3] Their offense level: 50 and 51—less than Mr. Householder's. To say that the Guidelines vastly overstate the seriousness of Mr. Householder's offense is to put it mildly.[4]

That conclusion is well supported by the law. "The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices. As such, district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring) (citing *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007) (holding that, because the sentencing guidelines for crack cocaine offenses were not developed using an empirical approach, a district court may vary downward "even in a mine-run case")); *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a

---

[3] The slip opinion can be found here: https://www.opn.ca6.uscourts.gov/opinions.pdf/23a0127p-06.pdf.

[4] This is not a suggestion that Mr. Householder's offense is not serious. It is. But, we submit, the Guidelines here, which are driven largely by the loss amounts, are out of proportion with Mr. Householder's conduct. As the authorities cited below indicate, the loss table overstates culpability in a great many cases.

sentencing judge to consider a non-Guidelines sentence."). That is why a Guidelines sentence driven largely by the loss table "is particularly appropriate for variances." *United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016); *id.* at 538-39 ("[T]he data suggest that loss is an unsound measure of the seriousness of many offenses, with the result that judges are increasingly willing to go below the Guidelines when they impose sentences in white-collar cases.") (quoting Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 19 (2013)). Indeed, "a broad judicial consensus has developed that Section 2B1.1's loss table overstates culpability in a great many cases." Barry Boss & Kara Kapp, *How the Economic Loss Guideline Lost its Way, and How to Save it*, Ohio St. J. Crim. L. 605, 618 (2021).

Here, Probation imposed a 22-level enhancement based on its finding that the value of the bribe was around $60 million. PSR ¶ 51 (citing U.S.S.G. § 2C1.1(b)(2)). This enhancement thus raises Mr. Householder's advisory guideline range, after factoring in the other enhancements, from 30 (97-121 months) to 52 (the statutory maximum: 240 months). Stated differently, Mr. Householder's sentencing range increases by over 10 years simply based on § 2B1.1's arbitrary loss table. There is nothing sound about using the loss table to justify such a drastic sentencing increase. For these reasons, we urge the Court—regardless of the Guidelines calculation it makes—to afford the Guidelines little weight when it imposes its sentence.

With that, we turn to our Guidelines objections. Mr. Householder objected to the value of the bribe, money-laundering, and obstruction of justice enhancements. If the Court sustained all his objections, the total offense level would equal 24, which yields a Guidelines recommended sentence of 51-63 months.

{01890175-2}

**1.** The value of the bribe is not $60 million. Under the Guidelines, "[i]f the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest, exceeded $6,500, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount." U.S.S.G. § 2C1.1(b)(2). Probation found that all the contributions made by FirstEnergy Corp., FirstEnergy Solutions, and Partners for Progress to Generation Now "represents payment for a benefit received."[5] PSR ¶ 51. That is wrong and is not supported by the evidence.

The government must demonstrate that each payment, ***all*** $60 million represents a bribe—that is, a *quid pro quo*. "[A] bribery offense sentenced pursuant to § 2C1.1 requires this type of *quid pro quo*." *United States v. Jones*, 260 F. App'x 873, 877 (6th Cir. 2008). In other words, the government must show that ***each*** payment was made in return for some specific official action and that Mr. Householder promised specific official action "*at the time* he receive[d] payment or other things of value." *United States v. Hills*, 27 F.4th 1155, 1179 (6th Cir. 2022). The Guidelines and the caselaw require this result. *See, e.g.*, U.S.S.G. § 2C1.1 cmt. n.2 ("[T]he applicable amounts under subsection (b)(2) … are determined separately for ***each*** incident and then added together.") (emphasis added); *see also United States v. Ring*, 811 F. Supp. 2d 359, 378 (D.D.C. 2011) ("Bribery requires the corrupt intent to exchange things of value for official acts, while an illegal gratuity need only be given 'for or because of' an official act. The Guidelines reflect this distinction not only with different base offense levels for bribery

---

[5] We understand Probation's finding to be premised on finding that $60 million represents the "value of the payment [*i.e.*, the bribe]." U.S.S.G. § 2C1.1(b)(2).

(10) and illegal gratuities (7), but also by allowing for an enhancement based on 'benefit received or to be received' under § 2C1.1 (bribery), but not under § 2C1.2 (illegal gratuities)").

This is not an attempt to relitigate the jury's verdict, as the government claims. At trial, the government was not required to show that all $60 million was a bribe, as it argued in closing. *See, e.g.*, Tr. 3840 (Doc. 238, PageID#9533) ("There's a lot of transactions, but, remember, you **only** need two acts of racketeering to convict. There are dozens and dozens and dozens that have been proven, but each defendant only needs to complete or agree that another conspirator will complete two acts of racketeering activity.") (emphasis added). The jury did not return special verdicts or interrogatories, it was not asked to decide the amount of any bribe, and it returned no verdicts on any substantive offense or any offense that required it to find the defendants committed any overt acts. The jury returned a general verdict on a conspiracy charge. It did not decide on the value of the bribe. But here at sentencing, when it's advocating for an enhancement that increases Mr. Householder's Guideline range by over 10 years, the government bears the burden of establishing the amount of any loss. *See, e.g.*, *United States v. Santana*, 723 F. App'x 331, 339 (6th Cir. 2018) ("[I]t is foundationally the Government's burden, where contested, to 'establish[] the [relevant] enhancement factors by a preponderance of the evidence.'") (quoting *United States v. Feinman*, 930 F.2d 495, 500 (6th Cir. 1991)); *United States v. Shafer*, 573 F.3d 267, 275 n.7 (6th Cir. 2009) (stating "the Government dropped the ball" by failing "to articulate" how an enhancement applied).

So, the question presented is whether the government has shown that at the time of every contribution made to Generation Now by FirstEnergy, FirstEnergy Solutions, and Partners for Progress Mr. Householder promised specific official action in return for those contributions. The government has not carried this burden. It points to the amount of contributions to Generation

{01890175-2}

Now, but with one exception, does not point to specific evidence showing that at the time of each contribution and for each contribution Mr. Householder promised specific official action. Because the government has not carried its burden here, we request that the Court impose no enhancement for the value of the bribe.

As noted, the one specific piece of evidence the government points to is Juan Cespedes's testimony. As the Court will recall, Cespedes testified at trial that he hand delivered a $400,000 FirstEnergy Solutions check to Mr. Householder in October 2018. Cespedes explained that after Mr. Householder received this check he "was very affirmative to his support of our issue." Tr. 1899 (Cespedes). We do not think this evidence is sufficient to justify an enhancement; that is, that it suffices to show a *quid pro quo*. But if the Court disagrees, the government's evidence at best establishes the value of the bribe was $400,000.[6] That yields a 14-level—not 22-level—increase. *See* U.S.S.G. § 2B1.1(b)(1)(H).

The Court should sustain Mr. Householder's objection to the value of the bribe calculation and find that either no increase is warranted or that only a 14-level increase is warranted.

**2.** The enhancements for money-laundering convictions are not appropriate. Under the Guidelines, "[i]f the defendant was **convicted** under 18 U.S.C. § 1956, increase by 2 levels" and a further 2-level increase is warranted if the "offense involved sophisticated laundering." U.S.S.G. § 2S1.1(b)(2), (3) (emphasis added). Mr. Householder, however, was not convicted of money-laundering offenses—he was convicting of a single count of RICO conspiracy.

---

[6] Even if the Court adds the other $100,000 check Cespedes delivered to Longstreth at the end of October 2018, that would not change the loss amount. *See* U.S.S.G. § 2B1.1(b)(1)(H) (loss of less than $550,000 but more than $250,000 warrants 14-level increase).

{01890175-2}

Because this Guideline expressly requires a conviction, the absence of a conviction precludes the Court from imposing this specific offense characteristic. *See* U.S.S.G. § 1B1.3 cmt. n.7 ("A particular guideline (in the base offense level or in a specific offense characteristic) may expressly direct that a particular factor be applied only if the defendant was convicted of a particular statute. For example, in § 2S1.1 (Laundering of Monetary Instruments; Engaging in Monetary Transactions in Property Derived from Unlawful Activity), subsection (b)(2)(B) applies if the defendant 'was convicted under 18 U.S.C. § 1956.'"). The application notes to § 2S1.1 make this clear. They explain that an increase is not warranted "if the defendant was convicted of a conspiracy under 18 U.S.C. § 1956(h) and the sole object of that conspiracy was to commit an offense set forth in 18 U.S.C. § 1957." § 2S1.1. cmt. n.3(C). A conviction is required. Because Mr. Householder was not convicted of any money laundering offense, the increase cannot be applied. *See United States v. Rosse*, 320 F.3d 170, 173 (2d Cir. 2003).

*United States v. Nedelcu* is not to the contrary. 46 F.4th 446 (6th Cir. 2022). The defendant there pleaded guilty to conspiracy to violate the RICO statute, and his plea agreement included factual stipulations that "specifically establish money-laundering offenses under § 1956(a)(1)(B)(i) and (h)." *Id.* at 450-51. The Sixth Circuit thus held that the district court appropriately applied a four-level increase under § 2S1.1 because if "'[a] ***plea agreement*** . . . contain[s]a stipulation that specifically establishes the commission of additional offense(s) shall be treated as if the defendant had been convicted of additional count(s) charging those offenses." *Id.* at 450 (emphasis added and quoting U.S.S.G. § 1B1.2(c)). In other words, according to the Sixth Circuit, a defendant "need only ***admit*** facts that allow the court to conclude that his conduct satisfied the elements of an additional offense." *Id.* at 451 (emphasis added). Mr. Householder, though, has neither pleaded guilty pursuant to a written plea agreement nor

admitted any facts. Section 1B1.2(c)—upon which *Nedelcu* relied—is thus inapplicable. What matters is the offense conviction, not any admitted or stipulated facts, as in *Nedelcu*.

Probation's other rejoinder—that Mr. Householder is treated as if were convicted of money-laundering offenses (even though he was not)—must also be rejected. The application notes to U.S.S.G. § 2E1.1 say that the Court when calculating the offense level for RICO offenses should "treat each underlying offense as if contained in a separate count of conviction for the purposes of subsection (a)(2)." *Id.* cmt. n.1. Relying on that application note—not the text of the Guidelines themselves—Probation concludes that the Court should treat Mr. Householder as if he were convicted of money-laundering offenses and thus impose the 4-level increase under § 2S1.1. But this departs from the plain language of the Guidelines, which require a conviction. The language of the Guidelines controls. *See, e.g.*, *United States v. Havis*, 927 F.3d 382, 387-88 (6th Cir. 2019) (en banc). And the Guidelines expressly require a conviction—nothing less will do.

The Court should sustain Mr. Householder's objection to the 4-level increase under § 2S1.1.

**3.** The Court should not impose a 2-level increase for obstruction of justice. To apply this enhancement for perjury, "the court must 1) identify those particular portions of defendant's testimony that it considers to be perjurious; and 2) either make a specific finding for each element of perjury or, at least, make a finding that encompasses all of the factual predicates for a finding of perjury." *United States v. Kennedy*, 714 F.3d 951, 961-62 (6th Cir. 2013) (cleaned up). But "confusion, mistake, or faulty memory" are not sufficient to justify the enhancement. *Id.* Mr. Householder's testimony—in late February and early March 2023—about a dinner in Washington, D.C. *six years earlier* was not perjurious.

{01890175-2}

Indeed, even Longstreth testified inconsistently about who attended this January 18, 2017 dinner in Washington, D.C. He insisted that Charles Jones attended the dinner, but the evidence showed that Jones was in Florida at the time and did not arrive in Washington until the following day. *See* HX 468; HX 479 at 9. Does that amount to perjury, or does it simply show that these witnesses may have been confused or mistaken about who exactly attended a dinner six years earlier? Mr. Householder's testimony was not perjurious.

The Court should sustain Mr. Householder's Guidelines objections.

## II. Departure and Variance

The Court should either depart downward or vary downward from the advisory Guidelines sentencing range.

A departure, unlike a variance, is grounded in the Guidelines themselves. *United States v. Rangel*, 697 F.3d 795, 801 (9th Cir. 2012) ("A 'departure' is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves."). Guideline departures are still a relevant consideration for determining the appropriate guideline sentence. *United States v. McBride*, 434 F.3d 470, 477 (6th Cir. 2006). Because standards justifying departures under the advisory Guidelines are narrower than the factors enumerated in 18 U.S.C. § 3553(a), *e.g.*, *United States v. Solis-Bermudez*, 501 F.3d 882, 886 (8th Cir. 2007) (cited approvingly in *United States v. Tristan-Madrigal*, 601 F.3d 629, 635 (6th Cir. 2010)), the departure grounds urged here, considered alone or in combination with other factors, also would support a variance from the Guidelines. *See, e.g.*, *United States v. Grams*, 566 F.3d 683, 687 (6th Cir. 2009) ("[T]he same facts and analysis can, at times, be used to justify both a Guidelines departure and a variance . . . .").

{01890175-2}

Because factors supporting a variance also support a departure, *see Grams*, 566 F.3d at 687, we respectfully request that the Court either depart downward or vary downward, for the reasons explained in § III *infra*.

## III. The § 3553(a) Factors

The advisory Guidelines calculation discussed above is only one of the many factors the Court must consider in crafting a sentence. After all, "the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Rita v. United States*, 551 U.S. 338, 351 (2007). Instead, a sentencing court must consider the advisory Guidelines calculation in conjunction with the factors to be considered in imposing a sentence that Congress established. 18 U.S.C. § 3553(a).

With this in mind, we turn to the § 3553(a) sentencing factors. In doing so, we are mindful that a sentencing court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007). A sentence that varies from the advisory Guideline range may be based on "an individualized determination that [the Guidelines] yield an excessive sentence in a particular case." *Spears v. United States*, 555 U.S. 261, 264 (2009).

### A. The nature of the offense and Mr. Householder's history and characteristics favor a below-Guidelines sentence.

As for the nature of the offense, the Court heard the evidence over the nearly two-month trial. We will not belabor those facts. Instead, there are two points we think significant.

First, unlike some of the other defendants, Mr. Householder did not benefit financially from the offense. None of contributions that were sent to Generation Now made their way into Mr. Householder's pockets. To be sure, Mr. Longstreth loaned Mr. Householder about $500,000.

But the evidence was undisputed—from Mr. Householder, Steven Myli (the Florida contractor Mr. Longstreth hired), Caryn Boyer (Mr. Householder's attorney), and from Mr. Longstreth himself—these monies were loans and were part of a house-flipping business that Mr. Householder and Mr. Longstreth were going to operate. The point is that at the time Mr. Longstreth made these payments on Mr. Householder's behalf, he believed that he was going to be repaid. While the contracts Ms. Boyer drafted may not have been signed, that did not change the fact that Mr. Longstreth and Mr. Householder viewed these payments as loans.

Second, Mr. Householder genuinely believed that House Bill 6 was an important piece of legislation, which is why he advocated and voted for it. That motivated his support for that piece of legislation far more than FirstEnergy's contributions. While, as the Court ruled (over Mr. Householder's objection), that may not have been a trial defense, it is certainly relevant for the Court to consider when assessing the nature of the offense.

Under § 3553(a)(1), the Court must also consider Mr. Householder's specific history and personal characteristics, which are even more exceptional than the nature and circumstances of his offense. To begin with, before this conviction, Mr. Householder had never faced scrutiny through any criminal action whatsoever.[7] But much more than that—Mr. Householder has, in many ways, led an exemplary life. This matters at sentencing, where the "punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)). As one court has explained:

> [S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all

---

[7] Probation found that he committed two drunk driving offenses—one nearly 40 years ago and the other 25 years ago. PSR ¶¶ 64-65.

> the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006).

First, Mr. Householder is a committed family man. The constant among all the letters of support is his commitment to family and, most importantly, his wife.

Second, Mr. Householder has an exceptional record of public service, charity, community service, and other good works, which can be a significant factor at sentencing and should be a mitigating factor here.

Consideration of such good works is completely appropriate in granting both downward variances and departures. *See, e.g.*, *United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013) (affirming sentence where district court had granted a downward variance for defendant's charitable work); *United States v. Crouse*, 145 F.3d 786, 791 (6th Cir. 1998) (exceptional community service record permissible ground for downward departure); *United States v. Kuhn*, 351 F. Supp. 2d 696, 705 (E.D. Mich. 2005) (defendant was entitled to downward departure based on community service record that extended beyond financial contributions). Indeed, courts have departed from the Guidelines for exceptional acts of charity similar to Mr. Householder's. *See United States v. Cooper*, 394 F.3d 172, 177 (3d Cir. 2005) (upholding a downward departure in a pre-*Booker* case where the offender "mentored [an] underprivileged young man, who later attributed his success to [the offender]" and "paid for not one, but four young men to attend a high school together where they would have a better opportunity to succeed"); *United States v. Woods*, 159 F.3d 1132, 1136–37 (8th Cir. 1998) (affirming downward departure because of defendant's exceptional acts of charity, including bringing "two troubled young women" into her home).

17

What's more, the collateral consequences of Mr. Householder's conviction, and his indictment, have already been extreme. His felony conviction bars him from ever holding public office in Ohio. *See* Ohio Rev. Code § 2961.02. His reputation has likewise been ruined.

These collateral consequences matter at sentencing. *See, e.g.*, *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (describing district court's finding that "the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment of the defendant") (internal quotations omitted); *see also United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting downward departure where defendant was punished by the loss of his business); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant lost a good public sector job as a result of his conviction).

### B. Retribution, deterrence, incapacitation, and rehabilitation militate in favor of a significantly below Guidelines sentence.

Section 3553(a)(2) instructs district courts to consider the need for the sentence imposed to achieve several overarching sentencing purposes, which the Supreme Court has summarized as "retribution, deterrence, incapacitation, and rehabilitation." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1903 (2018) (internal quotation marks and citation omitted). "District courts must determine in each case what constitutes a sentence that is 'sufficient, but not greater than necessary,' 18 U.S.C § 3553(a), to achieve [these] purposes." *Id.* We submit that sentencing Mr. Householder to a lengthy prison sentence would be greater punishment than necessary to accomplish the purposes of sentencing set forth in § 3553(a), which purposes would be fully served by a minimal prison sentence with any other requirements the Court deems appropriate.

The Supreme Court recognized in *Gall* that in some cases, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means

18

to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quoting district court opinion). The need for severe punishment further diminishes here when considering Mr. Householder's exemplary life, especially his substantial record of public service, personal service to those in need, and the fact that he is very different from the typical white-collar defendant—factors which have led courts to issue below Guidelines sentences. *See, e.g.*, *United States v. Cole*, 765 F.3d 884, 885 (8th Cir. 2014) (affirming noncustodial sentence in fraud case in part because defendant had no prior contact with law enforcement and was 'markedly different' than 'most of the fraudsters who appear before th[e] Court.'"); *United States v. Warner*, 792 F.3d 847, 850, 857 (7th Cir. 2015) (record of good deeds was the "primary mitigating factor" leading to noncustodial sentence).

Any sentence the Court imposes must also "afford adequate deterrence to criminal conduct" and "protect the public from further crimes of the defendant." § 3553(a)(2)(B)–(C). As we set forth below, a reasonable term of imprisonment will serve as an adequate general deterrent. Mr. Householder is simply not a threat to the public, and no public interest is served by putting him behind bars for decades. To the contrary, the public will suffer by being deprived of an individual whose charitable giving, good works, and work ethic have improved the lives of so many.

As for general deterrence, the Sixth Circuit has recognized that a non-custodial sentence, coupled with home confinement, can adequately deter white-collar crime. *Musgrave*, 647 F. App'x at 533–34 (quoting with approval district court's reasoning for sufficiency of a non-custodial sentence, as a would-be white-collar criminal would be deterred by the punishment imposed on the defendant because his "liberty has been restrained . . . very significantly"). In *Musgrave*, the defendant was convicted of one count of conspiracy to commit wire and bank

19

fraud and to make false statements to a financial institution, two counts of wire fraud, and one count of bank fraud. *Id.* at 531. Despite his Guidelines range of 57 to 71 months, the defendant received a variance to one day of imprisonment and five years of supervised release with two years of home confinement and a $250,000 fine. *Id.* at 532. In affirming the sentence, the Sixth Circuit found that "the district court addressed at length how the sentence satisfied the need for general deterrence," explaining that the sentence left the defendant's "liberty extraordinarily restrained." *Id.* at 533. The district court reasoned that the sentence would make would-be white-collar criminals "[s]tart to think about what it would be like to live for two years incarcerated in your home with no absences outside the home but for the preapproved stuff" indicated by the court. *Id. Musgrave* shows that even a sentence of home arrest serves general deterrence principles. A lengthy prison sentence is thus not necessary to meet this factor.

As for specific deterrence, Mr. Housheolder's age (64) and (lack of) criminal history show that he is no danger to the community and is not likely to recidivate. *See Recidivism Among Federal Offenders: A Comprehensive Overview* at 23, United States Sentencing Commission, available at https://bit.ly/2OwfdIT (Mar. 2016); *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders* at 6, United States Sentencing Commission, available at https://bit.ly/2B4CsXi (Mar. 2017) (finding that defendants "with zero criminal history points," like Mr. Householder, "had a lower rearrest rate than offenders with one criminal history point"). This is a conclusion that the Sixth Circuit has recognized: "observers of the criminal justice system have long acknowledged the key argument that elderly offenders pose so low a risk to the public that long or otherwise harsh sentences have little to no utilitarian benefit." *United States v. Payton*, 754 F.3d 375, 379 (6th Cir. 2014) (vacating 45-year sentence) (internal citations omitted); *see also United States v. Carter*, 538 F.3d 784, 792 (7th Cir. 2008) (finding no abuse of

20

discretion in consideration of defendant's age of 61 as "a mitigating factor" because "her age set her apart from the average offender and made it less likely that she would commit these crimes again (emphasis in original)).

The reputational loss from the conviction itself cannot be understated. As this Court is well aware, Mr. Householder's case was highly publicized. The media attention to Mr. Householder's trial, and the intense public scrutiny that came with that attention, was incredible. From jury selection through final verdict, this case was touted by the press and debated in the news each day, every day. The fact of Mr. Householder's conviction has only amplified the public's disfavor. These considerations also offer a powerful deterrent effect and impose substantial punishment on Mr. Householder, and they offer a powerful deterrent effect more generally too. *See, e.g.*, *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (granting downward variance based in part on "incalculable damage" defendant suffered from "tremendous media coverage of his case," including that defendant "was unflatteringly portrayed as the face of public corruption" and where defendant "and his family . . . endured the expense and emotional cost of two very lengthy, public trials"), *aff'd*, 523 F.3d 1258 (10th Cir. 2008); *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct.").

**C.     The need to avoid unwarranted sentencing disparities favors a below Guidelines sentence.**

**1.** 18 U.S.C. § 3553(a)(6) instructs the Court to impose a sentence that "avoid[s] unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." The 240-month statutory maximum sentence pre-determined by the Guidelines would create just such a disparity.

21

Without denigrating the seriousness of the crime for which Mr. Householder stands convicted, we ask the Court to consider the sentences imposed in the following public corruption cases, which we believe illustrate the unfairness of the effective life sentence recommended by the Guidelines:

*Robert McDonnell*. Governor of Virginia Robert McDonnell, age 61 at sentencing, accepted money and gifts in exchange for his efforts to assist a pharmaceutical company to secure state testing of one of its new pharmaceutical drugs. *United States v. McDonnell*, 792 F.3d 478, 485-88 (4th Cir. 2015), *rev'd*, 579 U.S. 550 (2016).[8] During a five-week jury trial, the evidence revealed that Mr. McDonnell was "lavished" by the company with "shopping sprees, money, loans, golf outings, and vacations." *Id.* at 518. Mr. McDonnell was convicted on 11 counts including honest services mail and wire fraud, Hobbs Act extortion, and conspiracy to commit those offenses. While his PSR offense level was 32, aligning with a Guideline range of 121 to 151 months' imprisonment, the district court sentenced Mr. McDonnell to 24 months. *See* Tr. at 178, *United States v. McDonnell*, No. 3:13-cr-00012-JRS (E.D. Va. Jan. 6, 2015), ECF No. 654.

*Richard Renzi*. U.S. Representative Richard Renzi, age 55 at sentencing, was convicted of assorted federal crimes arising from his support for federal land exchange legislation in exchange for personal benefits. Specifically, the jury convicted Mr. Renzi of diverting hundreds of thousands of insurance premiums paid by local businesses to fund his congressional campaign, while, at the same time, using his employees to prevent his insurance customers and underwriters from collecting lawfully owed payments. *See* Gov't Sentencing Br., *United States v.*

---

[8] After the Supreme Court vacated Mr. McDonnell's convictions, the government elected not to retry him, and he did not spend a day in prison.

*Renzi*, 4:08-cr-00212-DCB-BPV (D. Ariz. Oct. 21, 2013), ECF No. 1307. Among Mr. Renzi's 17 counts of conviction were six counts of honest services wire fraud, 18 U.S.C. §§ 1343, 1346. *See* Judgment, *Renzi*, No. 4:08-cr-00212-DCB-BPV (D. Ariz. Oct. 28, 2013), ECF No. 1318. While the government requested 108 to 144 months' imprisonment, including a 14-level enhancement under the § 2B1.1 loss table, the district court sentenced Mr. Renzi to 36 months and imposed a $25,000 fine. *Compare id.*, *with* Objections to the Draft Presentence Report, *Renzi*, No. 4:08-cr00212-DCB-BPV (D. Ariz. Oct. 7, 2013), ECF No. 1300.

*Robert Ney*. U.S. Representative Robert Ney, age 53 at sentencing, accepted a series of bribes and other benefits in connection with the Jack Abramoff lobbing scandal. The benefits he received included "substantial campaign contributions," access to luxury boxes at sporting events, free concerts and meals, paid trips to Scotland, the Northern Marianas Island, and the Super Bowl, and thousands of dollars in casino gambling chips. *See* Factual Basis for Plea, *United States v. Ney*, No. 1:06-cr-00272 (D.D.C. Oct. 13, 2006), ECF No. 5. In exchange, Congressman Ney performed a variety of legislative acts, including supporting and opposing specific legislation, inserting amendments into legislation, and inserting specific language into the Congressional Record. Congressman Ney also sought to influence executive branch agency decisions affecting the corrupt lobbyists, and helped one of their clients secure a multi-million contract bid with the U.S. House of Representatives. *See id.*

Congressman Ney pled guilty to conspiracy to defraud the United States and to falsifying his congressional financial disclosure forms. He received a sentence of 30 months' imprisonment, two years' supervised release on each count, and a $6,000 fine. Judgment, *Ney*, No. 1:06-cr-00272 (D.D.C. Jan. 23, 2007), ECF No. 20.

*Sheldon Silver*. Former Speaker of the New York State Assembly Sheldon Silver, age 74 at sentencing, "used his law firm work as a vehicle to exploit his elected position for unlawful personal gain." *United States v. Silver*, 948 F.3d 538, 546 (2d Cir. 2020). A jury found he did so by engaging in two different schemes: "In one scheme, Silver performed official acts beneficial to a medical doctor who referred mesothelioma patients to Silver's law firm. In the other, Silver performed official acts beneficial to two real estate developers who had hired a different law firm that paid referral fees to Silver. Together, these two alleged schemes generated more than $3.5 million in referral fees for Silver. The Government also charged that Silver engaged in money laundering by investing the proceeds of the Mesothelioma and Real Estate Schemes into various private investment vehicles." *Id.* Probation calculated Mr. Silver's Guidelines range to be 262 to 327 months' imprisonment. *See* Gov't Ltr. Br., *United States v. Silver*, No. 1:15-cr-93 (S.D.N.Y. July 20, 2018), ECF No. 436. The judge imposed a 7-year sentence. Judgment, *Silver*, No. 1:15-cr-93 (S.D.N.Y. July 30, 2018), ECF No. 450.

Mr. Silver died in prison last year. Jesse McKinley & Luis Ferre-Sadurni, *Sheldon Silver, 77, New York Power Broker Convicted of Corruption, Dies*, New York Times, https://www.nytimes.com/2022/01/24/nyregion/sheldon-silver-dead.html (Jan. 24, 2022).

*Other officials*. Before Mr. Silver's first sentencing hearing,[9] the district court ordered the government to "include in its sentencing submission a summary chart containing the sentences imposed on elected state and federal officers who were convicted in federal court of corruption-related offenses in the last five years." Order, *Silver*, No. 1:15-cr-93 (S.D.N.Y. Mar. 31, 2016), ECF No. 229. The government did so (Gov't Sent. Chart, *Silver*, No. 1:15-cr-93 (S.D.N.Y. Apr.

---

[9] The Second Circuit vacated his convictions after *McDonnell*. *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017). The government retried him and won convictions again.

{01890175-2}

20, 2016), ECF No. 264-1), and we attach that summary chart as Exhibit B. Of the 51 defendants included on the government's summary chart, 44 (87%) received prison sentences of less than 10 years.

These statistics and the illustrative cases cited above show that a Guidelines sentence would create unwarranted sentencing disparities. A substantially below-Guidelines sentence would not.

**2.** In addition to national sentencing disparities, the Sixth Circuit has expressly held that this Court may consider the sentences imposed on Mr. Householder's codefendants. *See United States v. Presley*, 547 F.3d 625, 631 (6th Cir. 2008) (affirming variance of 240 months below guidelines range based on codefendant's reduced sentence arising out of plea agreement with government). As the Court knows, Defendants Jeff Longstreth and Juan Cespedes pleaded guilty to conspiracy to violate the RICO statute—the same crime the jury convicted Mr. Householder of committing. In exchange for their guilty pleas and their agreements to cooperate, the government agreed to recommend a sentence of no more than six months' incarceration. *See, e.g.*, Tr. 2147 (Cespedes). To be sure, these are not Rule 11(c)(1)(C) agreements, and the Court, ultimately, has the discretion to craft an appropriate sentence—as it does here. But the government's sentencing agreements with Mr. Longstreth and Mr. Cespedes should factor into this Court's assessment of potential sentencing disparities. *See Presley*, 547 F.3d at 631.

That Mr. Longstreth and Mr. Cespedes pleaded guilty and testified for the government does not warrant a significant sentencing disparity. Like in *Presly*, those facts might justify Mr. Longstreth and Mr. Cespedes receiving a reduced sentence, but not one that is significantly less than Mr. Householder's. In *Presly*, the district court sentenced the defendant to a sentence that was 24 months greater than the sentence the court imposed on the co-defendant who pleaded

guilty to a sentence, but as explained, that sentence was 240-month downward variance from the Guidelines range.

Likewise, the Court should also consider the government's deferred prosecution agreement with FirstEnergy Corp. The government agreed not to prosecute FirstEnergy Corp. if it, among other things, admitted certain facts, cooperated with the government, and paid $230 million to the government and the State of Ohio. In short, a Fortune 500 company bought its way of criminal prosecution.

The Court has the discretion to consider sentencing disparities between Mr. Householder and his co-defendants and co-conspirator. Because the government has agreed not to prosecute FirstEnergy and agreed to recommend custodial sentences of no more than 6 months for Mr. Longstreth and Mr. Cespedes, the Court should craft Mr. Householder's sentence with those sentences and sentencing recommendations in mind.

*　　*　　*

As demonstrated above, a Guidelines sentence would not comply with the statutory mandate of 18 U.S.C. § 3553(a)(6) which requires a court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6). Instead, a sentence well below the Guidelines range would.

## CONCLUSION

Mr. Householder is a broken man. He has been humiliated and disgraced. All of the goals of sentencing—punishment, specific deterrence, general deterrence—have been achieved. Nothing will be accomplished by imposing a Guidelines sentence—what is likely to be a life sentence.

26

To achieve justice, criminal justice must have a conscience. It must have a sense of what is right, and what is wrong—in light of the unique characteristics of each criminal defendant and the interests of society as a whole. We respectfully submit, for all the reasons detailed above, that imposing a lengthy prison sentence would not achieve justice. All the relevant 18 U.S.C. § 3553(a) factors warrant a sentence significantly below the advisory Guidelines sentence. A sentence that is sufficient but not greater than necessary to further the purposes of § 3553(a)— one that would achieve justice—is, we submit, a sentence of 12-18 months' imprisonment.

Dated: June 22, 2023

Respectfully submitted,

*/s/ Steven L. Bradley*
Steven L. Bradley (0046622)
Mark B. Marein (0008118)
MAREIN & BRADLEY
526 Superior Avenue, Suite 222
Cleveland, Ohio 44114
Phone: (216) 781-0722
Email: steve@mareinandbradley.com
      mark@mareinandbradley.com

*/s/ Nicholas R. Oleski*
Robert T. Glickman (0059579)
Nicholas R. Oleski (0095808)
MCCARTHY, LEBIT, CRYSTAL
  & LIFFMAN CO., LPA
1111 Superior Avenue East, Suite 2700
Cleveland, Ohio 44114
Phone: (216) 696-1422
Email: rtg@mccarthylebit.com
      nro@mccarthylebit.com

*Counsel for Defendant Larry Householder*

{01890175-2}

## CERTIFICATE OF SERVICE

I certify that the foregoing was electronically filed on June 22, 2023. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*/s/ Steven L. Bradley*
Steven L. Bradley (0046622)

{01890175-2}