UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | : CASE NO. 20-CR-77 |
| | : |
| | : JUDGE TIMOTHY S. BLACK |
| v. | : |
| | : <u>UNITED STATES' SENTENCING</u> |
| | : <u>MEMORANDUM FOR DEFENDANT</u> |
| MATTHEW BORGES, | : <u>MATTHEW BORGES</u> |
| | : |
| Defendants. | : |
| | : |

On June 30, 2023, Defendant Matthew Borges will come before the Court for sentencing having been convicted by a jury of his peers for his participation in a criminal enterprise.

Borges' primary role in the enterprise was to deprive Ohioans of the opportunity to overturn what Borges knew was corrupt legislation—House Bill 6, the billion-dollar nuclear bailout, enacted into law because of co-Defendant Larry Householder's corrupt agreement with FirstEnergy and affiliates. Borges furthered the criminal enterprise by laundering FirstEnergy payments through his own account. He then used the money to bribe Tyler Fehrman for secret, real-time information that would help the enterprise defeat the ballot initiative and to further the enterprise's corrupt scheme.

The United States requests that the Court impose a sentence of five to eight years imprisonment. As set forth below, a sentence in this range reflects the seriousness of the offense, contemplates the history and characteristics of the defendant, and will deter others from furthering corruption in Ohio, while accounting for certain mitigating factors set forth below.

1

## ARGUMENT[1]

The Court's task at sentencing is to impose a sentence that is sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a). The Court should begin by correctly calculating the applicable Guidelines range. *Gall v. United States*, 552 U.S. 38, 49–50 (2007). However, the Guidelines represent a starting point—not the court's only consideration. Rather, the Court crafts an appropriate sentence by considering the Guidelines along with the § 3553(a) factors. *Id*. In so doing, the Court may not presume that the Guidelines range is reasonable but should make an individualized assessment based on the facts. *Id*.

### United States Sentencing Guidelines

In this case, the probation officer correctly calculated Borges' Guidelines range in the Presentence Investigation Report ("PSR"). Doc. 274, PageID 10866–77. The only exception is that the government does not object to exclusion of the two-level increase for obstruction of justice in response to Borges' objection to this enhancement. *Id*. at PageID 10869–70, PageID 10883–84. Borges objected to numerous aspects of the PSR. The United States responded to Borges' objections and its response is quoted in the addendum to the PSR. *Id*. at PageID 10883-10894; s*ee also* Exhibit A. Rather than duplicate that response, the United States incorporates it here by reference.

### Section 3553(a) Factors

After calculating the Guidelines range, the Court must analyze the section 3553(a) factors to determine an appropriate sentence. These factors support the government's sentencing recommendation.

---

[1] Due to the Court's extensive experience sentencing defendants in federal criminal cases, undersigned counsel will dispense with a recitation of the general law applicable to the sentencing guidelines and section 3553(a).

2

## Nature of the Offense

Borges joined the enterprise knowing its members were involved in a bribery conspiracy involving Householder and FirstEnergy entities; he agreed to further the enterprise's efforts while FirstEnergy accounts were paying over $38 million in bribe payments to Householder through Generation Now; and, to do so, he personally sought out, solicited, and then bribed Tyler Fehrman for insider information to defeat the ballot campaign, coordinated with Householder and others to pressure Attorney General Dave Yost to take action for their benefit, and laundered bribe money from Generation Now to further their efforts.

The trial evidence shows Borges knew about Householder's corrupt relationship with FirstEnergy as far back as 2018. *See* Doc. 211, PageID 6786–88 (Cespedes testified he told Borges about the Oct. 10, 2018, $400,000 payment to Householder from FirstEnergy).  By April 2019, while Borges was a registered lobbyist for FirstEnergy Solutions, Borges served as Cespedes' "sounding board" for all matters relating to HB 6. *Id*. at PageID 6820.  Specifically, Cespedes testified that FirstEnergy Solutions had to pay $15 million into Generation Now "if we expected to . . . have continued support, you know, of our legislation." *Id*. at PageID 6811–12.  Cespedes explained, "we had no choice" but pay $15 million through Generation Now, at Householder's direction, *id*. at PageID 6813–17; and Cespedes testified that he communicated this to Borges around April 2019.  *See id*. at PageID 6821–28 (testimony relating to text message exchange between Cespedes and Borges about $15 million payment); Gov. Ex. 461D (Borges and Cespedes text message exchange).

Instead of reporting what he knew or even just walking away, Borges enthusiastically advanced the conspiracy in August 2019.  During this period, FirstEnergy paid $38,738,581 in bribe money to Householder through Generation Now to defeat the ballot campaign, which

3

included a plan for Householder to introduce alternate legislation.  Doc. 211, PageID 6844–50; Doc. 213, PageID 7072; Gov Ex. 601C (7/24/2019 Kiani text to Dowling ("We are taking Householder's lead on fighting the referendum."); Gov. Ex. 601D (7/26/2019 Dowling text to Kiani: "I had a good conversation with Speaker H today re: the referendum issue.  I think you're in excellent hands.  I know more about his personal involvement and engagement.  We should all be following his lead."); Gov. Ex. 634A (9/4/2019 Jones text to Dowling: "He seemed confident in his referendum strategy and plans to pass it as a tax in a new bill if they get enough signatures."); Gov. Ex. 634B (Jones text message to Dowling: "Just spoke to the big guy.  He's got the 'tax' bill ready to go").

During this time, Borges created a new entity—17 Consulting Group LLC—and opened a bank account for that entity.  Borges then agreed to funnel $1.62 million that passed from FirstEnergy to Generation Now to the 17 Consulting account.  Doc. 212, PageID 6857–63; Gov. Ex. 605B (8/4/2019 text exchange).  Borges and Cespedes discussed this arrangement with Householder's team and FirstEnergy executives.  Doc. 212, PageID 6862–64; Gov. Ex. 605B (Cespedes texting Borges that he "will tell the Speaker that I'm gonna run ur LLC through gen now so I can appropriate funds easy/fast" and he will tell Householder that is how "FES wants you to run it"); Gov. Ex. 605D (8/4/2019 Borges text to Carle: referencing "[p]otentially very lucrative" project with "Generation Now (householder)").

During this time, Borges was all in.  For example, Cespedes testified that he communicated every day with Borges during the referendum period, and Borges was his "most trusted ally on my team."  Doc. 212, PageID 6864.  Cespedes explained that he "shared all information with [Borges] as he was my right hand in this process."  *Id*. at PageID 6870.  In addition, Borges knew that FirstEnergy was paying Householder through Generation Now to defeat the ballot campaign and

4

that Householder was prepared to introduce alternate legislation as part of the corrupt agreement. *Id*. at PageID 6865.  The signature information Borges and Cespedes sought from Fehrman through bribery was important because, if they knew the ballot campaign was likely to collect enough signatures, it "would allow us then to move toward that second legislation that we needed to put in place." *Id*. at PageID 6889–90.  Borges told Fehrman in a recorded call that Householder would likely introduce legislation to defeat the referendum.  Gov. Ex. 620D.

Borges was the mastermind behind the solicitation and bribe of Tyler Fehrman.  Gov. Ex. 623B (9/1/2019 Borges text to Fehrman: "I promise this will be worth your while.").  Borges came up with the idea; Borges set up the meeting with Fehrman; Borges offered Fehrman money for information on September 2, 2019; and Borges sealed the deal: "I can get this done.  They just want to know they have the right source." Gov. Ex. 621M.  He also knew the value of gaining the signature information—by accessing the ballot campaign's signature count in real time, the enterprise knew how much resources to allocate to defeat the campaign.

During this period, Cespedes, Borges, and Householder coordinated their efforts to convince the Attorney General ("AG") Yost to take official action that would help them defeat the ballot campaign.  Doc. 212, PageID 6870.  Cespedes testified that he asked Borges to help with the referendum effort because of Borges' and FirstEnergy's relationship with AG Yost.  Doc. 211, PageID 6839–41.  The plan included (1) "an effort to lobby [Yost] to prevent or to ask him not to approve language," and (2) to "do everything we could to make it be interpreted as a tax" by contacting "multiple statewide elected officials," including AG Yost.  Doc. 212, PageID 6865–66.  Cespedes testified that Borges "was our point of contact" with Yost, *id*. at PageID 6866; and Borges and Householder were coordinated as part of a "two-prong approach," *id*. at PageID 6867–70.  *See* Gov. Ex. 608B, 608C, 737 (text messages and phone records showing coordination

5

between Cespedes, Borges, and Householder); Gov. Ex. 606A (8/4/2019 Cespedes text message to Kiani: "Borges and I are working hard to have Yost deny the signatures but it is not certain.").

Borges characterized FirstEnergy's relationship with Householder and his own firm as an "unholy alliance"—demonstrating that he understood that he was entering and agreeing to further a corrupt bribe agreement. Gov. Ex. 615C. He described the corrupt payments from FirstEnergy to Householder as "Monopoly money at this point in time, you know, it's like not real." Gov. Ex. 616C. Borges told Fehrman, "people are going to get fat off of this. . . . So why the fuck not us." Gov. Ex. 615C. This statement illustrates Borges' willingness to participate in and profit from the enterprise.

In addition to paying himself $360,000 and Cespedes $600,000 of the $1.62 million that passed from a FirstEnergy account to Generation Now to 17 Consulting, Borges bribed Fehrman ($15,000 paid, originally budgeted as $25,000), Doc. 212, PageID 6894; he paid for consultants and private investigators to defeat the campaign (among other things), Gov. Ex. 602D; and he used the money to pay thousands of dollars in political contributions to public officials who helped with the House Bill 6 referendum, including the Attorney General, the Secretary of State, and Householder himself, Doc. 212, PageID 6874–76. *See* Gov. Ex. 602I, 132 (white board showing plan to pay public officials with 17 Consulting money, and Borges bank records showing the contributions).

The nature and circumstances of the offense support the government's recommended sentence.

**History and Characteristics of the Defendant**

Borges is familiar with the criminal justice system. As set forth in the PSR, in 2004, Borges plead guilty in Cuyahoga County Court of Common Pleas to a misdemeanor charge of improper use of a public office and was fined $1,000 for this conduct, which occurred while serving as chief of staff to the Ohio State Treasurer. Doc. 274, PageID 10877. Although the conviction was later expunged, Borges' conduct involved his participation in a scheme relating to money paid for business provided by the Treasurer's office, in other words, corruption in a public office. *Id.* at PageID 10894; Exhibit A. Equally important, is Borges' work history. Borges has been involved in politics and worked with public officials for over twenty years. Borges knew exactly where the lines were when he decided to cross them and participate in a criminal enterprise.

Borges' recorded conversations with Fehrman expose his true nature—which he never thought would be heard in courtroom. First, there are the threats. Borges threatened Fehrman not to tell anyone about his corrupt offer on multiple occasions. *See* Gov. Ex. 621D (Borges text to Fehrman: "And – no matter what – don't ever tell anyone about our conversation from earlier."); Gov. Ex. 614D, at 3 (recording, Borges to Fehrman: "That would be bad for both of us if a story like that came out, but it would be worse for you."); Gov. Ex. 616C, at 8 (recording, Borges to Fehrman: "I get a call from Randy Ludlow about this I'm going to blow your house up."). In fact, Borges previewed for Fehrman what he would do to Fehrman if his offer ever became public: "Do I want my name associated with something like that or whatever to become public? No. So how would I defend myself? I'd fucking trash you." Gov. Ex. 615C, at 15.

And that is exactly what Borges attempted to do after his conduct became public. Borges attempted to intimidate Fehrman by creating a website in which he characterized Fehrman and others as "lying liars." (Doc. 274, PageID 10878–79.) The website posted a photograph of

7

Fehrman and included a hyperlink titled "Fehrman Employment File," without any context as to why information in the link was relevant to Borges's website. (*See* Doc. 123-1, PageID 3463–64).) By clicking on the hyperlink, the public could view Fehrman's employment file from the Franklin County Auditor's Office, where he had worked from 2011 to 2013. The file contained unredacted copies of Fehrman's W-4 and I-9 tax forms and photocopies of his social security card and driver's license; Fehrman's social security number was listed multiple times in the file. Although Borges later took the employment information down, anyone visiting the site prior to that could obtain Fehrman's social security number, driver's license number, birth date, address, and other personal identifying information. Doc. 125, PageID 3540 (Order). The Court found it "entirely incredible that the Defendant posted the unredacted information inadvertently," and "any reasonable person would know the potential harm that public dissemination of this information could cause." *Id*. at PageID 3541–42.

The investigation and Borges' conduct after his arrest demonstrate a pattern of dishonesty that the Court should consider in analyzing his history and characteristics. For example, when Fehrman expressed concerned to Borges that their agreement could be exposed in federal court if Fehrman were called to testify during the ballot initiative, Borges told Fehrman not to "lie under oath." Borges then proceeded to instruct Fehrman to testify as to false facts: that Borges' prior solicitation for information to help his efforts defeat the campaign did not happen—which is untrue, as the recordings and Fehrman testimony made clear; that Borges did not work for Generation Now or Team Householder—he did, as the trial evidence made clear; and, if all else failed, Borges advised Fehrman to "just not show up" to federal court. Gov. Ex. 620D.

Borges continued the pattern of dishonesty when he made public statements that were contrary to what he told federal investigators about his bribery of Fehrman during proffer meetings.

8

On February 4, 2021 and March 2, 2021, Borges participated in proffer-protected interviews with government agents. Relevant here, though he minimized and misrepresented his conduct, Borges admitted to FBI agents that he paid Fehrman for signature information relating to Fehrman's efforts with the referendum, consistent with the allegations in the Indictment. Borges then completely contradicted this information when plea negotiations ended. In a pretrial filing, Borges claimed that the affiant of the complaint affidavit made a false statement by concluding that Borges intended to pay Fehrman for information relating to the Ballot Campaign—the same thing Borges told agents during his proffers. *See* Doc. 93 at PageID 1617 (arguing the affiant's description of the payment to Fehrman was a "bribe" is false because "Borges made clear his intention was to hire CHS-1 to perform services on political projects unrelated to the HB 6 referendum issue before, during, and after making the payment.").

Borges continued his pattern of dishonesty after his proffers with the FBI—asserting that the payment to Fehrman was only intended as an advance payment for an unrelated future political project.[2] Again, this contradicted what Borges told agents in his proffer. Moreover, Borges used false statements to attempt to undermine the validity of the judicial proceeding, by insisting that the charge against him was somehow the result of a personal vendetta by former President Donald Trump because Borges supported another candidate for president.[3]

But, despite this, Borges never filed a motion for vindictive or malicious prosecution—because no evidence would support such a frivolous motion. Rather, these actions sought to

---

[2] *See* https://www.cleveland.com/open/2021/08/federal-prosecutors-spar-with-house-bill-6-defendant-over-negotiations-in-ohio-corruption-case.html.

[3] https://www.cleveland.com/news/2022/06/matt-borges-says-house-bill-6-bribery-case-is-a-political-attack-because-of-opposition-to-donald-trump.html.

9

intimidate a key fact witness, dimmish public confidence in the judicial system, and undermine the case to the jury pool.

Courts have found this type of conduct relevant at sentencing. The district judge explained at the sentencing hearing in *United States v. Blagojevich*:

> . . . [Y]ou thought it was appropriate to reduce this case to a personal battle, much like a political campaign between you and the prosecutor in this district.
>
> To you this case was not to be decided on admissible evidence by an impartial jury, but on the public perception of the deeds and personalities of yourself and the prosecutor.
>
> In a political campaign contribution, this tactic had a great benefit for you because you faced the prosecutor who could not speak publicly after the first statements when the indictment was announced. So you are campaigning against somebody who could not put up his own billboards and give his own interviews. You sought to lead the general public for whom the jury would be drawn to think better of you than they think of the prosecutor.
>
> And the general public really has no obligation to be impartial in an election or even to pay any attention to a political contest. The jury, though, does have an obligation of impartiality, does have to pay attention to the evidence, and decide on the basis of the evidence, not on emotion nor personal preference.
>
> These were foolish and unworthy tactics in treating the charges as you did. And the reason I mention it now is it evinced a disrespect for our citizens, Illinoisans all, called to serve as jurors.

1:08-CR-888, Doc. 1036, at PageID 16896–97 (N.D. Ill.) (sentencing transcript). Borges tried to do the same here—he reduced the case to a political campaign knowing the government could not respond in kind; and, in doing so, he attempted to mislead the jury pool into believing the charge was politically motivated rather than the result of evidence presented to a grand jury—evidence consistent with his admission to the FBI in his proffer interviews.

10

Unfortunately, these tactics are all too common in political corruption prosecutions, as evidenced by the recent responses to corruption charges on behalf of public officials in this district. In fact, this case provides a stark example: while Borges claimed that he was charged in this case because of his opposition to former President Trump,[4] Householder suggested the opposite, comparing himself to Trump and suggesting "socialists" initiated "baseless and politically motivated investigations"[5]—despite both being charged *in the same case*. These misleading "tactics" used by Borges "disrespect . . . our citizens," while denigrating the public's faith in the justice system and judicial process. *Blagojevich*, 1:08-CR-888, Doc. 1036.[6] The Court should consider these facts in fashioning its sentence.

### Need for a Sentence to Reflect the Seriousness of the Offense and to Provide Just Punishment

Section 3553(a) also directs the Court to consider the need for the sentence to reflect the seriousness of the offense and to provide just punishment.[7]

The guidelines recognize that public officials—who owe a duty of honesty to the public—are more culpable than private citizens in public corruption prosecutions. This does not mean that

---

[4] https://www.cleveland.com/news/2022/06/matt-borges-says-house-bill-6-bribery-case-is-a-political-attack-because-of-opposition-to-donald-trump.html (Borges: "Thirty-one days after I launch a super PAC to beat the guy, the FBI shows up at my door and arrests me for something I didn't do.").

[5] https://www.ohiochannel.org/collections/ohio-house-rules-and-reference-committee (Householder: "We are in a very, very dangerous time in this country. The tactics and tools of the socialists who try to undermine our democratic process are very predictable. Just like they tried to do with President Trump, they will try to defeat you at the ballot box. When that doesn't work, they will defame you and they'll try to ruin your reputation. And they'll initiate baseless and politically motivated investigations.").

[6] Of course, Borges had the right to present his defense and otherwise assert his innocence publicly pretrial; the government is not suggesting that is improper. But doing so in a false and misleading way as set forth above is relevant to his history and characteristics for purposes of sentencing.

[7] The government set forth its position relating to the seriousness of the offense in its sentencing submission for Defendant Householder. Rather than restate that position, the government incorporates those arguments here.

11

private citizens conspiring with corrupt politicians get a free pass. "Government corruption breeds cynicism and mistrust of elected officials. . . . caus[ing] the public to disengage from the democratic process because . . . the public begins to think of politics as 'only for the insiders.'" *United States v. Ganim*, 2006 WL 1210984, at *5 (D. Conn. May 5, 2006). So private citizens who conspire with public officials engaged in corruption are themselves engaged in serious conduct that "undermines the confidence of the citizenry in the integrity of all public institutions and public officials" and "saps the strength of [ ] our democracy." *United States v. Fattah*, 813 F. App'x 808, 813–14 (3d Cir. 2020).

That is what Borges did here, furthering an "unholy alliance" between FirstEnergy and Householder at the expense of the public good. And he was no ordinary private citizen—as former head of the Republican Party in Ohio, he had firsthand knowledge of the important role that trust in public officials has in our democratic system. Borges agreed to further the enterprise, not because he believed in the merits of House Bill 6—he did not, Gov. Ex. 442A (4/20/2019 Borges text to Lynch: "I hate this issue" (HB 6)). Rather, Borges was in it for the money, Gov. Ex. 615C (Borges text to Fehrman: "people are going to get fat off of this. . . . So why the fuck not us"), and access to power, Gov. Ex. 605S (Borges agreeing in text with Cespedes that "the relationship with the Speaker and his inner circle and candidates was the true win. It was like a front of the line pass to team SLH.").

Borges' own conduct diminished the constitutional rights of Ohioans—denying Ohioans the opportunity to vote on corrupt legislation enacted by the General Assembly, as set forth in Article 2, Section 1 of the Ohio Constitution. Intended to "break industry's stronghold on the state political machine and expand individual liberty,"[8] and "free our government from the control of

---

[8] Grayson Keith Sieg, A Citizen's Guide to Redistricting Reform Through Referendum, 63 Clev. St. L. Rev. 901, 921 (2015).

12

money in politics," ballot initiatives under Ohio law give voters the right to "correct" the legislature whenever "it becomes misrepresentative."[9] Borges' role in the enterprise was to help strip Ohioans of their right to decide for themselves whether to overturn H.B. 6. *See* Gov. Ex. 620D (Borges to Fehrman: "I mean, obviously from, from the FirstEnergy Solution's side, you know, their whole thing was if it makes the ballot we're dead. So their whole . . . campaign was not, not to win, you know state issue one next year. It was to keep state issue one from ever happening at all.")  His efforts on behalf of the enterprise—including his bribe of Fehrman—also intended to help preserve legislation that he knew was corrupt. *See* Doc. 211, PageID 6786–88, PageID 6813–17, 6821–28; Gov. Ex. 461D.

The Court should consider the seriousness of the offense and the need to justly punish this conduct in sentencing Borges.

## Need to Deter Criminal Conduct, Promote Respect for the Law, and Protect the Public

The government's sentencing memorandum for Defendant Householder established that deterrence is an important sentencing factor for officials in public corruption cases. *See United States v. Watkins*, 691 F.3d 841, 853 (6th Cir. 2012); *United States v. Anderson*, 517 F.3d 953, 966–67 (7th Cir. 2008); *United States v. Sorenson*, 705 F. App'x 481, 483 (8th Cir. 2017); *see also United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("Deterrence is a crucial factor in sentencing decisions for economic and public corruption crimes") (citing Senate Report); *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes

---

[9] https://ehistory.osu.edu/exhibitions/1912/1912documents/CharterofDemocracy, A Charter of Democracy.

13

are prime candidates for general deterrence.") (quoting *United States v. Martin,* 455 F.3d 1227, 1240 (11th Cir. 2006)). The rationale applies with equal force to individuals like Borges—private citizens working with industry or government to corruptly impact legislation.

This case illustrates the need for general deterrence in this area. The trial evidence in this case included numerous lobbyists, law firms, consultants, and strategists who knew about Householder's relationship with Generation Now, who knew that FirstEnergy was funding Householder's coffers through payments into Generation Now, and who knew that Householder was receiving millions of 501(c)(4) dollars while advancing bailout legislation for FirstEnergy's benefit. This includes individuals working for some of the biggest and most powerful firms in the state. Rather than report Householder's and FirstEnergy's conduct to law enforcement, these individuals knowingly furthered the enterprise's efforts—for example, by passing money through secret accounts for both FirstEnergy and Householder, by papering FEC filings and internal documents to obscure the source and intent of funds, by coordinating corrupt payments to Householder, by furthering FirstEnergy's and Householder's efforts knowing the legislation was part of a corrupt bargain. And these individuals and firms benefited handsomely while doing so. Unfortunately, it seems, what was one of the largest public corruption schemes in Ohio history was simply business as usual on "Cap Square."

Furthermore, public officials are accountable to the voters, and even in the absence of law enforcement action, constituents have the power to vote out corrupt officials—to the extent voters are aware of the corruption. Political operatives, however, are not subject to public scrutiny or

14

public accountability. There is no way for voters to "throw out the bums" when the bums are unelected. This allows corrupt operatives to operate in a political sphere without accountability.

Borges' sentence should send a message to private citizens involved in corruption "that bribery is a serious crime that carries with it a correspondingly serious punishment.'" *Morgan*, 635 F. App'x at 450–51 (quoting *United States v. Kuhlman,* 711 F.3d 1321, 1328 (11th Cir. 2013)); *United States v. Sorenson*, 233 F. Supp. 3d 690, 699 (S.D. Iowa), *aff'd,* 705 F. App'x 481 (8th Cir. 2017) ("It must be made plain to the public at large that behavior such as that exhibited by Defendant is categorically unacceptable and will not be tolerated by a self-respecting and functional democratic government."). This would include deterring those private citizens who are involved in or adjacent to corruption—the lobbyists, the lawyers, the consultants—from knowingly furthering those criminal schemes.

## RECOMMENDATION

The United States submits that five to eight years is an appropriate sentence under the section 3553(a) factors. The government recognizes that this range is substantially below the guidelines range and is wider than a typical recommendation by the government. The range contemplates the fact that Borges joined the conspiracy later than other conspirators and his activities in the enterprise were less significant than Householder's, along with the mitigating circumstances set forth in the presentence report. Doc. 274, PageID 10870–72.

Should the Court find that the sentence imposed is appropriate regardless of its resolution of certain guidelines disputes, the United States requests that the Court make specific findings to support its conclusion.[10]

---

[10] The government recognizes that the parties disagree substantially over the guideline calculation, particularly the applicable loss amount. *See United States v. Morrison*, 852 F.3d 488, 491 (6th Cir. 2017) (recognizing that resentencing due to guidelines error is unnecessary "[i]f the record shows that the district court would have imposed its sentence regardless of the Guidelines range").

15

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

*s/Matthew C. Singer*
EMILY N. GLATFELTER (0075576)
MATTHEW C. SINGER (IL 6297632)
MEGAN GAFFNEY PAINTER
(NY 4849220)
Assistant United States Attorneys
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
(513) 684-3711

## **CERTIFICATE OF SERVICE**

 I hereby certify that a copy of the foregoing Sentencing Memorandum was filed electronically this 23th of June, 2023, and served upon all counsel of record via the Court's CM/ECF system.

            *s/Matthew C. Singer*
            MATTHEW C. SINGER
            Assistant United States Attorney